IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
SOUTH BEND DIVISION

| | | |
|---|---|---|
| AMOS and DEBBIE HOSTETLER, | ) | |
| RITA CHAIREZ, BECKY NULL, and | ) | |
| MARIA TOVAR, on behalf of themselves | ) | |
| and all others similarly situated, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | Cause No. 3:15-cv-00226-JD-CAN |
| | ) | |
| JOHNSON CONTROLS, INC. and | ) | |
| TOCON HOLDINGS, LLC, | ) | |
| | ) | |
| Defendants. | ) | |

**PLAINTIFFS' CONSOLIDATED REPLY BRIEF IN SUPPORT OF THEIR INITIAL
AND SUPPLEMENTAL MOTIONS TO REMAND**

Thomas A. Barnard
Rodney L. Michael, Jr.
Melissa A. Gardner
TAFT STETTINIUS & HOLLISTER LLP
One Indiana Square, Suite 3500
Indianapolis, Indiana 46204-2033
Telephone: (317) 713-3500

John. D. Ulmer
YODER, AINLAY, ULMER &
 BUCKINGHAM, LLP
130 North Main Street
Goshen, Indiana 46527
Telephone: (574) 533-1171

Attorneys for Plaintiffs

## I.     INTRODUCTION[1]

Not every environmental contamination case has or will qualify for remand under the local controversy exception, but this one does. Not every complaint requesting injunctive relief provides clear notice that the jurisdictional amount was satisfied, but this one did. The Ninth Circuit just examined the Class Action Fairness Act's ("CAFA") "local controversy exception" and quoted from the Senate Judiciary Committee's findings:

> This provision is intended to respond to concerns that class actions with a truly local focus should not be moved to federal court under this legislation because state courts have a strong interest in adjudicating such disputes. . . [A] federal court should bear in mind that the purpose of each of these criteria is to identify a truly local controversy – a controversy that uniquely affects a particular locality to the exclusion of all others.

*Benko v. Quality Loan Service Corp.,* 789 F.3d 1111, 1119 (9th Cir. 2015) (quoting S. Rep. No. 109-14, 39, 2005 U.S.C.C.A.N. 3, 38).

Lost in the Response filed by Defendant Johnson Controls, Inc. ("JCI") are the salient facts that here, residents in 115 homes in a small Goshen, Indiana neighborhood have been exposed to toxic chemicals and substances dumped or released by the two defendants operating the same manufacturing plant (the "Site") in their same Goshen neighborhood. These homeowners and tenants filed suit for relief in the closest courthouse, Elkhart Circuit Court, located within one mile of the chemical and asbestos releases. Other than the fact that JCI's headquarters are located outside Indiana, there is no *interstate* aspect to this local controversy; JCI's Goshen plant was a 70-year fixture in this neighborhood and was for years Goshen's largest employer.

---

[1] Plaintiffs sought leave to file an oversize consolidated reply brief of up to 30 pages [DE 65], and JCI responded that it did not oppose 25 pages, but did object to 30 pages [DE 66]. Plaintiffs' motion for oversize brief was still pending at the time of this filing; accordingly, Plaintiffs respectfully submit only a 25-page consolidated reply brief in light of JCI's prior page-limit agreement.

1

And these residents have never been ambiguous or inconsistent about their requested injunctive relief – from day one they have told Defendants they want this mess cleaned up to non-detect levels to return their neighborhood to its original condition. It is not surprising that JCI instantly ascertained (with no investigation whatsoever) that this injunctive demand "would certainly" cost more than $5 million. JCI already had spent $10 million and the Plaintiffs' shallow groundwater – in the heart of their neighborhood – was still as contaminated in 2014 as it was when it was first sampled many years ago. Plaintiffs' Complaint, therefore, provided unambiguous notice to JCI (as it has readily conceded) that the jurisdictional amount was exceeded, and JCI's removal was untimely.

Unfortunately, in the environmental contamination field, trouble begets trouble, and the Site's current owner, Defendant Tocon Holdings, LLC ("Tocon") has created its *own* environmental mess by illegally dumping thousands of yards of asbestos and dumping the contents of 55-gallon drums, creating another environmental emergency. JCI's attempts to downplay Tocon's environmental misconduct are inconsistent with JCI's internal emails, in which JCI lamented that Tocon likely was dumping and burying industrial solvents from 55-gallon drums. Tocon is not akin to a local insurance broker who merely sold a policy issued by the "real" defendant insurance company (located out-of-state). Tocon not only exacerbated JCI's contamination, it contributed its own, very serious pollutants and was properly named as a defendant for its own environmental violations.

## II.    ARGUMENT

### A.    JCI's removal was untimely.

JCI has conceded that Plaintiffs' Complaint provided JCI with clear notice that Plaintiffs' requested injunctive relief would cost JCI more than $5 million, thus satisfying the jurisdictional

amount. Nothing more is required to start the 30-day clock under 28 U.S.C. § 1446(b), and JCI's admission should resolve any doubt that JCI's removal was timely. *Walker v. Trailer Transit, Inc.*, 727 F.3d 819 (7th Cir. 2013), does not require a different result. The crux of JCI's argument is that *Walker* rejected the contention that "the defendant *should have inferred* the amount in controversy from the nature of the claims." [DE 49 at 5 (emphasis added).] Here, however, there was no "inference" involved. Rather, JCI has admitted that it instantly knew upon receipt of Plaintiffs' Complaint, without investigation or calculations of any kind, that JCI's cost to comply with the requested injunctive relief "would certainly exceed" $5 million. [DE 1 at ¶ 20.] There could be no better evidence of a "clear" and "unambiguous" pleading. While injunctive relief requests might vary from case to case, there is no need to craft a sweeping standard for other situations when JCI – in this case – has admitted that Plaintiffs' Complaint was clear under an objective standard.

In their Complaint, Plaintiffs are seeking both monetary damages and an injunction against JCI and Tocon to remediate the contamination at the Site and in Plaintiffs' neighborhood to non-detect levels so that they no longer have to live next door to a very real threat to their health and the environment. [*See* DE 4-1 at 28, ¶ 4.] In an attempt to create ambiguity and uncertainty where none exists, JCI states: "Plaintiffs' injunctive claim even fails to define the geographic boundaries for which they seek injunctive environmental cleanup, thereby throwing more uncertainty at the potential costs of compliance." [DE 49 at 8.] This is plainly false. Plaintiffs not only define the class area in their Complaint, but they also attach a map created by JCI's own consultant showing the boundaries of the contamination plume set by that consultant. [*See* DE 4-1 at 17, 33.] JCI even explains the extent of Plaintiffs' requested injunction in its Notice of Removal, stating that "JCI has already spent more than $10 million on remediation

3

efforts, which remain ongoing[,]" and Plaintiffs "far more rigorous cleanup . . . would require remediating all groundwater (shallow and deep), soil, sub-slab, and vapor and indoor contamination levels at the 13-acre plant site itself (the source of the contamination), in addition to the 103 properties adjacent to the plant that fall within Plaintiffs' proposed class boundaries." [DE 1 at ¶ 20.]

Then, on August 14, 2015, Plaintiffs served discovery on JCI titled "Plaintiffs' Requests for Production to Defendant Johnson Controls, Inc. re: Jurisdictional Issues (Timeliness)" in an attempt to confirm that JCI knew the jurisdictional amount was satisfied when it received Plaintiffs' Complaint. Specifically, Request for Production No. 7 sought "[a]ll Documents and/or Communications Concerning *when* JCI *first became aware* that 'the additional and far more rigorous cleanup that Plaintiffs now seek would certainly exceed $5 million.'" [Ex. 1 at 9 (emphasis added).]  In response, JCI again admitted that it knew immediately from Plaintiffs' Complaint that the jurisdictional minimum would "certainly" be exceeded, stating:

> Johnson Controls [sic] statement *was not based on any specific investigation* performed by Johnson Controls to determine the estimated costs to remediate its former Goshen manufacturing site and the surrounding properties to non-detect levels, but rather reflected a *common sense deduction* that if remedial activities performed by Johnson Controls to date exceeded $10 million, any court order mandating cleanup to a far more rigorous standard than that required by Johnson Controls under the law now would likely *in and of itself exceed the CAFA prerequisite of $5 million.*

[*Id.* (emphasis added).]

Despite this admission, JCI still relies heavily on cases holding that no burden is placed on defendants to independently analyze jurisdictional facts to determine removability. [*See, e.g.,* DE 49 at 6.] For example, JCI cites to *Curone v. Mortgage Elec. Reg. Sys., Inc.*, 749 F.3d 137

(2d Cir. 2014), as support for that proposition. [*Id.*] [2] The Second Circuit did indeed hold that a defendant is not required "to perform an independent investigation into a plaintiff's indeterminate allegations to determine removability and comply with the 30-day periods of 28 U.S.C. §§ 1446(b)(1) and (b)(3)." 749 F.3d at 145. Notably, Plaintiffs do not dispute that holding as it is inapposite when the removing party admits no investigation was required.

However, in citing *Curone*, JCI does not include the Second Circuit's test for determining whether the 30-day removal clock has been triggered – most likely because it dooms JCI's argument that Plaintiffs' Complaint did not start the clock. After analyzing *Walker* and various cases from other circuits, the Second Circuit explained:

> We agree with these circuits and hold that, in CAFA cases, the removal clocks of 28 U.S.C. § 1446(b) are not triggered until the plaintiff serves the defendant with an initial pleading or other document that explicitly specifies the amount of monetary damages sought *or sets forth facts from which an amount in controversy in excess of $5,000,000 can be ascertained.*

*Id.* at 145 (emphasis added). Here, in light of JCI's concession as to its knowledge without any investigation, there is no question Plaintiffs' Complaint "set forth facts from which an amount in controversy in excess of $5,000,000 can be ascertained." To hold otherwise would be inconsistent with *Walker*.

JCI argues that Plaintiffs were still required to put a dollar amount on its injunctive relief.[3] [DE 49 at 5-6.] Notably, *Walker* involved a claim for money damages and did not examine any claims for injunctive relief.[4] Plaintiffs' contention that JCI's removal was untimely

---

[2] JCI also cites to *Kuxhausen v. BMW Fin. Servs. NA LLC*, 707 F.3d 1136 (9th Cir. 2013), and *Harris v. Bankers Life & Cas. Co.*, 425 F.3d 689 (9th Cir. 2005), as support for that same proposition. [DE 49 at 6.] However, neither of these cases involved an admission from the defendant that it knew, without investigation or analysis of facts, that the amount in controversy was exceeded. As such, each of these cases is inapposite to the instant matter.

[3] Plaintiffs are seeking both monetary and injunctive relief. Plaintiffs acknowledge that their Complaint does not "specifically disclose the amount of *monetary damages* sought."

[4] In fact, no case cited by the *Walker* court involved a claim for a mandatory injunction.

5

does not "fl[y] in the face of" *Walker*. After setting forth the requisite test, the *Walker* court, in evaluating the trigger with respect to plaintiff's request for money damages, went on to state that "the pleading or other paper must specifically disclose the amount of monetary damages sought." 727 F.3d at 824. Underlying such a rule in money-damages cases is the presumption that the plaintiff is in a far better position than the defendant to know the extent of the injury or harm he has suffered and the amount he wants as compensation. This presumption does not apply, however, in cases like this one where not only is the defendant in a better position to know the cost to fully remediate a property it contaminated, but the defendant admits that it actually knew the cost to comply with such relief sought. *See Bea v. Encompass Ins. Co.*, 2013 WL 1747910, at *3 (N.D. Cal. Apr. 23, 2013) (holding that removal was untimely where the defendant's notice of removal was "an objective statement of Defendant's knowledge that the amount in controversy was well in excess of $75,000").

JCI describes the distinction between monetary and injunctive relief claims as "artificial." [DE 49 at 7.] However, this distinction between legal and equitable remedies has been recognized by the United States court system since its beginnings.[5] *See Buzard v. Houston*, 119

---

[5] While the adoption of the Federal Rules of Civil Procedure merged courts of law and courts of equity and thereafter allowed a party to bring both legal and equitable *claims* as one civil action, there are still important substantive and remedial distinctions. *Grupo Mexicano de Desarrollo S.A. v. Alliance Bond Fund, Inc.*, 527 U.S. 308, 323 (1999). For instance, "[l]egal remedies traditionally involve money damages. Equitable remedies, by contrast, are typically coercive, and are enforceable directly on the person or thing to which they are directed. Traditionally, equitable relief is discretionary, whereas legal relief is not." *Dexia Credit Local v. Rogan*, 2009 WL 528902, at *3 (N.D. Ill. Mar. 2, 2009) (quoting *Int'l Fin. Srvs. Corp. v. Chromas Tech. Canada, Inc.*, 356 F.3d 731, 736 (7th Cir. 2004)). Moreover, in examining whether a right of trial by jury attaches to a particular claim, courts engage in an analysis of the remedy sought and determine whether it is legal or equitable in nature. *Tull v. United States*, 481 U.S. 412, 417-18 (1987). This analysis would be nonsensical if there was, in fact, no true distinction between such remedies, as JCI contends.

JCI cites *Reece v. Bank of N.Y. Mellon*, 760 F.3d 771 (8th Cir. 2014), *Darryl Jorgenson Realty, LLC v. Kieffer*, 2015 WL 2374187 (D. Minn. May 18, 2015), and *Rao v. Tyson Foods, Inc.*, 2009 WL 1118773 (E.D. Cal. Apr. 27, 2009) for its contention that "courts have consistently rejected the artificial distinction between monetary and injunctive relief claims that Plaintiffs advocate here." [DE 49 at 7.] Yet in none of those cases was the amount in controversy determined by the defendant's cost to comply with a mandatory injunction. Additionally, in none of those cases did the defendant admit that it knew upon receiving the complaint that the jurisdictional amount had been exceeded.

6

U.S. 347, 352-53 (1886) (explaining the distinction between law and equity). In line with this actual distinction, the Seventh Circuit has routinely held that, in suits for injunctive relief, the amount in controversy can be measured in two different ways – "what the plaintiff stands to gain, or what it would cost the defendant to meet plaintiff's demand." *Macken ex rel. Macken v. Jensen*, 333 F.3d 797, 799-800 (7th Cir. 2003) (citations omitted); *see also BEM I, LLC v. Anthropologie, Inc.*, 301 F.3d 548, 553 (7th Cir. 2002) ("It seems to us beyond absurd to allow a defendant to remove if the plaintiff is seeking damages of $75,000.01, but not if the plaintiff is seeking an injunction directing the defendant to tear down, as a nuisance, a $10 million building that the defendant owns.").

To Plaintiffs' knowledge, the only case ever to consider when the removal clock starts in a case where the plaintiff seeks a mandatory injunction is *Clemons v. Ferolito, Vultaggio & Sons*, 2004 WL 442602 (N.D. Ill. Feb. 2, 2004). The court in *Clemons* held that the removal clock started in that case when the defendant received the initial complaint because the information it needed to determine its cost to comply with the injunction was solely within its possession. *Id.* at *3. *Walker* did not abrogate *Clemons*; rather, *Walker* cautioned that "[a]ssessing the timeliness of removal should not involve a *fact-intensive inquiry about what the defendant subjectively knew or should have discovered through independent investigation*."  727 F.3d at 825 (emphasis added).[6]

---

[6] Moreover, district courts within the Seventh Circuit that expressly rely on *Walker* hold that a defendant's knowledge of facts relevant to removability triggers the 30-day removal clock regarding issues other than the amount-in-controversy. *See, e.g., Speedy v. 3M Co.*, 2015 WL 2265410, at *2-3 (S.D. Ill. May 12, 2015) (citing *Walker*'s "bright-line" standard for removability yet holding that the defendant's knowledge of facts not disclosed in the plaintiff's pleadings but relevant to removability under the federal officer removal statute started the removal clock, thereby making the removal untimely); *Douthitt v. ArvinMeritor, Inc.*, 2013 WL 5255677, at *3 (S.D. Ill. Sept. 17, 2013) ("A reasonable and commonsense reading of the complaint should have put Bell Helicopter on notice that this action was immediately removable."). One such case is *Kadambi v. Express Scripts, Inc.*, 2014 WL 2589673 (N.D. Ind. June 10, 2014), where a complaint requesting "multiple preliminary and permanent injunctions, an award of attorney fees, compensatory damages, pre- and post-judgment interest, and punitive damages" triggered the 30-day clock. *Id.* at *2-3.

In the present case, JCI has admitted in its Notice of Removal, and again in response to jurisdictional discovery, that the Complaint affirmatively and unambiguously revealed that *Plaintiffs' request for injunctive relief alone* would far exceed the $5 million jurisdictional minimum and, therefore, the case could clearly be removed. *See Walker*, 727 F.3d at 823 ("The short removal time limit forces the defendant to make a prompt decision about removal once a pleading or other litigation documents provides clear notice that the predicates for removal are present."). As such, JCI notice of removal, filed 359 days after it was served with Plaintiffs' Complaint, is untimely.

**B.      JCI's has waived any right to removal.**

JCI is wrong that the waiver doctrine was effectively extinguished by *Walker*.  For example, in *Douthitt*, the court cited and applied *Walker*, yet still found that the defendant had waived its right to remove the case. 2013 WL 5255677, at *3. Here, JCI removed this case just weeks before the state court hearing on Plaintiffs' motion for class certification, 359 days after it received Plaintiffs' Complaint, and after it had lost on its motion to dismiss all of Plaintiffs' claim. Under these facts, JCI should be deemed to have waived any right to remove this case.

**C.      CAFA's local controversy exception provides an additional ground for remand.**

**1.      Plaintiffs have met the two-thirds citizenship requirement.**

Plaintiffs opening brief and JCI's Response devoted numerous pages to the citizenship requirement of the local controversy exception. [DE 27 at 5-10; DE 49 at 30-39.] Thereafter, on October 21, 2015, JCI filed its twenty-five (25) page Motion to Strike the Expert Report of Malcolm S. Cohen and Laura Steiner, accompanied by numerous exhibits including the Expert Report of Dr. Abraham Wyner. [DE 50.] Plaintiffs responded to the Motion to strike with their twenty-five (25) page brief filed on December 8, 2015 [DE 63.] On December 18, 2015, JCI

filed its Reply. [DE 71.][7] Little remains to be said on this issue and Plaintiffs will not burden the Court by repeating in any detail the case law and arguments contained in their Response to the motion to strike.

In summary, if the Court denies JCI's motion to strike (as Plaintiffs respectfully believe it should), Plaintiffs should prevail on this issue because JCI has offered no evidence of its own to rebut Plaintiffs' experts' opinions and affidavits. Plaintiffs respectfully submit that they have met their burden to establish by a preponderance of the evidence that more than two-thirds of the proposed class are Indiana citizens, satisfying 28 U.S.C. § 1332(d)(4)(A)(i)(1).

2.      **TOCON's "significance" should be determined from the Complaint.**

For CAFA's local controversy exception to apply, Tocon, an Indiana citizen, must be a defendant "from whom significant relief is sought by members of the plaintiff class" and "whose alleged conduct forms a significant basis for the claims asserted by the proposed plaintiff class." 28 U.S.C. § 1332(d)(4)(A)(i)(II). Plaintiffs pointed out in their Supplemental Motion to Remand that although a few early decisions after CAFA's enactment considered extrinsic evidence in making the "significance" determinations called for by the local controversy exception, "the majority of circuit courts (and every such court to analyze the issue explicitly) has held that the significance inquiry is limited to the four corners of the complaint." *Simmons v. Ambit Energy Holdings, LLC*, 2014 WL 5026252, at *6 n. 5 (S.D.N.Y. Sept. 30, 2014). Plaintiffs continue to believe this Court should follow the majority rule, and adopt the  analysis provided in *Coleman v. Estes Express Lines, Inc.*, 631 F.3d 1010, 1015 (9th Cir. 2011). However, as demonstrated below, whether this Court chooses to limit its analysis to the "four corners of the complaint," or

---

[7] In its Reply, JCI moves to strike the Rebuttal Report of Dr. Cohen and Ms. Steiner, and the affidavits from Ms. Scott and Ms. Gardner. [DE 71 at 3.]  Plaintiffs disagree and plan to seek leave to file a sur-reply to respond to this new argument.

looks at extrinsic evidence, it is clear Plaintiffs' claims against Tocon more than satisfy the two "significance" requirements of the local controversy exception.

### 3.      TOCON is a significant Defendant.

If the test for significant defendant is "who made the biggest mess," Plaintiffs concede that JCI would win – but that is not the test. JCI created a plume of underground contamination (which contains TCE as well as many other hazardous chemicals) that has migrated into the Plaintiffs neighborhood, underneath Goshen High School, and is currently headed towards Goshen's municipal well supply field.[8] However, as described below, Tocon has created its own environmental mess by dumping the contents of at least fifty 55-gallon drums in a fresh excavation at the back of the property, and then illegally demolishing the factory without removing all of the asbestos, leaving behind approximately 14,000 cubic yards of asbestos contaminated construction debris. The estimated cost to properly remove this asbestos is $1,750,000.00. [Ex. 4 at 94:4-95:9.] This is not a case where the local defendant's tortious conduct is derivative to the out-of-state defendant. In this case, Tocon engaged in independent tortious conduct which created significant environmental harms.[9]

---

[8] In its Response, JCI dismisses the plume map attached to Plaintiffs' complaint which was prepared by its own environmental consultant, GZA. [DE 4-1 at 33.]  JCI goes on to argue "JCI had already cleaned up the contamination under the State's Voluntary Cleanup Program. . ."  [DE 49 at 8-9.]  Plaintiffs are bewildered by JCI's statement. JCI's own consultants have determined that JCI's remediation efforts have been insufficient to control TCE migration. Testing of the groundwater in the heart of the neighborhood just a few months ago identified TCE in shallow groundwater at levels over 1,000 ppb. [Ex. 2.]  Additionally, in an April 29, 2010 email, JCI's environmental consultants criticized the remediation system at the Site and determined: "the groundwater remediation system was improperly designed and insufficient to control TCE migration beyond the line of on-Site and off-Site pumping wells. GZA also discovered that the down-gradient extent of TCE in groundwater had been missed." [Ex. 3.]  JCI has not cleaned up the contamination. To the contrary, the levels in the neighborhood today are about the same as they were almost 20 years ago when JCI entered the VRP.

[9] The alleged environmental contamination in *Kurth v. Arcelormittal USA, Inc.*, 2009 WL 3346588 (N.D. Ind. Oct. 14, 2009) and *Evans v. Walter Indus., Inc.*, 449 F.3d 1159 (11th Cir. 2006), was significantly different than in the Goshen neighborhood where Plaintiffs reside. The proposed class in *Kurth* was expansive – it included all Indiana citizen school children who attended *any school in Lake County* for a period of approximately 10 years prior to the lawsuit. The case did not involve just a small neighborhood like the one at issue in Goshen, where the homes have been contaminated by *same manufacturing plant.* Moreover, the evidence before the *Kurth* court indicated that one defendant (Burns Harbor) was located outside Lake County and 16 miles from the closest Lake County school, and

JCI's position has been uniformly rejected by courts. As was said in *Anderson v. Hackett*,

646 F. Supp. 2d 1041 (S.D. Ill. 2009):

> [T]he statute establishes that an action may qualify for the local controversy exception in two ways. First, as relied on by Plaintiffs in this case, a controversy may be local if one or more "significant" defendants are non-diverse citizens. 28 U.S.C. § 1332(d)(4)(A). Second, a controversy may be local if one or more "primary" defendants are non-diverse citizens. 28 U.S.C. § 1332(d)(4)(B). Clearly, then, one need not be a "primary" defendant in order to be a "significant" defendant. Cerro's argument conflates the two. It argues that it is not a significant defendant because more culpable actions are attributable to the Monsanto Defendants than to it. Whether or not this is the proper test to determine when one is a "primary" defendant, it is not the test for whether one is a "significant" defendant.

*Id.* at 1048. *See also Caruso v. Allstate Ins. Co.*, 469 F. Supp. 2d 364, 369 (E.D. La. 2007)

("Clearly, CAFA intended there to be a substantive difference between 'primary defendants' and

'significant defendants' as contemplated by the two exceptions to the exercise of jurisdiction

under the statute.").

While the Seventh Circuit has not set forth a specific test for determining if a defendant's

conduct is significant, JCI does not dispute that the majority of courts addressing the issue

compare the local defendant's alleged conduct with the alleged conduct of all defendants. [DE 49

at 15.] The only Court of Appeals decision the Plaintiffs have located which set forth a specific

test is the Third Circuit in *Kaufman v. Allstate New Jersey Insurance Company*, 561 F.3d 144

---

that the other local defendant (PCL) had "by far" the lowest emissions all defendants. 2009 WL 3346588, at *11-12. The court found it important that plaintiffs' complaint failed to "single out" either Burns Harbor or PCL but instead alleged that six *other* defendants were "most responsible" for the Lake County air pollution. The *Kurth* court likely was skeptical of plaintiffs' ability to assign liability to eight different pollution sources throughout Lake County for "toxic air" that allegedly impacted every Lake County student. Air pollution over an entire county containing a variety of pollutants is much more difficult to trace back to a source than the discrete chemicals and asbestos present at the JCI plant in Plaintiffs' neighborhood. Here, both JCI and Tocon have caused environmental contamination from the *same site*, and the *same chemicals* have continuously migrated from that site onto Plaintiffs' homes. In addition, Tocon has contributed its own contamination to the neighborhood (as alleged in the complaint) – asbestos is a known human carcinogen, just like TCE, and is in many ways even more dangerous to human health.
*Evans* also is factually distinguishable. *Evans* involved only one local defendant whose operations had ceased in 1951, and whose plant was not even located near the class members' neighborhood. 449 F.3d at 1167. Again, Tocon now owns the former JCI plant which is located immediately adjacent to Plaintiffs' homes.

(3d Cir. 2009). In *Kaufman,* the court held "[t]he local defendant's alleged conduct must be an *important* ground for the asserted claims in view of the alleged conduct of all the Defendants." [*Id*. at 157.] In the present case, it is irrefutable that it is *important* to the Plaintiffs that the 14,000 cubic yards of asbestos contaminated construction debris be removed from their neighborhood. The Plaintiffs do not want Tocon's asbestos fibers blowing onto their lawns any more than they want JCI's TCE vapors migrating into in their homes.

Focusing on the allegations of Plaintiffs' Complaint, it is clear that Tocon's alleged conduct can render it liable to class members, both for contributing to the TCE plume and for causing other contamination, and thus forms a significant basis for the claims Plaintiffs assert.[10]

JCI is wrong that Plaintiffs' allegations about Tocon are "facially unrelated" to the plume of TCE contamination, and that those allegations are "vague" and "few." Every count of Plaintiffs' six-count Complaint alleges that JCI and Tocon *each* "caused or allowed" TCE and other chemicals to migrate onto Plaintiffs' properties in violation of statutory and common-law duties JCI and Tocon owed them. [*See* DE 4-1 at ¶¶ 112, 119, 122, 127, 130, 132, 139, 144.][11] Plaintiffs' claim for punitive damages adds that JCI and Tocon *each* knew the TCE plume posed

---

[10] In fact, *every* putative class member has a claim under the Environmental Legal Action Statute, Ind. Code §13-30-9-2. The statute provides relief to persons who undertake removal or remedial action whether or not they have been harmed by a release of contaminants. *See Shell Oil Co. v. Meyer*, 705 N.E. 2d 962, 970 (Ind. 1998) (holding with regard to Indiana's analogous Underground Storage Tank Act or USTA that "the Legislature's very obvious affirmative change of language to permit recovery by 'a person' demonstrates a clear purpose of the General Assembly to make this remedy available *to anyone who initiates corrective action*") (emphasis added); *Bernstein v. Bankert*, 733 F.3d 190, 217 (7th Cir. 2012) ("The USTA is similar to the ELA in that it creates a cause of action for a person who 'undertakes corrective action resulting from a release from an underground storage tank, regardless of whether the corrective action is undertaken voluntarily or under an [administrative] order[,]' to recover his expenditures by suing a party responsible for the release.") (brackets in original). Thus, all class members who incur costs of removal or remedial action related to releases of contaminants from Tocon's property may obtain relief from TOCON whether or not they lived in the neighborhood when the releases occurred.

[11] JCI's argument ignores the fact that Tocon can be held liable to Plaintiffs for "contributing" to the TCE contamination even if it did not "cause" it. Indiana's Environmental Legal Action statute (the "ELA") imposes liability on anyone who *either* caused or contributed to a release of hazardous substances. *See* Ind. Code § 13-30-9-2.

risks to Plaintiffs yet recklessly failed to notify them of those risks. [*See id.* at ¶¶ 152, 153.] Additionally, contrary to JCI's arguments, this case is about *all* of the hazardous chemicals that have migrated into Plaintiffs' neighborhood, homes and bodies. In fact, Plaintiffs specifically alleged "[a]s a direct and proximate result of Defendants' wrongful actions and inactions, hazardous chemicals released at the Plaint have entered the Plaintiffs' neighborhood and impacted their homes and bodies." [*Id.* at 2.] "Hazardous chemicals" means all of the hazardous chemicals emanating from the Site, not just the TCE.[12]

The Complaint goes on to make *additional* allegations, specific to Tocon, that it left asbestos-contaminated demolition debris and other hazardous materials at the Site, thereby providing additional grounds for Tocon's liability to class members. [*See id.* 2; *see also id.* at ¶¶ 14, 33, 125, 139.] Thus, Plaintiffs have made numerous specific allegations of liability-producing conduct by Tocon relating both to the plume of TCE emanating from its property and to other contaminants it has released onto and from that site.

In its Notice of Removal, JCI relied solely on a single piece of extrinsic evidence – deposition testimony by Plaintiffs' expert, Dr. Vasiliki Keramida – in contending that Tocon's alleged conduct does not form a significant basis for class members' claims. JCI claimed "Dr. Keramida admitted in that deposition that there is no evidence that Tocon caused or contributed

---

[12] JCI is also wrong that Plaintiffs' Complaint does not allege injury to class members beyond their exposure to the groundwater plume. The Complaint defines the class to consist of "all persons within the Class Area (defined below) who, within the statutory period prior to the filing of this action, have owned, rented, or occupied property that has been impacted by the Contamination caused by, or were otherwise exposed to, releases from the Plant ('the Class')." [DE 4-1 at ¶ 101.] The term "Contamination" is not defined in the Complaint and is not limited to any particular type of contamination. And "releases from the Plant" clearly could include airborne releases of asbestos no less than waterborne or vapor-borne releases of TCE.

Furthermore, each of the Complaint's six counts alleges that Plaintiffs have been harmed by JCI's and TOCON's releases of "TCE *and other hazardous chemicals*" [DE 4-1 at ¶¶ 119, 127, 129, 138, 142, 146], thereby making explicit that the cause of their injuries is limited neither to TCE nor to the groundwater plume beneath their neighborhood. Indeed, Plaintiffs' nuisance claim and their claim for relief under the ELA specifically identify the debris piles and associated contamination resulting from TOCON's demolition activities as forming part of the basis for those claims. [*See id.* at ¶¶ 125, 139.]

to the contamination at issue in and sought to be redressed by this lawsuit." [DE 1 at ¶ 25.] In moving to remand this action, Plaintiffs pointed out that at the time of Dr. Keramida's deposition, JCI had not yet produced *any* documents in this litigation, and in particular had not produced emails from its Director of Environmental Affairs to IDEM [*see* DE 27-8; DE 27-9] expressing JCI's concern that Tocon was causing contamination through its storage of "open, leaking drums and drums with hazardous waste labels."[13]

### 4.    Tocon is using the Site as an illegal dumping ground.

JCI argues that "Plaintiffs create the misleading impression that over 100 55- gallon potentially leaking drums were moved about the JCI site by conflating two distinct events." [DE 49 at 27.] JCI continues "[T]here was no indication in the Notice the drums were leaking[, and] Plaintiffs fail to inform the Court that on October 28, 2013, IDEM issued a Notice of Compliance to Tocon because the 135-drum issue had been resolved." [*Id.*] Plaintiffs agree that IDEM issued a Notice of Compliance to Tocon on October 28, 2013. However, Plaintiffs dispute that the "135-drum issue" was resolved, at least not legally. What JCI failed to inform the Court, is that its Site Operations Manager discovered that the contents of 50 of those drums had been buried on site at the back of the property.

On July 17, 2013, IDEM issued Tocon a RCRA Violation Letter as a result of the improperly stored drums. [Ex. 5.] In response to the violation letter, Richard Swift, Tocon's demolition contractor, hired D&B Environmental to remove 67 drums of non-hazardous material

---

[13] Plaintiffs also pointed out that (i) JCI's argument should be rejected if for no other reason than that matters outside the pleadings may not be considered in determining compliance with the "significant basis" requirement of CAFA's local controversy exception; (ii) Dr. Keramida testified only that she did not have information showing the contamination was caused by Tocon but did not say she had no information showing Tocon *contributed* to the contamination; and (iii) if the Court chooses to consider extrinsic evidence, there *is* evidence, much of it in affidavits, emails, photographs, and regulatory violation notices filed with Plaintiffs' motion, showing Tocon both contributed to and caused contamination at issue in this action.

and delivered 18 drums of resin to Midwest Waste Solutions[14] for a total of 85 drums. [Ex. 6 at IDEMVFC0033073, IDEMVFC0033081.] However, since there were 135 total, that still left 50 drums unaccounted for. According to a receipt dated June 12, 2013, tendered to IDEM, the remaining drums were empty and were sold for scrap metal. [*Id*. at IDEMVFC0033080.] On October 11, 2013, the IDEM inspector visited the Site, confirmed that the drums had been removed, and subsequently issued a Return to Compliance Letter on October 28, 2013 that is described above. [*Id*. at IDEMVFC0033072.]

What IDEM did not know was that the contents of these 50 drums were most likely dumped on site by Swift. On June, 12, 2013, the same date as the receipt for the empty drums that were sold for scrap metal, David Troup (JCI's Site Operations Manager) sent an email to Jeff Werwie (JCI's Environmental Coordinator) and Richard Shafer (JCI's Regional Manager) and stated:

> Today I returned to Goshen. While looking for Richard Swift this morning I noticed a flat truck with crushed drums. Looks like some of the drums that were stored in the old building crushed with holes in the side possible from an excavator bucket. They smell of fiberglass resin. I cannot see if any of the drums were hazardous waste labeled[15] but does not appear so. I took a walk to the back lot to find some fresh excavation just across the drive from the south oil separator. The ground seems to be worked with a bob cat. There are bob cat tracks as well as marks left by either an excavator or a bull dozer's tracks, before now I did not have total count of the drums so I took a count of the drums remaining. There are now 85 drums remaining inside the building. No one is on site yet today. I took these pictures to protect ourselves just in case.

[Ex. 7 at GZA0032407.] On June 13, 2013, the very next day, Werwie emailed Troup, Shafer, his attorney and his environmental consultants and stated: "I spoke to John Howard – RCRA

---

[14] Non-hazardous materials and resins are significantly less expensive to dispose than hazardous materials.

[15] There is a difference between a hazardous waste label, which is supposed to be affixed to drums that contain waste that is hazardous, and hazardous materials labels for raw materials intended to be used in the manufacturing process. The second photo Troup took of the crushed drums clearly shows a red hazardous materials label on at least one of the drums. [*See* Ex. 7 at GZA0032410.]

Inspector at IDEM, he was the person that did the inspection and issued the NOV for the 135

drums. IDEM has once again demonstrated how spineless and bureaucratic they are." [Ex. 8.][16]

Werwie rightfully recognized that IDEM had been tricked. As of June 13, 2013, the 85 drums

that were left were the nonhazardous materials that were ultimately removed by D&B

Environmental and Midwest Waste Solutions. [*See* Ex. 6 at IDEMVFC0033073,

IDEMVFC0033081.]  The 50 empty drums that had formerly contained waste paint and solvents

shown in the photographs Werwie sent to IDEM on April 18, 2013, [DE 27-8] and the fresh

excavation were what led Werwie to believe the drums' contents had been dumped on-Site.

There is no evidence that those drums were ever properly disposed of. Werwie continued, "[w]e

are on our own at the plant, . . . Tony Atkins = Jimmy Conroy."[17] Werwie then instructed his

environmental consultant "John, forget about us sampling the pile of dirt, even if we found part

A&B resin or the waste paint and solvents in those drums, IDEM would claim they have no

evidence the contractor released the material. We just need to keep a closer eye on the

disposition of the drums." [Ex. 8.][18]

---

[16] Werwie continued: "IDEM claims the owner (Tony Atkins) sampled the contents of the drums and nothing is hazardous waste. Tony claimed the material is usable, and has value, which Tony says he is arranging to transfer the material. With respect to the crushed drums, IDEM said they were probably empty or Tony consolidated waste." [Ex. 8.]

[17] As described below, Jimmy Conroy was the "con" in Tocon – he was Tony Adkins' co-founder of Tocon and Adkins now describes him as a "crook."

[18] Tocon's illegal dumping at the Site has not been limited to the contents of the 50 drums that were dumped in the excavation discovered by Troup. On August 9, 2013, Troup emailed Werwie to say he had seen trucks dumping soil at the site that was being brought from a local RV manufacturing facility. [Ex. 9.]  Werwie recommended sampling the soil. [*Id.*]  Then on September 19, 2014, Werwie sent an email to a City of Goshen official with a copy to IDEM, stating:

> GZA is finished up sampling this week and noticed a new pile of debris that was trucked/dumped onto the site. The material has an odor as well. See attached picture. Also, all the open, leaking drums and drums with hazardous waste labels that the owner/contractor was cited for by the City of Goshen have been moved out of sight behind the large dirt pile. The dirt pile was also material that didn't originate from the site.

[DE 27-9.]  Since the IDEM inspector had confirmed on October 11, 2013 that the 135 drums that were the subject of the original violation had been removed [*see* Ex. 6], the presence of these new drums a year later shows that Tocon brought additional leaking drums of hazardous waste onto the site, and that JCI knew about it. All of this

Furthermore, as Dr. Keramida noted at her recent deposition, the presence on the Site of large quantities of waste, at times comprising up to 135 drums, many of which were old-looking and rusted, is inconsistent with Tocon's roughly year-long period of operations and indicates the waste came from elsewhere. [Ex. 10 at 12:16-21; 61:1-4; 62:2-5; 64:7-9; 80:2-17.]

Plaintiffs believe the drums Tocon has brought to and dumped on the Site contain TCE as well as other hazardous materials. Werwie believed the 50 drums contained A&B resin, waste paint and solvents. [*See* Ex. 8.] According to Dr. Keramida, TCE is a common solvent used in the fiberglass industry. [Ex. 10 at 11:19-12:8, 44:9-25.] In its Response, JCI argues that Tocon could not have contributed to the spread of the TCE plume because Tony Adkins, the president of Tocon, provided an affidavit in which he claims Tocon never used TCE in its operations. [DE 49 at 23.] According to emails produced by Tocon, the affidavit was prepared by JCI's counsel to be used in connection with JCI's Response to Plaintiffs' Motion to Remand. When Plaintiffs took Adkins' deposition on December 3, 2015, Adkins recanted his affidavit statements and admitted that he has no idea whether any solvents were used in any operations that were conducted during the period Tocon owned the site. [Ex. 11 at 70:15-71:6.] Indeed, Adkins testified that he does not even know what solvents, chlorinated solvents, trichloroethylene, or degreasers are. [*Id.* at 52:11-25.]

### 5.    Friable asbestos has been illegally deposited in the construction debris.

JCI now disputes that Tocon's demolition debris contains asbestos. JCI also says that even if the debris does contain asbestos and other hazardous substances, it is undisputed that those substances have not affected the plume of contamination present beneath Plaintiffs'

---

evidence supports Plaintiffs' claim that Tocon has caused additional groundwater contamination that is now migrating off-site.

neighborhood.[19]  As described below, JCI's internal emails again contradict its litigation position.

In 2006, JCI hired an environmental consultant to prepare an asbestos survey for the entire facility. [*See generally* Ex. 12.]  The survey revealed over a mile of asbestos covered piping and several thousand square feet of additional asbestos containing materials. [*Id.* at GBC000005-7.] When TOCON purchased the site from JCI in 2007, Adkins and Conroy were the owners. [Ex. 11 at 8:7-13.] Conroy relinquished his ownership in approximately 2009. [*Id.* at 54:1-8.] Adkins testified that "Jimmy and I went separate ways because I found out ***Jimmy was a crook basically***." [*Id.* at 23:10-11 (emphasis added).][20]

In 2009, a potential deal began to develop by which Goshen High School would acquire the Site to use for bus parking and perhaps athletic fields, and JCI's obligations to remediate the Site would be reduced by a $1,000,000 brownfield grant from the United States Environmental Protection Agency. [Ex. 13 at 22:19-23:4; 165:11-166:19.]  JCI was keen on the idea, and on July 27, 2009, Werwie emailed his environmental consultant and told him;

> I want to keep this moving because the school district is very warm on acquiring the Goshen Plant, taking it to the ground and making a baseball field. This may be an opportunity for JCI to pass on the long term liability to the school district, if we can convince IDEM to let us transfer it. The school district is flush with funding and the Superintendent of Schools met with the Goshen Mayor 2 weeks ago to gain his support.

---

[19] If the Court considers extrinsic evidence, Plaintiffs' burden to establish a right to remand would not be to *prove* through such evidence that TOCON *is liable* to class members. Instead, it is to show that Tocon's alleged conduct forms a significant basis for their *claims*. Evidence that demolition debris left by Tocon contains asbestos is substantial, and is more than enough to show the significance of Tocon's alleged conduct as a basis for the claims that are asserted.

[20] Conroy was caught by the Goshen police climbing the fence to the Site and stealing transformers (which often contain PCBs). [Ex. 13 at 175:20-176:9.]  According to Rebecca Herschberger, the Brownfield Coordinator for the City of Goshen, Conroy does not have a good reputation in the community [*Id.* at 175:14-15], and according to Adkins, Conroy "vandalized" the Site in 2008, stealing $200,000 of materials. [Ex. 11 at 20:10-21:12.]

[Ex. 14.] The plan would only work if the buildings were demolished – the problem was the buildings were full of asbestos.

On May 10, 2011, JCI provided access to the facility to several asbestos abatement contractors to obtain bids for asbestos removal. [Ex. 15.] Werwie commented on the tour ". . . hopefully none of them were too shocked when they saw the mess[.] worse yet, *hopefully none of them will call the agency*[.]" [*Id.* at GZA0024157 (emphasis added).][21] The asbestos was not abated and Adkins hired Swift to demolish the buildings anyway. [Ex. 11 at 20:4-5.]  Swift has several felony convictions, including a conviction as a habitual criminal, and convictions for larceny, receiving stolen goods and forgery. [*See generally* Ex. 20.] Most currently, Swift has been charged in LaGrange County with a Level 5 Felony arising out of a bad check for over $85,000 involving false representations concerning the Site. [Ex. 21.] Swift is awaiting trial on this latest charge. Swift was interviewed by IDEM asbestos inspectors in 2013 and 2014, and provided false information to IDEM, leading IDEM to believe that all asbestos had been removed from the Engineering and Administration Buildings.  [Ex. 4 at 73:7-77:17.]

Eventually, Dennis Carter and his company, TecServ, Inc., were hired to inspect certain areas of the buildings at the Site for asbestos, and to remove asbestos from a portion of the buildings at the Site. [Ex. 11 at 29:9, 85:24-86:1.] Carter is a licensed asbestos abatement contractor in the State of Indiana. [Ex. 22 at 6:10-11.] On May 30, 2012, Diamond

---

[21] On February 23, 2012, a Goshen Building inspector issued a stop work order because TOCON did not obtain proper permits for demolition and asbestos removal. [Ex. 16 at GZA0030898.]  On March 6, 2012, IDEM emailed Adkins and told him there is a "great deal" of asbestos that needs to be removed and a "significant cost associated with abating all of the asbestos in the buildings."  [Ex. 17 at GZA0022985.]  Adkins responded and asked if it was JCI's responsibility to remove the asbestos since they put it in the facility. [*Id.* at GZA0022984.]  IDEM forwarded Adkins' question to Werwie. [*Id.*]  On April 4, 2012, Werwie emailed Adkins and told him he provided a copy of the 2006 asbestos report to IDEM and requested a meeting to talk about areas of concern prior to demolition. [Ex. 18 at GZA0023037-38.]  On April 23, 2012, IDEM email Werwie and notified him that several samples which IDEM had collected in the building were positive for asbestos. [Ex. 19.]

Environmental, at the direction of Dennis Carter, removed 40 lineal feet of lose asbestos wrappings from one building in the South east corner of the factory.  [Ex. 23.][22]

In February 2013, Carter oversaw a second asbestos abatement in the southwest portion of the facility. [Ex. 22 at 19:20-21:4; 25:15-27:12.] However, Carter was not paid for this work and he therefore placed a lien on the Site. [*Id.* at 30:11-16.] Thereafter, Carter was paid by Tocon's lender, First Federal Savings Bank who held a mortgage on the property. [Ex. 25.] On December 18, 2013, Carter issued to Adkins a proposal to remove asbestos from the Engineering and Administration Buildings. [Ex. 26.] Carter was never hired to do this work, and he is unaware of anyone removing the asbestos from these two buildings. [Ex. 22 at 43:7-17.]  Adkins testified that Carter was the only asbestos contractor he knew of doing work at the Site. [Ex. 11 at 89:19-21.]

According to the 2006 asbestos report and Carter, there was a significant amount of asbestos remaining in the Engineering and administration buildings before they were demolished. [*See* Ex. 12 at GBC000005-7; Ex. 26.] Additionally, Carter testified that there was one whole section of the plant that he never even inspected. [Ex. 22 at 51:19-52:2.] According to the 2006 asbestos report and Becky Hershberger, there were asbestos containing materials in that building too. [Ex. 12 at GBC000005-7; Ex. 4 at 28:20-30:15.] John Clevenger, the asbestos inspector for IDEM who oversaw the Site testified that IDEM never received notification of asbestos removal for the Engineering and Administration buildings and that the asbestos could not have been legally removed. [Ex. 4 at 77:4-17.]  Hershberger and Dr. Keramida both testified they believe asbestos containing materials have become intermingled with the debris piles at the site. [*Id.* at 36:4-7, 90:2-91:18.]  JCI knows that the debris piles contain unabated asbestos

---

[22] On August 15, 2012, JCI's environmental consultant took photographs showing that demolition was taking place in areas of the main plant where no asbestos abatement had been performed. [Ex. 24.]  Werwie emailed and said he was going to call IDEM because he was "concerned about asbestos disturbances."  [*Id.*]

because Troup was present within that building when Carter sampled for asbestos. [Ex. 22 at 35:16-36:21.] Troup subsequently kept Werwie and Schafer apprised of the demolition activities, even taking photographs of the Engineering Building as it was being demolished. [Ex. 27; Ex. 28.]

When Swift demolished the Engineering and Administration Buildings in 2014, the asbestos became mixed with the other building debris, and as such, all debris must be considered asbestos-containing waste materials ("ACM"), and disposed of as ACM at a licensed landfill accepting ACM. [Ex. 10 at 26:1-11, 66:3-6; *see also* Ex. 4 at 77:18-78:22.]  In the meantime, the construction debris is allowing the friable asbestos to become airborne and posing a significant health threat to the children and other residents in the neighborhood. [Ex. 10 at 66:10-12; *see also* Ex. 4 at 91:19-92:7.]

### 6.     Tocon and Swift have violated the Clean Air Act.

Asbestos has been designated as a "known human carcinogen" by the United States Environmental Protection Agency and the International Agency for Research on Cancer. [*See* "Asbestos Toxicity, How Does Asbestos Induce Pathogenic Changes?", Agency for Toxic Substances & Disease Registry, at 1, attached hereto as Ex. 29.]  Asbestos is heavily regulated under the Clean Air Act, as implemented in Indiana by IDEM's Office of Air Quality.[23]

---

[23] Under Indiana law, as part of a demolition project, no person can remove asbestos without prior notification to IDEM and local authorities. 326 I.A.C. § 14-10-3(1); *see also* 326 I.A.C. § 14-10-3(7) ("In no event shall [Regulated Asbestos Containing Material] removal work (or any other activity, including site preparation that would break up, dislodge or similarly disturb asbestos material) or demolition activities begin on a date other than the date contained in the most recent written notification."). A person also cannot demolish a structure containing asbestos without first properly removing the asbestos [*see* 326 I.A.C. § 14-10-4(1)], must hire a contractor who is properly licensed or accredited to remove asbestos [*see* 326 I.A.C. §§ 14-10-4(13), 18-1-3], and cannot "deposit any contaminants upon land in a place and manner that creates or would create a pollution hazard that violates or would violate a rule adopted by" the Air Pollution Control Board [*see* Ind. Code § 13-30-2-1(3)].  *See generally, IDEM v. Schnippel Construction, Inc.*, 778 N.E.2d 407 (Ind. Ct. App. 2002).

Persons who knowingly violate any of the applicable requirements regarding asbestos reporting commit a Class C misdemeanor, or a Class D felony "if the offense results in damage to the environment that renders the environment unfit for human or vertebrate animal life."  Ind. Code § 13-30-2-1(3). *See U.S. v. O'Malley*, 739 F.3d 1001, 1007

The above sworn testimony from Carter, Adkins, Hershberger, Clevenger and Keramida establishes that Tocon engaged a habitual criminal to demolish two buildings that Tocon and JCI *knew* contained asbestos, and that Tocon and JCI *knew* had not been abated. Thus, it is clear that TOCON's alleged conduct forms a significant basis for the claims in this action.

### 7.        Plaintiffs seek significant relief from TOCON.

Plaintiffs allege a right to compensatory and punitive damages from Tocon and JCI under each count of their Complaint, as well as a right to an injunction directed at both defendants. Not every class member needs to have a claim against Tocon for the relief sought from it to be deemed significant. *See Kaufman*, 561 F. 3d at 156 (explaining that CAFA's significant-relief requirement may be satisfied "even if not every member of the putative class had a claim against the local defendant").[24]

Here, JCI is wrong that "the vast majority" of class members could not have been harmed by Tocon. Tocon owned the Site for seven years of the 22-year class period, a proportion of 32%. Therefore, even if there was a 100% turnover in the neighborhood's residents concurrent with Tocon's arrival, roughly a third of all class members could have been injured by Tocon's conduct. JCI is also wrong that the existence of such harm is even a necessary element of the class's principal claim in this action. To obtain relief from Tocon under the ELA, class members need only show that Tocon caused or contributed to a release of contaminants and that they

---

(7th Cir. 2014) (holding "the very fact that O'Malley was knowingly working with asbestos-containing materials met the *mens rea* requirement outlined in [*U.S. v. International Minerals & Chemicls Corp*., 402 U.S. 558, 563 (1971)], as asbestos is certainly a dangerous material of a type where 'the probability of regulation is so great that anyone who is aware that he is in possession of [it] . . . must be presumed to be aware of the regulation.'"); *see also U.S. v. Smith*, 2015 WL 5829884, at *4 (3d Cir. Oct. 7, 2015).

[24] Additionally, relief sought by proportions of class members that were less than 50% has been held to be significant for purposes of CAFA. *See Benko*, 789 F.3d at 1119 (holding in an action involving allegedly illegal loan foreclosures that a non-diverse defendant who foreclosed on 15% to 20% of the homes of all class members satisfied the significant-relief requirement); *Caruso*, 469 F. Supp. 2d at 369 (holding in an action involving alleged bad-faith settlement practices by insurers that a non-diverse defendant having a share of the relevant market less than one-third that of a diverse defendant satisfied the significant-relief requirement).

22

incurred costs of "removal or remedial action." Ind. Code § 13-30-9-2. As described in footnote 10 above, every class member has a claim against TOCON under the ELA.

JCI repeatedly relies on Tocon's Chapter 7 bankruptcy as support for its position that Plaintiffs cannot obtain significant relief from Tocon. But discovery in the bankruptcy case has shown that JCI is attempting to use Tocon's bankruptcy for an improper purpose. Tocon filed its Chapter 7 petition on October 6, 2015, the day before JCI's response brief was originally due in this Court. Tocon counsel (Leona Frank) communicated with JCI's counsel on October 2, 2015, and JCI's counsel wrote in an email to Ms. Frank, "JCI currently has a major brief (with expert and other evidentiary support) due next Wednesday (10/7) in opposition to a motion to remand by Plaintiffs, so it was useful for us to know that your expected bankruptcy filing on Tocon's behalf is in advance of that date." [Ex. 30 at ADKINS000890.] Then, on Monday, October 5, 2015, JCI's counsel again emailed Ms. Frank, stating "Hi Leona. From the edge of our seats, we were wondering if you had any update for us?" [Ex. 31 at ADKINS000894.] Ms. Frank replied, "Tony will be in Indy at 9:30 am to sign. Finishing up petition now. Filing tomorrow."  [*Id.*]

JCI then used Tocon's Chapter 7 filing in its brief opposing Plaintiffs' motion to remand. JCI argued to this Court that Tocon's bankruptcy cuts against Movants' motion to remand. [*See* DE at 49] ("Here, neither the Complaint, nor the extrinsic evidence, indicates that . . . Plaintiffs could obtain any meaningful relief from Tocon for that contamination. *Indeed, that Tocon filed for Chapter 7 bankruptcy protection on October 6, 2015 (Ex. A), and that Plaintiffs have not moved to try to lift the automatic stay of their claims against Tocon speaks volumes of Tocon's lack of significance*.") (emphasis added).]

Even more telling is that on December 16, 2015, at the hearing on Plaintiffs' motion to dismiss the bankruptcy case, Tocon orally withdrew its objection to Plaintiffs' motion to dismiss.

23

[Ex. 4 at 18:12-15; Ex. 32.] The Chapter 7 Trustee also orally indicated that he was "neutral" on Plaintiffs' motion to dismiss. [Ex. 4 at 21:1-6.] At that point, *only* JCI objected to Plaintiffs' motion to dismiss the bankruptcy. *Only* JCI participated in the hearing before the bankruptcy court.[25]  JCI opposes dismissal of Tocon's bankruptcy so it can continue to argue to *this Court* that Tocon is not a significant defendant. But JCI's reliance on Tocon's bankruptcy to show the supposed inapplicability of CAFA's "significant relief" requirement has a more fundamental flaw:  the existence of federal jurisdiction is determined as of the time the case was filed, meaning events occurring after that time do not affect the applicability of CAFA's exceptions to that jurisdiction. Two recent cases illustrate that principle. *See Standard Fire Ins. Co. v. Knowles*, 133 S. Ct. 1345, 1349 (2013) ("For jurisdictional purposes, our inquiry is limited to examining the case 'as of the time it was filed in state court.'") (quoting *Wisconsin Dept. of Corrections v. Schacht*, 524 U.S. 381, 390 (1998)); *see also Vodenichar v. Halcon Energy Properties, Inc.*, 733 F.3d 497, 503 n. 1 (3d Cir. 2013).

Moreover, even if satisfaction of the "significant relief" requirement of the local controversy exception hinged on whether Plaintiffs could "obtain" such relief from Tocon, JCI is wrong that the possibility of recovery from Tocon's liability insurers is disproven by Tocon's bankruptcy petition, and JCI knows it. JCI argues that Tocon's "sworn Bankruptcy Petition provides that Tocon has estimated liabilities approaching $1 million, that any unencumbered assets are 'uncollectable,' and that it does not have insurance." [DE 49 at 25.] However, on September 30, 2015, Adkins forwarded an email from his accountant to JCI's attorney

---

[25] The Bankruptcy Court has taken Plaintiffs' motion under advisement.

identifying the name of Tocon's insurance provider as well as an account number for the policy.[26] [Ex. 33 at ADKINS001025.]

Therefore, as with JCI's argument regarding Tocon's conduct as a basis for class members' claims, none of the extrinsic evidence cited by JCI shows that class members do not seek significant relief from Tocon.

**D.    JCI has walked away from its fraudulent joinder claim.**

JCI removed this case on two bases: CAFA and fraudulent joinder. Plaintiffs has demonstrated why JCI cannot maintain its assertion of fraudulent joinder. [DE 27 at pp. 22-24.] JCI failed to even mention fraudulent joinder in its response. JCI, who has itself filed a crossclaim against Tocon alleging that Tocon caused *all* of Plaintiffs' alleged injuries [DE 8 at 5; DE 10 at 45], has therefore conceded that its argument was without merit.  For the reasons set forth in Plaintiffs' Motions to Remand [DE 21 at 12-13; DE 27 at 24-25], Plaintiffs respectfully request an award of attorney fees because JCI's fraudulent joinder argument "lacked an objectively reasonable basis for seeking removal."  *Martin v. Franklin Capital Corp.,* 546 U.S. 132, 141 (2005).

### III.    CONCLUSION

For all of the foregoing reasons, Plaintiffs respectfully request that this case be remanded.

---

[26] Plaintiffs had issued a subpoena for documents to Tocon, but Tocon never responded; Plaintiffs only received this email when Tocon produced documents to the Trustee in connection with Tocon's bankruptcy on December 3, 2015. Plaintiffs are confident that Tocon maintained insurance. Tocon's bank listed in the bankruptcy petition lent over $600,000 to Tocon and took a mortgage on the property. Lenders typically require commercial general liability insurance as a condition for loans to businesses. Plaintiffs, therefore, reasonably believe that Tocon obtained such insurance to satisfy the bank's loan conditions.

Respectfully submitted,

*/s/ Thomas A. Barnard*
Thomas A. Barnard, Attorney No. 4011-49
Rodney L. Michael, Attorney No. 23681-49
Melissa A. Gardner, Attorney No. 29920-49
TAFT STETTINIUS & HOLLISTER LLP
One Indiana Square, Suite 3500
Indianapolis, IN 46204
(317) 713-3500

John D. Ulmer, Attorney No. 921-20
Yoder, Ainlay, Ulmer, & Buckingham, LLP
130 North Main Street
Goshen, Indiana 46527
(574) 533-1171

*Attorneys for Plaintiffs*

## CERTIFICATE OF SERVICE

I hereby certify that on December 21, 2015, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system, which sent notification of such filing to all counsel of record. Parties may access this filing through the Court's system.

The undersigned hereby certifies that on December 21, 2015, a copy of the foregoing was mailed by U.S. Mail, to:

TOCON Holdings LLC
c/o Tony Adkins
5722 Pond Ridge Circle
Georgetown, IN 47122

*/s/ Thomas A. Barnard*

14975350.1

26