IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
SOUTH BEND DIVISION

| | | |
|---|---|---|
| AMOS and DEBBIE HOSTETLER, | ) | |
| RITA CHAIREZ, BECKY NULL, and | ) | |
| MARIA TOVAR, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | Cause No. 3:15-cv-00226-JD-MGG |
| | ) | |
| JOHNSON CONTROLS, INC. and | ) | |
| TOCON HOLDINGS, LLC, | ) | |
| | ) | |
| Defendants. | ) | |

**PLAINTIFFS' RESPONSE TO DEFENDANT JOHNSON CONTROLS, INC.'S _MOTION TO EXCLUDE THE EXPERT OPINIONS OF (1) JEFFREY RECHTIN AND JOSEPH GIDDENS, (2) KRISTEN STOUT, AND (3) ADAM STEPANEK_**

John D. Ulmer, Attorney No. 921-20
YODER AINLAY ULMER & BUCKINGHAM LLP
130 North Main Street
Goshen, Indiana 46527
(574) 533-1171

Thomas A. Barnard, Atty. No. 4011-49
Rodney L. Michael, Jr., Atty. No. 23681-49
Benjamin A. Wolowski, Atty. No. 33733-49
TAFT STETTINIUS & HOLLISTER LLP
One Indiana Square, Suite 3500
Indianapolis, Indiana 46204
(317) 713-3500

Mark T. Hayden, Atty. No. 6653-95-TA
TAFT STETTINIUS & HOLLISTER LLP
425 Walnut Street, Suite 1800
Cincinnati, OH 45202-3957
(513) 357-9610

_Attorneys for the Plaintiffs_

# TABLE OF CONTENTS

I.    Introduction. ................................................................................................... 1

II.   Factual Background ...................................................................................... 2

III.   Standard of Review ....................................................................................... 10

IV.   The Opinions of Jeffrey Rechtin and Joseph Giddens Should Not Be Excluded. ............. 11

   A.     Rechtin's and Giddens's Three Opinions. ................................................ 11

   B.     Rechtin and Giddens are Well Qualified to Offer Opinions on Asbestos Abatement, Demolition, and Releases of Airborne Asbestos. ........................................... 12

     1.    Rechtin's Qualifications. .............................................................. 12

     2.    Giddens' Qualifications. .............................................................. 13

   C.     Rechtin and Giddens's Opinion # 1 is Admissible. ...................................... 13

   D.     Rechtin and Giddens Are Qualified to Offer Opinions #2 and #3, Which Are the Product of a Reliable Methodology. ........................................................ 14

     1.    Rechtin and Giddens are Qualified to Offer these Opinions. ...................... 15

     2.    Rechtin and Giddens Applied a Reliable Methodology. ............................ 17

V.    The Opinions of Kris Stout Should Not Be Excluded. ........................................... 20

   A.     Stout's Qualifications. ..................................................................... 21

     1.    Stout is qualified in the areas of photo interpretation, photo analysis, and geospatial analysis. ..................................................................... 21

     2.    Stout is qualified to offer opinions on asbestos and abatement. .................. 22

     3.    Stout is qualified to opine on demolition-related issues. ........................... 24

   B.     Stout's Role Was Not to Simply Tell a "Factual Narrative." .......................... 25

   C.     Stout Applied a Reliable Methodology to Her Analysis of the Process of Abatement, Demolition, and Movement of Debris at the Site. ....................................... 26

VI.   The Opinions of Dr. Adam Stepanek Should Not Be Excluded. ................................ 31

   A.     Dr. Stepanek's Opinions. .................................................................. 32

   B.     Dr. Stepanek is Qualified to Offer These Opinions. ..................................... 32

   C.     Dr. Stepanek's Opinions are the Product of a Meteorologically Reliable Methodology. ................................................................................ 33

   D.     Dr. Stepanek's Opinions are Not Specific or Limited to Asbestos. .................... 34

   E.     Dr. Stepanek's Opinions are Helpful to the Trier of Fact. ............................. 35

VII.   Conclusion. ................................................................................................. 35

# TABLE OF AUTHORITIES

**Cases**

*Carnegie Mellon Univ. v. Marvell Tech. Grp., Ltd.*, 807 F.3d 1283 (Fed. Cir. 2015).................. 29

*Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579 (1993).................................................... 11, 24

*Dhillon v. Crown Controls Corp.*, 269 F.3d 865 (7th Cir. 2001) ................................................. 35

*Duling v. Domino's Pizza, LLC*, No. 1:13-CV-01570-LMM, 2015 WL 3407602 (N.D. Ga. Jan.

14, 2015) ................................................................................................................................. 26

*Empire Med. Review Servs., Inc. v. CompuClaim, Inc.*, No. 13-CV-1283, 2018 WL 5823660

(E.D. Wis. Mar. 16, 2018) ..................................................................................................... 24

*Estate of Arama v. Winfield*, No. 2:13-CV-381-JD, 2017 WL 1951462 (N.D. Ind. May 11,

2017) ....................................................................................................................................... 29

*Gopalratnam v. Hewlett-Packard Co.*, 877 F.3d 771 (7th Cir. 2017) ......................................... 28

*In re Rezulin Prod. Liab. Litig.*, 309 F. Supp. 2d 531 (S.D.N.Y. 2004) ...................................... 26

*Kumho Tire Co. v. Carmichael*, 526 U.S. 137 (1999) .................................................................. 11

*Lapsley v. Xtek, Inc.*, 689 F.3d 802 (7th Cir. 2012) .................................................................... 11

*Palmer v. Asarco Inc.*, No. 03-CV-0498CVEPJC, 2007 WL 2302584 (N.D. Okla. Aug. 7,

2007) ....................................................................................................................................... 16

*Perrine v. E.I. du Pont de Nemours & Co.*, 225 W. Va. 482 (2010) ........................................... 17

*Pledger v. Reliance Tr. Co.*, No. 1:15-CV-4444-MHC, 2019 WL 4439606 (N.D. Ga. Feb. 25,

2019) ................................................................................................................................. 26, 30

*Reichhold, Inc. v. U.S. Metals Ref. Co.*, No. CIV. 03-453(DRD), 2007 WL 674686 (D.N.J. Feb.

28, 2007) ................................................................................................................................. 16

*Roundy's Inc. v. N.L.R.B.*, 674 F.3d 638 (7th Cir. 2012) ............................................................ 14

*Schultz v. Akzo Nobel Paints, LLC*, 721 F.3d 426 (7th Cir. 2013) ............................................... 11

*United States Fid. &, Guar. Co. v. Soco W., Inc.*, No. CV 04-29-BLG-RFC, 2010 WL 11537439

    (D. Mont. Mar. 1, 2010)........................................................................................................ 22

*United States v. Conn*, 297 F.3d 548 (7th Cir. 2002).................................................................. 24

**Rules**

Federal Rule of Civil Procedure 26(a)(2)(B)(i) .......................................................... 34

Federal Rule of Evidence 702................................................................... 10, 11, 14, 24

Federal Rule of Evidence 703........................................................................................ 28

Federal Rule of Evidence 704........................................................................................ 14

**Regulations**

326 IAC 14-10-4(f)(1) ..................................................................................................... 1

## I.    Introduction.

On March 6, 2012, Carmen Anderson, former Project Manager of the IDEM's Voluntary Remediation Program ("VRP") wrote to Jeff Werwie, Johnson Controls Inc.'s former Director of Environmental Affairs, Jeff Werwie, stating that "[k]nocking down the buildings without taking the proper precautions would be a nightmare . . . I don't think [TOCON owner Tony Adkins] understands the health impacts both to him and those that live around the building from the improper handling of the asbestos." (Ex. #1.) But that is exactly what happened in this case. Four years later, after Plaintiffs enlisted the assistance of the USEPA, the agency wrote that "[t]he demolition went forward with no (or grossly inadequate) abatement of asbestos. As a result, the site is covered with piles of asbestos-containing debris. Some of the asbestos is on the surface and can (and has) become airborne." (Ex. #2, at 1.)

Asbestos fibers are microscopic, cannot be seen by the naked eye, and when released into the air can stay suspended for days. (Ex. #3, at 4–6.) That is why Indiana's asbestos regulations strictly require that all regulated asbestos containing material that has been "removed or stripped" be "adequately wet" until collected and contained, and "be adequately wet throughout all stages of disposal." 326 IAC 14-10-4(f)(1). None of the stripped ACM at the Site was wetted, during demolition or after, and instead left out in the open in large debris piles immediately adjacent to Plaintiffs' homes. When the heavy equipment scooped, shoveled, and ran over dry debris piles, the Plaintiffs experienced large amounts of dust blown onto their yards and into their homes.

To some degree, Plaintiffs' experts' opinions regarding asbestos are stating the obvious— dust containing airborne asbestos was generated at the Site and blown into their homes. Yet these experts' expertise, education and training is necessary to better explain just how these asbestos

exposures occurred. Evidence in this case establishes that significant disturbances of asbestos-containing materials occurred at the former Johnson Controls facility ("Site") during several years of illegal demolition activities. These demolition activities alone would have cause microscopic asbestos fibers to become airborne and blown off-Site. Worse, after the buildings were demolished, the asbestos-laden debris was repeatedly shoveled, picked, and dumped elsewhere on the concrete slab using heavy equipment and with no water or other security measures to ensure the asbestos fibers did not blow off-Site.

Plaintiffs' experts' instant opinions are fundamentally different than Dr. Keramida's asbestos opinion offered for class certification purposes. In her 2017 opinion, Dr. Keramida concluded that asbestos fibers had impacted the "entire class area," but had not relied on the homeowner's reports of dust in their homes, and did not identify her methodology. Here, Plaintiffs' experts are not opining as to an entire geographic "class area" but just to those specific homes in which the Plaintiffs testified that dust was present from the Site. Mr. Rechtin and Mr. Giddens use their expertise and training in ACM and in demolitions to explain *how* asbestos became airborne, and *how long* the asbestos fibers would be expected to remain airborne and travel with suspended dust. Ms. Stout relies on her 43 years as a forensic aerial analyst on hazardous waste sites to further explain how the documents in this case demonstrate the significant disruptions of ACM and asbestos-laden debris piles. And Dr. Stepanek relied on undisputed weather data and mathematical meteorological calculations to establish that on at least 415 days the wind was blowing over the Site in the direction of Plaintiffs' homes, supporting the Plaintiffs' eyewitness accounts.

## II.    Factual Background

In 2007, JCI sold the Site to Defendant TOCON Holdings, LLC ("TOCON") but retained

responsibility for certain environmental matters, including remediation of chemicals released to the soil and groundwater. (Ex. #4.) Prior to the sale, in 2006, JCI commissioned a survey to determine the nature and extent of asbestos-containing materials ("ACM") present throughout the Site, which was prepared by Micro-Air, Inc. ("2006 Survey"; Ex. #5.) The 2006 Survey revealed extensive amounts of asbestos throughout the buildings at the Site, including in the Site's main manufacturing buildings, the Administration Building, and the Engineering Building. Specifically, Micro-Air documented more than 6,700 linear feet of asbestos Air-cell pipe wrap, over 6,300 feet of asbestos paper, and over 35,000 square feet of other ACM, including floor tiles, moldings, paneling, adhesives, and asphalt shingles. (*Id.* at GZA0002162–64, -94–97.)

In 2009, JCI developed a plan to "pass on the long term liability" of its remediation obligations to the Goshen Community Schools ("GCS"), which was already interested in the Site. (Ex. #6) This could be accomplished through TOCON's transfer of the Site to GCS. (*Id.*) However, GCS would only consider such transfer if the buildings were removed. JCI obtained bids for demolition of the former factory, which ranged from nearly $800,000 to more than $1,500,000—excluding asbestos removal. (Ex. #7.) Later, JCI had the Site re-appraised and concluded that the demolition costs exceeded the value of the property. (Ex. #8.)

Tony Adkins, the remaining owner of TOCON, hired Richard Swift, a convicted habitual criminal, to tear down the buildings at the Site in exchange for Swift retaining salvage rights to scrap materials. (Ex. #9; Ex. #10; Ex. #11) Adkins would later brag during his testimony at a 341 Meeting of Creditors as part of TOCON's bankruptcy proceedings that as a result of his bargain with Swift, "I got the building tore down free." (Ex. #12, at 27:2–5.) Swift began his salvage operations sometime in 2010 or 2011, which caused the beginning of asbestos disturbances at the Site. (Ex. #13; Ex. #14.)

In May 2011, JCI arranged for asbestos abatement contractors to tour the Site and prepare bids to remove ACM. (Exs. #15, #16.) Becky Hershberger, the Brownfields Coordinator for the City of Goshen, accompanied JCI's representative and the asbestos abatement contractors. She testified that she observed suspect ACM on the floor of throughout the Site. (Ex. #17, at 29:6-30:15.) Werwie noted that "there will be ACM dispersed throughout the building." (Ex. #18.)

By February 2012, Swift had begun demolition without properly abating any asbestos. According to an email from Hershberger, there were "several violations with regards to the asbestos issues[.]" (Ex. #19; *see also* Ex. #14.) IDEM also informed Adkins, who was eager to complete demolition, that "[a]s I[']m sure you know there is a great deal of asbestos that needs to be abated before the buildings can come down." (Ex. #20, at 2.)

JCI's Werwie emailed his environmental consultants, stating that "[t]he boilers were removed without any abatement. Chunks of friable asbestos insulation and ACM brick are laying over the entire boiler room." (Ex. #19; *see also* Exs. #18, #59) David Troup, JCI's Site Operations Supervisor, emailed Werwie a few weeks later to tell him that during a recent visit, Troup "asked the demo boys about the main steam pipe that went through the center of the sensing element buildings that I know was wrapped in asbestos insulation. They said there was no pipe there so I left it at that." (Ex. #21, at 2.) Werwie responded, "I did get a chuckle out of the demolition guys. They are probably sweeping up the asbestos fibers that were disturbed during other demolition. The disturbance is a major EPA violation I know because JCI techs have done it at customer job sites by accident." (*Id.* at 1.)

In April 2012, an IDEM asbestos inspector, Doyle Houser, collected samples at the Site, which tested positive for chrysotile asbestos. (Exs. #22, #23; #24, #25.)

In May 2012, Swift hired Dennis Carter (owner of TecServe) and Diamond

Environmental to inspect and remove 40 linear feet of pipe wrap, but only from the structural steel buildings at the southwest corner of the Site. (Ex. #26; Ex. #27, at 14:18-17:7 & Ex. 35 thereto.) Swift continued demolition of part of the five structural steel buildings and other parts of the Site, including opening a hole in the west side of the main plant building. (Exs. #28, #29.)

In early 2013, Swift again hired Dennis Carter to inspect and abate another part of the Site. Carter inspected the "southwest manufacturing facility" and notified IDEM of the removal of 2,500 linear feet of pipe insulation. (Ex. #30.) Swift completed demolition of the manufacturing portions of the Site by mid-2013. Much of the demolition debris remained scattered and piled at the Site, left uncovered, exposed to the elements, and open to the public. Swift had attempted to discard some demolition debris in the local landfill but the load was rejected because it contained ACM. (Ex. #31, at 1–2.)

Carter was subsequently asked to perform an inspection of the Engineering and Administration buildings, which were still standing. (Ex. #27, at 31:1–33:10, 35:16–37:1.) Carter prepared a bid to remove the extensive amount of asbestos in the Engineering and Administration buildings, and sent it to Adkins on December 18, 2013. (Ex. #32.) However, Carter and Diamond Environmental did not perform any inspection or abatement of the Engineering and Administration buildings. (Ex. #27. at 43:3-11; Ex. #33, at 14:5-16:1.)

By March 2014, Swift had demolished the Engineering and Administration buildings without properly notifying IDEM and without removing the extensive amount of asbestos. (Ex. #34.) The next month, Werwie and Troup discussed moving the demolition debris piles because they were covering areas of the Site JCI needed access to for groundwater sampling. (Ex. #35.) Werwie suggested that Bernard ("Bernie") Fenelon, employee of JCI's environmental contractor GZA GeoEnvironmental, Inc., hire someone to move the debris piles. (*Id.*) Troup told Werwie

that he "had discussed this possibility with Bernie a couple of weeks ago. He was hesitant to move any of the piles due to the possible contamination." (*Id.*) Werwie asked: "Was Bernie concerned about asbestos contamination?" Troup responded, "Yes that was his concern. He feared if we moved it we could own it." (*Id.*) Werwie replied, "I guess we are the only people that believe asbestos in [sic] present in the debris, because the City and IDEM are in denial that asbestos exists in the debris, otherwise they would have done something by now." (*Id.*) JCI and GZA nevertheless discussed which piles would need to be moved (Exs. #36, #37). JCI was ultimately able to successfully convince Swift to move debris piles to facilitate GZA's subsurface testing. (Ex. #38, at 284:18-85:17, Ex. #39, Ex. #40) The heavy equipment used by Swift to move this debris caused significant emissions of dust and asbestos fibers. (*See, e.g.*, Ex. #3, at 52–74.)

Throughout 2014, Swift and his crew continued to move piles of asbestos-containing debris around at the Site using heavy equipment including an excavator. In October 2014, IDEM solid waste inspector Cheryl Satkus visited the Site and emailed photographs she took to IDEM asbestos inspector John Clevenger and other IDEM employees. (Ex. #41.) In her November 20, 2014, email, Satkus stated, "[i]t's a mess with [construction and demolition] debris, wood piles, plastics, insulation and garbage. . . . And get this….they're pulling up areas of the main level concrete floor and burying the debris in the basement." (*Id.*)

Later that same day, IDEM asbestos inspector John Clevenger emailed several IDEM employees and informed them that he had attempted to contact the asbestos abatement contractor to determine if the asbestos had been abated before the buildings at the Site were demolished. Clevenger stated, "I am afraid the abatement contractor will inform me that they did not remove all the asbestos from the entire site especially when I clearly see suspect asbestos containing air

cell type pipe insulation in Cheryl's [Satkus] picture number 5." (Ex. #42.)

The next day, November 21, 2014, Clevenger updated his IDEM colleagues:

I have spoken to the licensed asbestos abatement contractor, Diamond
Environmental Services, Inc., and as I suspected they were not contracted to
remove all of the asbestos from the entire facility. In fact, even though they were
contracted to remove some of the asbestos containing pipe insulation 'southwest
manufacturing facility' portion of the plant they were not asked to abate the entire
building. Taking into consideration that the only notice of abatement we have
received was submitted by Diamond, Doyle's samples and the suspect asbestos
pipe wrap in Cheryl's picture, it is my opinion that the demolition debris/trash
from the building documented in Cheryl's pictures is most likely contaminated
with asbestos containing pipe wrap.

(Ex. #43.) Clevenger and IDEM agreed that Clevenger should visit the Site as soon as possible

and take samples of suspect ACM, because they were concerned that Swift would attempt to haul

ACM debris off-Site. (*Id.*)

Clevenger, Satkus, and an IDEM asbestos trainee visited the Site on December 3, 2014.

(Ex. #44, at IDEM000093.) Clevenger took, but failed to analyze, samples of suspect ACM from

the Site. (Ex. #45.) His Inspection Report gave the Site the all-clear, failing to cite TOCON for

its demolition without prior notification. (Ex. #44.)[1]

Swift made plans to remove the debris with no mention of wetting the piles, as if it

contained no asbestos at all. On December 11, 2014, eight days after Clevenger's December

2014 inspection, Thomas Mills, FFSB's Senior Vice President, emailed Swift instructions for

removing the debris:

You are committed to put your full energy and attention on cleaning up the site
(weather permitting) on the following days. If any of these days are missed due to
weather or other uncontrollable events, you commit to being on site on the next
business day available (alternative dates to be used in chronological order),

---

[1] Clevenger's 2014 Inspection Report flatly contradicted his email of November 21, 2014, which
confirmed that both Carter and Diamond informed him that they had not inspected and abated the entirety
of the Site. (Ex. #43.) When asked during a deposition about this and other factual inconsistencies in his
report, Clevenger admitted his report contained inaccuracies for which he had no explanation. (Ex. #46, at
159:1–162:15.)

      a. The December 2014 dates are 12/22, 12/23, 12/29, 12/30
      b. The January 2015 dates are 1/5, 1/6, 1/7, 1/8, 1/9, 1/12, 1/13, 1/14
      c. Alternative dates 1/15, 1/16, 1/19, 1/20, 1/21

(Ex. #47.) Mills arranged for the refinancing of a previous non-performing loan that Swift had

with FFSB, and an additional line of credit to cover Swift's expenses involved with removing

debris from the Site and burying it in a nearby farmer's field. (*Id.*)

Over the course of the next six months, Swift submitted receipts to Mills for

reimbursement for dumping fees, labor costs, and equipment expenses totaling $29,980.50. (Ex.

#48.) Included in those receipts were eight hand-written receipts for dumping fees totaling

$11,250. (Ex. #49.) Swift dumped several loads of asbestos-containing debris down a ravine on a

farm owned by Herbert Yoder, just outside Goshen's city limits. Swift then covered the debris

with top soil to hide the evidence of the illegal dumping. (Ex. #50.) In an email dated February

12, 2015, Mills wrote to fellow FFSB employees:

> Probably hard to tell in the videos and pictures I sent. Richard has moved
> approximately 200 loads to date. He probably has 75 to 100 loads to go. I got a
> good understanding as to why it is taking so long. Mostly The [sic] result of
> where he is dumping the debris. It takes longer because he is covering the debris
> with topsoil as well as loading trucks and transporting the debris. The good news
> about where he is dumping the debris is that it is costing him probably one third
> of what it would cost to transport and dump the debris at a landfill.

(*Id.*)

In an evidentiary hearing in Bankruptcy Court on December 16, 2015, Clevenger testified

that IDEM had received no notification prior to the demolition of the Engineering and

Administration buildings. (Ex. #51, at 77:12–17.) He explained that no one could have legally

removed asbestos from those two buildings without first notifying IDEM. (*Id.* at 77:15–24.)

Clevenger then testified that because the buildings had been demolished without proper asbestos

abatement, the construction debris would all need to be treated as potentially containing asbestos

materials. (*Id.* at 78:3–16.)

The very next day, on December 17, 2015, Clevenger went back to the Site at the instruction of IDEM's General Counsel, to conduct a second inspection. (Ex. #52.) Contrary to his testimony in the bankruptcy proceedings, Clevenger *again* issued a report to Swift finding "[n]o violations," despite his previous testimony that IDEM had not received notification for the demolition of the Engineering and Administration buildings. (*Id.*)

Upon learning of IDEM's "no violation" determination from the December 17, 2015, inspection, the *Hostetler* and *Schmucker* Plaintiffs engaged Keramida Environmental, Inc., to conduct sampling of the demolition debris at the Site. (*See* Ex. #53.) On January 29, 2015, Vasiliki Keramida, Jeffrey Rechtin, and Steven Cobb, visited the Site. (*Id.* at 1.) Rechtin returned with Joseph Giddens on February 1, 2016, and the asbestos inspectors collected 115 samples from the debris at the Site, 47 of which tested positive for asbestos. (*Id.* at 2–9.)

On February 4, 2016, Plaintiffs' counsel notified USEPA of Keramida's sample results, and requested federal assistance in getting the Site secured. (Ex. #54.) USEPA quickly conducted its own confirmatory sampling and then immediately took steps to secure the site by fencing it off and covering the debris piles in foam and tarps. (Ex. #2, at 3–4.) USEPA posted warning signs on the fence alerting the public to the fact that asbestos is a "cancer and lung disease hazard" and that "respirators and protective clothing are required in this area." (Ex. #55.)

In its July 15, 2016, Action Memorandum, USEPA stated:

> The demolition went forward with no (or grossly inadequate) abatement of asbestos. As a result, the site is covered with piles of asbestos-containing debris. Some of the asbestos is on the surface and can (and has) become airborne. The site is in a busy part of Goshen and near a public school and homes. The response actions proposed herein will continue the efforts made during the emergency removal action and are necessary to mitigate the threats to public health, welfare and the environment posed by the presence of uncontrolled asbestos waste abandoned in several waste piles located on the site.

(Ex. #2, at 1–2.) USEPA added, "[b]ased on the damaged condition and presence of ACM [asbestos containing materials] within the debris piles observed during the site assessment, the debris at the site presents a potential threat to the public health or welfare or the environment through migration as windblown particles. Additionally, storm water runoff could cause migration of ACM offsite through storm drains and overland to residences." (*Id.* at 7.) USEPA estimated there was "7,000 tons of readily identifiable ACM wastes" at the Site. (*Id.* at 8.)

Tetra Tech, USEPA's contractor who conducted the removal assessment in February 2916, stated that "asbestos appeared to be at the site that may present a health risk to nearby occupants. There is potential exposure to nearby human receptors (including nearby commercial occupants and residents in their homes) from the hazardous substances, pollutants, or contaminants migrating off site. Due to the nature of asbestos, there is the likelihood that wind may transport asbestos off site. Additionally, natural degradation of the bulk material containing asbestos will continue to degrade and be released." (Ex. #56, at 2.)

From August to December 2016, USEPA conducted a time-critical removal action to remove the entirety of asbestos-laden debris from the Site. In total, USEPA removed 5,420 tons of regulated ACM, an additional 606 tons of non-friable asbestos, nearly 30 tons of solid wastes, and 20,000 gallons of contaminated water (used to keep ACM wet during removal). (Ex. #57.) The final total for USEPA's removal efforts was nearly $2 million. (Ex. #58, at 2, 4.)

## III.   Standard of Review

Federal Rule of Evidence 702 governs the admission of testimony by expert witnesses. Under that rule, a witness "who is qualified as an expert by knowledge, skill, experience, training, or education" may offer an opinion if the following criteria are met:

(a) The expert's scientific, technical, or other specialized knowledge will help the

> trier of fact to understand the evidence or to determine a fact in issue;
> (b) The testimony is based on sufficient facts or data;
> (c) The testimony is the product of reliable principles and methods; and
> (d) The expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702. A court has a gatekeeping role to ensure that expert testimony meets these criteria. *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579 (1993). The purpose of the *Daubert* inquiry is to scrutinize proposed expert witness testimony to determine if it has "the same level of intellectual rigor that characterizes the practice of an expert in the relevant field" so as to be deemed reliable enough to present to a jury." *Lapsley v. Xtek, Inc.*, 689 F.3d 802, 805 (7th Cir. 2012) (quoting *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 152 (1999)).

However, as the Seventh Circuit has emphasized, a court does not assess "the ultimate correctness of the expert's conclusions." *Schultz v. Akzo Nobel Paints, LLC*, 721 F.3d 426, 431 (7th Cir. 2013). Rather, a court must focus "solely on principles and methodology, not on the conclusions they generate." *Id.* at 432 (quoting *Daubert*, 509 U.S. at 595). "If the proposed expert testimony meets the Daubert threshold of relevance and reliability, the accuracy of the actual evidence is to be tested before the jury with the familiar tools of 'vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof.'" *Lapsley*, 689 F.3d at 805 (quoting *Daubert*, 509 U.S at 596)).

## IV.   The Opinions of Jeffrey Rechtin and Joseph Giddens Should Not Be Excluded.

### A.   Rechtin's and Giddens's Three Opinions.

Jeffrey Rechtin and Joseph Giddens are both licensed in the State of Indiana as asbestos inspectors. Based on their combined 27 years of experience working with asbestos, their training, and their understanding of the activities at the Site, they have offered the following three opinions:

1) The buildings at the JCI Site were torn down in violation of the applicable standards in Indiana's asbestos regulations.

2) Asbestos fibers at the JCI Site became airborne both during and after the demolition of the buildings.

3) Each of the five Plaintiffs were impacted by asbestos from the JCI Site when they were exposed to dust and debris contaminated with asbestos fibers that blew into their homes and onto their properties from the former JCI Site.

(Ex. #3, at 3–4; *see also id.* at 9–75.) For the reasons that follow, JCI's motion to exclude each of these opinions should be denied.

### B. Rechtin and Giddens are Well Qualified to Offer Opinions on Asbestos Abatement, Demolition, and Releases of Airborne Asbestos.

#### 1. *Rechtin's Qualifications.*

Rechtin has a Bachelor's degree in environmental engineering technology from the University of Dayton. (Ex. #3, at 1.) He has been working on asbestos-related projects since 1998. He possesses several asbestos-related certifications that allow him to participate in many aspects of projects involving asbestos. First, he is a licensed asbestos inspector in Indiana, Kentucky, Illinois, and Michigan. (Ex. #3, at 1; Ex. #60, at 1.) To become a licensed asbestos inspector, one must attend a three-day training class, complete an application, pass a written exam, and complete a yearly refresher course with examination. (Ex. #61, at 8:24–9:14.) This license allows him to "go into the particular buildings, look for any suspect materials, collect those materials, and end up reporting what's there." (Ex. #62, at 17:9–18:1.)

Rechtin is also licensed as an asbestos project designer and management planner in Indiana. (Ex. #3, at 1; Ex. #60, at 1.) With these certifications, Rechtin is qualified to plan abatement work in schools (which require the management planner license) and other facilities. (Ex. #62, at 18:2–19:9.) Finally, he is licensed as an asbestos supervisor, which allows him to both oversee an abatement crew and participate in the abatement of asbestos from buildings

undergoing renovation and/or demolition. (Ex. #62, at 18:17–22.) Rechtin's licensures have required him to participate in dozens of initial and refresher training courses. (Ex. #3, at 1.) Over the last 20 years, Rechtin has inspected hundreds of commercial, industrial, and residential facilities, has supervised other inspectors, and has participated in the abatement of asbestos at many other facilities. (*Id.* at 1–2.) In addition, he has taught courses on asbestos identification and awareness. (*Id.*; *see also* Ex. #62, at 89:8–13, 91:9–13.)

2.      *Giddens' Qualifications.*

Giddens has a Bachelor's degree in environmental management from Indiana University. (Ex. #3, at 2; Ex. #63, at 1.) Giddens is also a licensed as an asbestos inspector in Indiana, since 2012. (*Id.*) He has completed asbestos inspections at hundreds of residential homes and facilities—as many as 30 inspections per week at some points in his career. (Ex. #61, at 7:16–8:14.) Since joining Keramida, Inc., Giddens has significant asbestos-related work experience, including on projects involving the renovation of a former naval base, bridges along Interstate 69, and residential work. (*Id.* at 10:19–11:22.) In addition, Giddens has experience with both clearance (or aggressive) sampling following abatement (*id.* at 47:3–48:6) and fugitive dust plans on construction and demolition projects (*id.* at 50:16–22, 58:3–12). Giddens' training and experience qualify him as an expert in the identifying suspect asbestos materials. (*Id.* at 47:3–7.)

**C.      Rechtin and Giddens's Opinion # 1 is Admissible.**

JCI presents three attacks on Rechtin and Giddens' first opinion, regarding the violations of governing asbestos regulations during the demolition and post-demolition process.

First, JCI contends this opinion "goes to liability" and should have been disclosed by February 28, 2018. [DE 383–1, at 13.] However, this opinion is not about Defendants' liability; rather, it is foundational, and directly related to their second and third opinions, and serves to

explain why and how asbestos was able to become airborne and how the Plaintiffs came to be exposed to that asbestos. This "exposure" opinion was timely disclosed to JCI. [*See* DE 352, DE 353.]

Second, JCI contends that their opinion on whether the demolition of buildings at the Site invades the province of the court. [DE 383–1, at 14.] Rechtin and Giddens are not offering an opinion on the ultimate legal issue. *Cf. Roundy's Inc. v. N.L.R.B.*, 674 F.3d 638, 648 (7th Cir. 2012) (Rules 702 and 704 'prohibit experts from offering opinions about legal issues that will determine the outcome of a case.' (citations omitted)). And they are not opining on what the regulations mean as a matter of law. Rather, based on their experience, training, and understanding of the facts of the case, they conclude that the demolition did not adhere to the requisite federal and state regulations that asbestos professionals follow in the demolition of asbestos-containing buildings, and that the failure to do so impacted the Plaintiffs.

Third, JCI contends that Rechtin and Giddens "lack the required expertise to opine on legal regulations" because they are not lawyers. [DE 383–1, at 14.] Again, Rechtin and Giddens have been trained on these regulations and utilize them on a daily basis in the course of their work. (Ex. #61, at 34:16–37:8.) Their opinion does not invade the province of the Court; rather, they are applying their training and experience as any practitioner in this field would do.

**D.    Rechtin and Giddens Are Qualified to Offer Opinions #2 and #3, Which Are the Product of a Reliable Methodology.**

JCI argues that Rechtin and Giddens' second and third opinions—that asbestos became airborne and impacted the Plaintiffs—should be excluded because they failed to employ a reliable methodology and because they are unqualified to render these opinions. JCI's arguments fail on both counts.

14

1.     *Rechtin and Giddens are Qualified to Offer these Opinions.*

JCI argues that Rechtin and Giddens are not qualified to offer opinions on how asbestos impacts the body or how asbestos is capable of moving through the air. [DE 383–1, at 14–16.]

As a preliminary matter, Plaintiffs have not offered Rechtin and Giddens as experts with respect to the medical impacts of asbestos. Plaintiffs have engaged a different expert, Dr. Kenneth Spaeth, to address that topic and to discuss the effects of asbestos exposure the Plaintiffs have experienced.

Rechtin and Giddens explained in their report that, as a result of the improper abatement and demolition practices used at the Site, asbestos fibers can and did become airborne, and that Plaintiffs were exposed to asbestos fibers commingled with dust from the Site. They explained that dust from the demolition is a marker, a means of estimating how far asbestos fibers would have traveled, because the asbestos is even lighter than dust. (*See* Ex. #3, at 52; *see also* Ex. #62. at 138:3–140:3.)[2] As part of both Rechtin's and Giddens' years of experience and training, they have learned about the size and weight of asbestos fibers—information they included in their report. (Ex. #3, at 4–5). Rechtin expressly testified that this understanding is "based on my experience of working on demolition sites." (Ex. #62, at 139:13–140:3.) Giddens further explained that he has specific experience in working to control fugitive dust at construction sites, and that because "asbestos is lighter than dust . . . I know that the asbestos fibers are going to go even farther." (Ex. #61, at 58:3–12.)

JCI criticizes Rechtin and Giddens for being unable to point to a scientific study about how far asbestos can travel compared to dust. [DE 383–1, at 15–16.] JCI argues that their

---

[2] Importantly, Rechtin and Giddens are not opining as to the maximum geographic distance the asbestos could travel, but only to the *actual* distance to the specific Plaintiffs' homes, as established by the presence of Site-related dust with which it was commingled.

reliance on information like the relative size of dust verses asbestos fibers is not suitable for an expert opinion because a lay jury can understand that concept. [*Id.* at 16.] But Rechtin and Giddens possess specialized training and expertise *not* possessed by lay persons regarding both 1) the size of asbestos fibers versus dust particles, and 2) the ability for asbestos fibers to stay aloft for potentially days at a time. (*See* Ex. #3, 4–5.) Both of these pieces of information constitute specialized knowledge that a lay juror could readily *comprehend*, but Rechtin and Giddens are the experts in possession of that information through their training and experience. (*See id.* at 1–9.)

JCI further criticizes them for a lack of air-modeling experience or expertise. [DE 383–1, at 15.] But air dispersion modeling is not always appropriate or reliable in determining whether air borne particles have impacted an off-site property. For example, in *Reichhold, Inc. v. U.S. Metals Ref. Co.*, No. CIV. 03-453(DRD), 2007 WL 674686, at *10–11 (D.N.J. Feb. 28, 2007), an expert opined that fugitive dust from the defendant's site had carried metals onto adjoining properties. The defendants sought to exclude this opinion arguing, *inter alia,* that the expert (Pearson) had "applied no methodology to reach his conclusion that the particles were actually deposited on the Site and made no effort to quantify the amount of particles that reached the site." *Id.* at *11.  The court rejected defendants' argument, concluding that Pearson's environmental expertise, coupled with his review of wind patterns and environmental reports from state and federal environmental agencies rendered his opinion admissible.  *Id.* at *12– 13. The court concluded that "Pearson relies on numerous sources in formulating his opinion as to the dispersion of particles on the site." *Id.* at *13. *See also Palmer v. Asarco Inc.*, No. 03-CV-0498CVEPJC, 2007 WL 2302584, at *7 (N.D. Okla. Aug. 7, 2007) (allowing plaintiff's expert to testify that "wind-blown dust has caused lead contamination" without reliance on air modeling);

*Perrine v. E.I. du Pont de Nemours & Co.*, 225 W. Va. 482, 564 (2010) (Davis, C.J., concurring in part) (finding *Palmer* persuasive). Similarly, here, Rechtin and Giddens' opinions are supported by their review of the 2006 Survey, extensive documentation and photographs of the Site, their personal inspection of the Site, their interviews of Plaintiffs' and their eyewitness accounts of fugitive dust generated at the Site and blown onto their properties, and their consideration of wind patterns as contained in Dr. Stepanek's Report.  Moreover, like Pearson in *Reichold,* the Rectin Report does not attempt to quantify the amount of asbestos leaving and arriving at each Plaintiffs' property.[3] *See Reichhold*, 2007 WL 674686, at *11–13.

## 2.    *Rechtin and Giddens Applied a Reliable Methodology.*

Next, as to their methodology, Rechtin and Giddens visited the Site in February 2016 and collected samples of suspect ACM, which ultimately confirmed the presence of asbestos in the commingled demolition debris. (Ex. #3, at 3, 48–51; Ex. #61, at 25:6–34:13; Ex. #62, at 58:10–73:7) They reviewed extensive documentation regarding the extent and location of asbestos in the buildings prior to demolition. (*Id.* at 2–3.) They reviewed documents showing the limited abatement that occurred at the Site, as well as the demolition process itself. (*Id.*) They reviewed aerial and street-level photos compiled by Kris Stout. (*Id.* at 19–24, 28–34, 73.) They interviewed the Plaintiffs and other neighborhood residents about both the movement of debris piles and visible dust on and within their homes. (*Id.* at 41 & Ex. K thereto; Ex. #62, at 76:19–78:24.) They reviewed relevant deposition transcripts from the Plaintiffs and other residents about dust and debris from the Site. (*Id.* at 41–46, 53–73.) And they considered wind direction data from Dr. Stepanek. (*Id.* at 74.) Rechtin explained their ultimate conclusions were based on:

All of that information. It's not just one piece. It's not just Dr. Stepanek's

_____

[3] Plaintiffs' personal injury claims are not based on a manifested asbestos-related disease at this point, but rather from emotional distress, nuisance damages, and trespass damages from their exposure to dust commingled with asbestos.

> information. It's not just the dust from the interviews. It's not just the samples we
> collected. It's a collection of all of that information is what gives me the certainty
> saying that material went from . . . your site to the site of these homes.

(Ex. #62, at 83:16–24.)

Despite Rechtin's and Giddens' use and description of their methodology of incorporating all available evidence, JCI argues that they failed to take any air or surface sampling at or around Plaintiffs' homes. For example, JCI points out Rechtin's and Giddens' failure to take indoor "wipe" samples from inside the Plaintiffs' homes, arguing that this raises questions about the reliability of their opinions. [DE 383–1, at 18.] However, Giddens explained that wipe sampling is "a very bad sampling method," and that any such sampling would have had minimal value because samples would have become diluted from routine home cleaning. (Ex. #61, at 49:11–50:10, 55:15–23.)

JCI further contends that Rechtin and Giddens have "dismissed the only existing data, from USEPA's sampling, which detected no airborne asbestos." [DE 383–1, at 17.] But Rechtin and Giddens did not *dismiss* this data. This sampling was taken in mid-2016, *i.e.*, *after* the USEPA secured the Site, wetted and covered the piles, and began removing the asbestos-contaminated debris. As both Rechtin and Giddens explained, the USEPA's non-detect sampling was clear evidence that the USEPA was following the proper NESHAP regulations for abatement of ACM—including keeping it wet at all times—during its removal activities. (Ex. #62, at 23:2–24:8, 27:14–24, 98:5–99:12; Ex. #61, at 57:6–21; *see also* Ex. #3, at 74.) This non-detect sampling does not, in any way, undermine Rechtin and Giddens' opinions that Plaintiffs were exposed to asbestos fibers from the Site prior to the USEPA's involvement to secure, wet, and remove the debris.

JCI is wrong when it argues that Rechtin and Giddens simply "embellish" Dr.

Keramida's earlier class opinion.  First, Dr. Keramida's opinion was broader in scope and was offered to establish that all putative class members within the designated class area had been exposed to asbestos. Here, the Rechtin Report relates only to the five Plaintiffs' homes. (Ex. #3, at 3–5, 48–75.) Second, unlike Dr. Keramida, Rechtin and Giddens are licensed asbestos experts and have a combined 27 years of experience in inspecting and overseeing asbestos abatement projects. (*Id.* at 1–2.) Rechtin and Giddens testified about their training and experience in dealing with airborne asbestos, the need for containment, and the number of days that asbestos fibers remain airborne in their personal experience. (*See* Ex. #3, at 4–9.) Third, Giddens has specific experience in fugitive dust issues at remediation sites which is of particular relevance here. (Ex. #61, at 50:16–24, 58:3–7.) Fourth, Rechtin and Giddens specifically relied on the Plaintiffs' testimony regarding the presence of fugitive dust in their homes, blown from the Site. (Ex. #3, at 53–73.) Fifth, Rechtin and Giddens considered and relied on Dr. Stepanek's calculations from actual meteorological data to support their opinion that once airborne, the asbestos fibers were blown onto the Plaintiffs' properties. (*Id.* at 74.)

JCI challenges Rechtin and Giddens' utilization of documents produced by the parties, as well as their incorporation into their report of photos and chronologies provided by Plaintiffs' counsel. [DE 383–1, at 18–19.] Although the chronology of documentary materials was provided, Rechtin and Giddens reviewed and incorporated these materials into their report, as they provided an analysis of each section of the timeline and provided their conclusions from the facts of the case. (Ex. #3, at 13–41, 46–53, 74–75.)

JCI additionally argues that, although Rechtin and Giddens refer to and incorporate the interviews Rechtin conducted with Plaintiffs and their neighbors in June 2017, and deposition testimony from these same witnesses, about dust and debris from the Site, "the report does not

otherwise rely on them to support Opinions 2 or 3." [DE 383–1, at 19.] JCI's argument is untenable. In addition to the fact that these witness statements were included in and appended to their report (*see* Ex. #3, at 41–46, 53–73, & Exs. K and L thereto), Rechtin and Giddens expressly relied upon the observations of Plaintiffs and their neighbors in rendering their opinions. For example, Rechtin explained, "I know from talking with . . . the people I interviewed that they had dust blowing into their home from the demolition, and that dust is going to be mixed with the asbestos fibers." (Ex. #62, at 82:15–18; *see also* 83:16–24 (discussing, *inter alia*, reliance on interviews about dust). He added, "[w]e know from the testimony of the -- or the depositions of the witnesses that those houses had dust. The asbestos fibers would be mixed with that dust."). (*Id.* at 124:17–19.)

Finally, JCI argues that Rechtin and Giddens "did nothing with" the report of Dr. Adam Stepanek regarding the wind directions. [DE 383–1, at 20.] Rechtin's own testimony refutes JCI's argument: "I relied on information he had in terms of wind blowing in certain directions." (Ex. #62, at 36:20–24.)[4]

For all of these reasons, this Court should deny JCI's motion to exclude the opinions of Jeffrey Rechtin and Joseph Giddens.

**V.    The Opinions of Kris Stout Should Not Be Excluded.**

Kristen K. ("Kris") Stout is a photographic analyst with extensive experience interpreting historical aerial photographs. She has provided opinions with respect to the improper demolition of buildings at the Site, the inadequate abatement of asbestos during demolition, the mishandling of demolition debris, and the fact that these activities generated significant amounts of dust. (*See*

---

[4] JCI also argues that Rechtin and Giddens failed to apply Stepanek's data "to any quantity of asbestos becoming airborne." [DE 383–1, at 20.] But Rechtin and Giddens were not tasked with quantifying the amount of asbestos released from the Site or the amount to which the Plaintiffs were exposed; instead they confirmed that Plaintiffs were exposed to asbestos fibers from the Site.

Ex. #64, at 1–14.). For the following reasons, JCI's motion to exclude Stout's opinions should be denied.

**A.      Stout's Qualifications.**

*1.      Stout is qualified in the areas of photo interpretation, photo analysis, and geospatial analysis.*

Kris Stout is highly qualified to offer expert opinions based upon her review of photographic and documentary evidence regarding the demolition of buildings at the Site and movement of piles of demolition debris. She has more than 43 years of experience in photographic analysis. (Ex. #64, at Att. A (pp. 23–25); Ex. #65, at 107:3–108:18.) For 17 years, Stout worked as a photographic analyst on contract to the United States Environmental Protection Agency's Environmental Photographic Interpretation Center (EPIC). (Ex. #64, at 14, 24; Ex. #65, at 20:15–24, 22:24–23:11, 107:9–22.) During that time, she developed extensive experience in applying photo analysis to detect and document the release of hazardous wastes in support of the EPA's remedial efforts under both RCRA and CERCLA. (Ex. #64, at 14; Ex. #65, at 107:14–111:4.))

Since 1993, Stout has been the Executive Vice President, of Environmental Research, Inc. ("ERI") in Linden, Virginia. (Ex. #64, at 14, 23; Ex. #65, at 107:23–108:18, 111:4–112:13.) In that position, she specializes in historical aerial photographic analysis and geo-spatial data integration, for both remediation and litigation purposes, of environmental contamination at industrial facilities, hazardous waste sites. (*Id.*)

Stout has performed photographic analysis site investigations for litigation on over 100 sites. She has authored between 50 and 100 expert reports, has provided expert testimony in 33 cases, and her opinions have never been excluded by any court. (Ex. #64, at 14; Ex. #65, at 7:13–14.); *see also, e.g.*, *United States Fid. &, Guar. Co. v. Soco W., Inc.*, No. CV 04-29-BLG-RFC,

2010 WL 11537439, at *2 (D. Mont. Mar. 1, 2010) (denying motion to exclude Stout's testimony). She has also authored or co-authored dozens of articles on the analysis of historical aerial photography, extensively lectured on that subject, and in the past four years, has given expert testimony in six cases. (Ex. #64, at 26–30; Ex. #65, at 14:12–16:9.)

> 2.      *Stout is qualified to offer opinions on asbestos and abatement.*

JCI argues that Stout is unqualified to offer any opinions about asbestos because that term does not appear in her CV and because she is not a licensed asbestos inspector. [DE 383–1, at 28–29.] JCI further argues that Stout "admitted that Plaintiffs' counsel gave her all the literature she relied on to reach her opinions and that she reviewed them for *the first time* for this case." [DE 383–1, at 29–30.] JCI's characterization of Stout's testimony is incorrect and misleading.

Stout testified that she has expertise on asbestos-related issues, including "what the hazards are, certain materials, materials that contain asbestos, the demolition practices, the standards for demolishing asbestos, buildings with asbestos in them." (Ex. #65, at 11:11–21; *see also* 117:13–118:3.) Stout has been involved in studies involving photographic identification of asbestos sources and airborne asbestos migrating from a Site. (*Id.* at 12:7–13:1.)[5]

JCI incorrectly states that *all* of Stout's asbestos-related information came from Plaintiffs' counsel. [*See* DE 383–1, at 29.] In fact, Stout expressly stated that she obtained some asbestos-related documentation, including materials from IDEM, herself. (*See, e.g.*, Ex. #65, at 48:1–14 (explaining that she unilaterally obtained "Asbestos Management and Control

---

[5] Stout has not offered any opinions with respect to medical impacts on the Plaintiffs, nor has she attempted to offer any opinions on modeling the fate and transport of airborne asbestos fibers.

 Further, JCI inaccurately claims Stout offered herself as an expert in "asbestos-related diseases," [DE 383–1, at 29], Stout's deposition refutes that assertion. When asked if she was an expert in that topic, Stout testified that she "know[s] what the diseases are," but expressly disclaimed any expertise in diagnosing or treating them. (Ex. #65, at 62:21–63:2.)

Program/Asbestos-Containing Materials" publication).) She also clarified that, apart from materials provided by Plaintiffs' counsel, she has "reviewed other documents that relate to asbestos that say, basically, the same thing" as materials provided by Plaintiffs' counsel. (*Id.* at 48:25–49:1.) In addition, Stout expressly testified to a working familiarity with national standards for abating asbestos and demolishing buildings containing asbestos. She explained that she was able to take her understanding of these regulations "and factor that into my analysis when I'm looking at the photography and looking at documents as to what was actually done." (*Id.* at 11:17–21.)

Most significantly, JCI omits *any* discussion whatsoever of Stout's prior experience with working on asbestos-related projects, to which she testified in detail during her deposition. Specifically, Stout testified that she has experience with analyzing asbestos and dust-generating activities from work experience. (*Id.* at 117:13–10.) Stout testified that she has obtained expertise about how asbestos fibers can travel through the air from her work on a prior project that involved "the generation of information to model asbestos fibers moving in the air from a source, sources." (*Id.* at 63:18–64:4.) During that project, Stout had significant experience using aerial photography to "look[] at the sources in and the other sources of asbestos in an area." (*Id.* at 100:12–15.) In addition to working with aerial photography, Stout worked closely with air modelers to determine how asbestos fibers could travel, and what types of environmental and geographic factors could impact the movement of airborne asbestos fibers. (*Id.* at 63:25–64:5; 117:13–118:10.) Stout testified to having developed an expertise as to those factors, as well as about the fact that asbestos fibers are "very easily suspended into the air," —all of which was information Stout derived from her prior work experience. (*Id.* at 63:25–64:5, 100:3–15.)

In sum, based on her knowledge and experience, Stout is well qualified to offer those

asbestos-related opinions which she actually offers, including with respect to demolition and

abatement procedures and requirements and movement of airborne fibers. *See United States v.*

*Conn*, 297 F.3d 548, 555 (7th Cir. 2002) ("Rule 702 is flexible and permits a witness to be

qualified as an expert if he is 'qualified as an expert by *knowledge, skill, experience*, training, or

education.'" (quoting Fed. R. Evid. 702) (emphasis added)).

                    3.       *Stout is qualified to opine on demolition-related issues.*

        According to JCI, Stout lacks any qualification to talk about demolition and the operation

of excavators because she does not personally drive an excavator or demolish buildings herself.

[DE 383–1, at 30–31.] Not only is that not what *Daubert* requires, but Stout does have a

significant history of applying her expertise in photo analysis to documenting and analyzing

demolitions at various sites.

        JCI contends that Stout has failed to explain what relevant work experience she possesses

regarding demolition. [DE 383–1, at 30.] Again, JCI has misconstrued her deposition testimony.

When asked about demolition-related work experience, Stout frankly explained that she has

previous experience:

>       Reconstructing demolition activities. Well, there are numerous sites where
>       demolition has been a part of the release, how they demolish tanks or buildings,
>       pipes. It's important that they clean them out, that they, essentially, abate them
>       before they demolish them. So there are some sites where they didn't do that. And
>       so they release contaminants into the environment.

(Ex. #65, at 119:14–20.)

        As to her knowledge and expertise with respect to excavators, Stout explained that based

on her work experience, she has "more knowledge than the layperson when it comes to

excavators." (*Id.* at 83:8–11.) But unlike *Empire Med. Review Servs., Inc. v. CompuClaim, Inc.*,

No. 13-CV-1283, 2018 WL 5823660, at *5 (E.D. Wis. Mar. 16, 2018), which JCI cites [DE 383–

1, at 31], Stout is not merely claiming to have more knowledge on something that a layperson

"can, and must, determine on its own." *Id.* Stout's deposition testimony confirms that that she

has significant on-the-job experience analyzing the use of excavators, especially in relation to her

role as a photo analyst:

> Well, excavators are used -- they're used at waste sites or sites that are being
> investigated, hazardous waste sites where they will go in if they want to dig a test
> pit or a trench as part of the investigative process. And I've seen how they use
> excavators there. Also, during remediation of sites, they'll use excavators if
> they're removing material, solid materials. They'll use an excavator, whether it's
> soil or debris or whatever. Also, the excavators I've seen -- I've seen heavy
> equipment on aerial photography when the site is active, if they're using them for
> a particular purpose, like if they're doing dredging a channel or a ditch.

(Ex. #65, at 82:1–12.)

This experience with and understanding of excavators and demolition sufficiently

qualifies Stout to offer expert opinions under Rule 702.

> ### B.     Stout's Role Was Not to Simply Tell a "Factual Narrative."

JCI inaccurately claims that Stout "curiously testified that she is not offering any expert

opinions." [DE 383–1, at 21.] Stout did not testify to anything of the sort. JCI selectively quotes

portions of Stout's deposition where she stated, "I wasn't really asked to render an opinion on a

particular topic." [DE 383–1, at 21 (citing Stout Dep. at 37:17–18).] JCI's cherry-picking of

Stout's deposition is misleading.

The portion of Stout's deposition that JCI has excerpted is taken from Stout's thorough

explanation that her role in this case evolved from initially providing some information to

Plaintiffs' counsel as a consulting expert into a testifying expert, and that after she reviewed

photographs, she suggested that she could opine on topics related to demolition and the

movement of debris piles at the Site. (Ex. #65, at 36:15–38:17.) Contrary to how JCI has framed

her role, Stout's deposition testimony reveals not only that she is offering actual opinions in this

case, but also that that her opinions relate squarely to the topics of demolition and debris.

Moreover, Stout's report expressly indicates that her role was to: "1) acquire and analyze aerial and ground photographs of the site; 2) review site documents produced in the case; and 3) develop a timeline of site activities relevant to the demolition, handling, and disposal of asbestos contamination of the site and surrounding area." (Ex. #64, at 1–2; *see also* Ex. #65, at 40:9–11 ("[M]y role was, primarily, to document the demolition activities and how the debris was handled and moved around the site.").)

JCI argues Stout was simply parroting documents as a "vehicle for a party's factual narrative or timeline of events." [DE 383–1, at 22.] The reality is that Stout employed a forensic approach, relying on her 43 years of experience and synthesizing ground and aerial photography, coupled with documentary evidence to "provide context as to . . . what was happening, where it was happening." (Ex. #65, at 121:2–3.) While courts have excluded witnesses who merely regurgitate a "factual narrative," *e.g. In re Rezulin Prod. Liab. Litig.*, 309 F. Supp. 2d 531, 551 (S.D.N.Y. 2004), "[an] expert is allowed to articulate the 'factual underpinning' upon which [s]he bases h[er] opinion." *Pledger v. Reliance Tr. Co.*, No. 1:15-CV-4444-MHC, 2019 WL 4439606, at *12 (N.D. Ga. Feb. 25, 2019) (citing *Duling v. Domino's Pizza, LLC*, No. 1:13-CV-01570-LMM, 2015 WL 3407602, at *12 (N.D. Ga. Jan. 14, 2015)). This is precisely what Stout has done here, weaving photographic and documentary evidence into a report containing her opinions about asbestos and the demolition process at the Site.[6]

### C.   Stout Applied a Reliable Methodology to Her Analysis of the Process of Abatement, Demolition, and Movement of Debris at the Site.

---

[6] JCI incorrectly asserts that Stout also offers opinions with respect to the groundwater contamination at the Site. [DE 383–1, at 31 n.5.] She does not offer any opinions on that subject at all; she does, however, refer to JCI's subsurface contamination and treatment activities as a means of providing context for her opinions regarding the moving of asbestos-containing debris piles to facilitate subsurface sampling. (*See, e.g.*, Ex. #64, at 10.)

Stout's opinions are the product of a reliable methodology. Specifically, Stout applied her environmental forensic experience through a process termed photo analysis, to integrate available aerial, historic, and current photography, along with maps, documents, communications, and environmental reports. (Ex. #65, at 17:6–14, 112:15–25.) Her geo-spatial analysis "integrate[s] everything together to try to get a . . . more complete understanding of the site than one would get if you just looked at one type of information." (*Id.* at 112:25–13:5.) This "convergence of evidence" from "multiple sources that corroborate another . . . create[s] this more complete picture of the site," from which she was able to render her opinions about the nature of demolition and spread of asbestos-containing debris. (*Id.* at 113:5–16.) She further elaborated on her methodology:

> Well, I use photography. But I also, when I'm looking at where contamination came from, I also use my understanding and knowledge about that particular waste product and where -- and documents, historical documents, documents that describe what was released . . . . So really, it's much more than just the photography. Sometimes, in some cases, the photography just acts as, sort of, a pallet to combine information from multiple sources such as witness depositions, former employees, information that they might have. . . . But it's that, kind of, whole array of types of information that I gather and then using the photography -- or some type of geo-spatial construct, then to, kind of, layer that information on, provide context.

(*Id.* at 120:4–121:1.)

JCI challenges Stout's methodology first on the grounds that she did not utilize her expertise in either photogrammetry or photointerpretation.[7] [DE 383–1, at 25–26.] These are red herring arguments, though, as Stout testified that—although she qualified in such areas—her role in this did not require her to employ such techniques. (Ex. #65, at 17:6–19.) Rather, as described above, she employed a photo analysis method to reach her conclusions. (*Id.* at 17:8–14.)

---

[7] Stout described photogrammetry as "the use of aerial photographs to create maps and to generate measurements," and photointerpretation as "using aerial imagery . . . and looking at it stereoscopically." (Ex. #65, at 16:14–1, 20–21.)

Further, JCI argues that Stout failed to actually apply any expertise in her photo analysis. [DE 383–1, at 26.] JCI posits that Stout's opinions are "nothing more than her lay observations of what the photographs obviously show." [*Id.*] However, as Stout explained, she was looking at the photographs included in her report with the experience of a trained and experienced analyst. (Ex. #65, at 25:13–26:10.) She was looking for, and pointing out things that lay observers would not necessarily look for or pick up on. For example, Stout describes looking at one photo, Figure 6–4, which she describes as "provid[ing] a better view of the heterogeneity of the materials in the debris piles including some fine-textured materials, which further indicates the physical breaking, smashing, pulverizing, and mixing of materials that has occurred." (*Id.* at 10.)

JCI further criticizes Stout's methodology, saying that "some of her narrative information came from other 'experts,' particularly Rechtin and Giddens." [DE 383–1, at 22.] Specifically, JCI points to seven specific instances where Stout utilized Rechtin and Giddens' knowledge of the specific asbestos-containing materials at the Site, to note their presence in several figures. [*Id.* at 22–23.] However, Stout testified that she was not *solely* relying on Rechtin and Giddens to identify each of these things. Regarding the roofing materials [number 5 on JCI's list], Stout said that she specifically consulted the 2006 Survey, which had already identified the roofing materials as asbestos-containing. (Ex. #65, at 87:23–88:13.)

In addition, Federal Rule of Evidence 703 inherently recognizes that experts may rely on facts or data that they do not themselves perceive, but which are "made known to the expert." Fed. R. Evid. 703. It is beyond dispute that an expert may rely on another expert's specialized knowledge and expertise. *See, e.g.*, *Gopalratnam v. Hewlett-Packard Co.*, 877 F.3d 771, 789 (7th Cir. 2017) ("[T]here is nothing objectionable about an expert relying upon the work a colleague. . . . Such a scenario is explicitly contemplated by the Rules of Evidence." (citations

omitted)). Stout's incorporation of Rechtin and Giddens' visual identification of ACM—which are themselves reliable—into her figures does not render her opinions unreliable. *See Carnegie Mellon Univ. v. Marvell Tech. Grp., Ltd.*, 807 F.3d 1283, 1303 (Fed. Cir. 2015) ("For areas outside her expertise . . . the district court properly concluded that [the expert] could, indeed must, rely upon . . . other experts having such industry-specific experience.").

The same is true for Stout's analysis of and incorporation of testimony and evidence from Dennis Carter and Trena Hazinski—the licensed asbestos inspector and owner of the abatement company employed at the Site, respectively. JCI complains about Stout's use of the same designation of "four areas" as delineated during Carter's deposition. [DE 383–1, at 24.] But there was no reason for Stout to reinvent the proverbial wheel, or to create any confusion with how she identified portions of the buildings at the Site. Utilizing Carter's "four areas" allowed her to succinctly link her photographic analysis to the specific portions of the buildings to which Carter referred. Reviewing and incorporating Carter's and Hazinski's testimony into her report does not transform Stout into a "mouthpiece of the witnesses" on whom she was relying, as was the case in *Estate of Arama v. Winfield*, No. 2:13-CV-381-JD, 2017 WL 1951462, at *4 (N.D. Ind. May 11, 2017). In that case, the expert witness was "merely regurgitat[ing] the testimony of defense witnesses" and was not "actually draw[ing]" on his own expertise." *Id.* The same is not true of Stout, who analyzed and incorporated the testimony of the asbestos professionals who actually worked at the Site, to help her determine what ACM was removed from which portions of the Site prior to its demolition (and what ACM remained thereafter).

JCI next argues that Stout was not applying any expertise when she relied upon and incorporated documents produced in this case into her opinions. [DE 383–1, at 22.] Even where Stout disclaimed use of "expertise" in reviewing these documents (*see, e.g.*, Ex. #65, at 44:17), it

is important to consider that Stout *does* have expertise in reviewing documents and photography to determine the sources of releases of asbestos fibers (*id.* at 121:6–12), and had to apply that expertise even when reviewing documents. (*See, e.g.*, *id.* at 43:16–46:4 (applying expertise in considering documents about abatement of ACM in boiler room).) In addition, Stout testified that "the documents provide information as to, say, activities that might have been going on inside the building, relate to, maybe, time periods that are in between the photographic evidence. And it provides context for the photo analysis." (*Id.* at 113:17–21.) This is not impermissible "parroting," as JCI claims [DE 383–1, at 22]; rather, this is a matter of Stout properly utilizing and synthesizing documentary evidence to "articulate the 'factual underpinning' upon which [s]he bases h[er] opinion." *Pledger*, 2019 WL 4439606, at *12.

JCI further argues Stout failed to apply a reliable methodology with respect to her Figure 7-1, upon which she drew three green "polygons" to depict where piles of debris sat in mid-2014. [DE 383–1, at 27.] (*See also* Ex. #64, at 10 & Fig. 7–1.) JCI contends that Stout's methodology was "pure guess-work based on documents she read." [DE 383–1, at 27.] This is incorrect and misrepresents Stout's explanation for her work on Figure 7-1. Specifically, Stout testified:

> The other information where the green polygons are, that was from another map. That was attached to an e-mail. I think it was a May 2014 e-mail where GZA wanted to take -- they had -- they were laid out where they wanted to take their samples. But the problem was there were some debris piles that were in the way. And so he provided a map with locations of where he wanted to take samples and highlighted the ones that they would -- where the debris piles would have to be moved. And so what I've done is also registered that map in the GIS and delineated the areas where those samples were. So that's what the green polygons show.

(Ex. #65, at 91:21–92:7.) That is, rather than *guessing* about the location of the piles GZA needed moved, Stout took the very map GZA prepared showing these piles (*see* Ex. #37), and using GIS software, digitally placed GZA's own depictions of the piles onto her figure. This type

30

of analysis is precisely within Stout's expertise and methodology. *See supra* pp. 21–25.

Lastly, JCI contends that Stout offers nothing more than inadmissible "could have" speculation with respect to the demolition of buildings at the Site. [DE 383–1, at 31–32.] Specifically, JCI takes issue with Stout's opinion that Swift's demolition crew did not remove HVAC equipment from roofs prior to pulling those roofs down, and contends that she "dismisses this actual photographic evidence" it insists refutes her opinion. [*Id.*] In fact, JCI Stout was asked whether she was aware of whether Swift's demolition crew used an excavator to take HVAC systems off the roof and set them down before pulling the roofs down. (Ex. #65, at 83:18–85:14.) She responded that she was not, and she had just previously referred to Figure 4-4, which depicts an HVAC on a roof beginning to fall over. (*Id.* at 83:24–85:24) Stout has not "dismisse[d] this actual photographic evidence, and Stout's statement that the demolition contractor would "do the easy thing" and let the HVAC systems fall to the ground (*Id.* at 85:16–24), actually *comports* with the photographic evidence available.

For all of these reasons, this Court should reject JCI's request to exclude or limit the testimony of Kris Stout.

## VI. The Opinions of Dr. Adam Stepanek Should Not Be Excluded.

JCI argues that Dr. Stepanek's "opinion that asbestos was blown by the wind toward Plaintiffs' properties should be excluded." [DE 383–1, at 32.] JCI misstates what Dr. Stepanek has *actually* offered opinions on and his qualifications to offer those opinions. As discussed below, Dr. Stepanek has offered opinions with respect to the number of days during January 1, 2012, through February 29, 2016, that the wind blew from the Site toward the Plaintiffs' homes, and that wind direction would have allowed "the motion of airborne particles from the JCI site toward" each of the Plaintiffs' homes. (Ex. #66, at 2.) While Dr. Stepanek's opinions are not

specific to asbestos, these opinions are based on reliable data, and helpful to the finder of fact, and should not be excluded.

### A.   Dr. Stepanek's Opinions.

Plaintiffs retained Dr. Stepanek to opine on the wind direction and speed at the Plaintiffs' homes and the Site during the period of January 1, 2012, through February 29, 2016. Dr. Stepanek has opined that on 415 days during this period (out of a 1,521—less 12 days for which insufficient data was available), the wind was blowing "from the JCI Site to at least one" of the four homes occupied by the five Plaintiffs, at an average speed of approximately 7.4 miles per hour. (Ex. #66, at 2.) He concludes that "there are days in which the wind direction would have supported the motion of airborne particles from the JCI site toward each of the four specified households." (*Id.*)

### B.   Dr. Stepanek is Qualified to Offer These Opinions.

Dr. Stepanek has nearly 20 years of experience in meteorology. (Ex. #67, at 15:22–16:10; Ex. #68, at 1–2.) He earned a Ph.D. in atmospheric science from Purdue University in 2017, a Master's degree in meteorology from the Naval Postgraduate School in 2006, and a Bachelor's degree in meteorology from Valparaiso University in 2001. (Ex. #67, at 15:22–10, 21:5–23; Ex. #68, at 1–2.)

He is currently an assistant professor of geography and meteorology at Valparaiso University, where he has taught courses in meteorology since 2015. (Ex. #67, at 24:5–17; Ex. #68, at 1.) Prior to that, he served as a staff meteorologist at Valparaiso University from 2008 to 2015. (Ex. #67, at 25:3–13; Ex. #68, at 1.) Previously, Dr. Stepanek served in the United States Air Force from 2001 through 2007, where he was "part of a team actively forecasting weather conditions, briefing pilots, [and] generally looking at weather" across the United States, North

America, and Europe." (Ex. #67, 25:14–26:18; Ex. #68, at 1–2.) He is the author of two

meteorology-related publications—one of which has been peer-reviewed, and the other was in

the process of peer-review as of his April 2019 deposition. (Ex. #68, at 4; Ex. #67, at 27:15–

28:3.)

Dr. Stepanek's curriculum vitae demonstrates his qualifications as an expert in

meteorology based upon "knowledge, skill, experience, training, and/or education". Fed. R.

Evid. 702. He is thus qualified to offer his opinions related to wind at and near the Site.

### C.     Dr. Stepanek's Opinions are the Product of a Meteorologically Reliable Methodology.

Dr. Stepanek used a scientifically reliable methodology in determining the number of

days the wind blew from the direction of the Site toward any of the five Plaintiffs' homes to the

west and northwest. He began by obtaining the best available wind data for Goshen, Indiana,

using data from an Automated Surface Observing System (ASOS), located at the Goshen Airport

("KGSH").[8] (Ex. #66, at 1; Ex. #67, at 42:21–43:12.) The airport is approximately 3.8 miles

from the Site, and it is the most representative location for which consistent data was available.

(Ex. #66, at 1; Ex. #67, at 43:9–44:16.) He has explained that meteorology frequently requires

use of proxy data, and that using data from the Goshen Airport was an appropriate proxy for the

wind at the Site. (Ex. #67, at 93:19–95:16.)

This data from the Goshen Airport consisted of both wind direction and wind speed, as

measured hourly at the airport's weather station. (*Id.* at 49:25–52:10.) Dr. Stepanek broke the

wind direction down into a "U component" (the east/west component of wind direction), and a

---

[8] The ASOS is a joint effort between the National Weather Service (NWS), the Federal Aviation
Administration (FAA), and the Department of Defense (DOD). *See* National Weather Service,
"Automated Surface Observing Systems," *available at* https://www.weather.gov/asos/asostech (last
accessed October 20, 2019.)

"V component" (the north/south component). (*Id.* at 52:21–55:2.) From this data, Dr. Stepanek was able to develop a daily average for both the wind angle, taking into consideration both the direction and magnitude of wind for each day. (Dep., at 56:8–61:10.)[9] Twelve days did not have at least 10 hourly wind observations, so he excluded those days along with observations that had missing data. (Ex. #66, at 1; Ex. #67, at 81:15–82:18, 86:9–89:6.) Finally, Dr. Stepanek analyzed the angles from the JCI Site to each of the Plaintiffs' homes. He determined which wind angles would go from the Site toward the Plaintiffs' homes, then determined which days had angles that fit within that range. (Ex. #66, at 2; Ex. #67, at 100:11–111:15).

### D.      Dr. Stepanek's Opinions are Not Specific or Limited to Asbestos.

JCI argues that Dr. Stepanek "appeared to offer some limited opinions on asbestos," which should be excluded. [DE 383–1, at 33.] As described above, Dr. Stepanek's written opinion concludes that "there are days in which the wind direction would have supported the motion of airborne particles from the JCI site toward each of the four specified households." (Ex. #66, at 2.) JCI asked Dr. Stepanek during his deposition about what types of airborne particles his opinion included. He explained that "the air motion at the former JCI site would have supported any type of airborne particle, to include things like soot, dust, asbestos, anything that can be suspended in the air." (Ex. #67, at 146:20–25.) JCI's argument that Dr. Stepanek has violated Rule 26(a)(2)(B)(i) by omitting a complete statement of his opinions is incorrect.

JCI next argues that Dr. Stepanek is not qualified to opine as to the movement of airborne asbestos particles. [DE 383–1, at 34.] But as Dr. Stepanek explained, he is not offering that opinion. He is, instead, merely offering an opinion about the wind speed and direction from the

---

[9] Dr. Stepanek explained that there are two generally accepted methods of describing wind speed, vector and scalar—both of which are meteorologically valid. (Ex. #67, at 58:1–59:12, 90:11–91:15.) Dr. Stepanek opted to utilize the scalar method to describe wind speed. (*Id.* at 90:14–91:3; Ex. #66, at 1–2.)

Site toward Plaintiffs' homes, and that such winds would have been capable of moving *any* airborne particle, whether dust, asbestos, or some other particle. (Ex. #67, at 33:1–5, 146:20–25.)

JCI cites *Dhillon v. Crown Controls Corp.*, 269 F.3d 865, 871 (7th Cir. 2001), for the proposition that an expert "must testify to something more than what is 'obvious to the layperson' in order to be of any particular assistance to the jury." [DE 383–1, at 34.] But unlike in *Dhillon*, Dr. Stepanek is not merely testifying to a general, obvious proposition that a door might keep a forklift operator's leg inside. *Cf. Dhillon*, 269 F.3d at 869–71. Rather, as a Ph.D. meteorologist, Dr. Stepanek has analyzed wind direction and magnitude and determined that on 27% of days he considered, it would have been sufficient to move airborne particles from the Site toward Plaintiffs' homes. (Ex. #66, at 2.) This required the application of his specialized expertise, for which he is plainly qualified.

**E.    Dr. Stepanek's Opinions are Helpful to the Trier of Fact.**

Dr. Stepanek's opinions are not intended to be considered in a vacuum. Instead, his opinions compliment the opinions from Rechtin, Giddens, and Stout, discussed above. Those experts have provided opinions regarding the generation of asbestos-containing dust and debris at the Site, and how that asbestos-containing dust was able to become airborne. Dr. Stepanek's opinions regarding wind data provide a scientific means of connecting the dots between those opinions and the exposure, as they demonstrate the meteorological mechanism by which asbestos-containing dust would have been able to reach the Plaintiffs' homes during and after the demolition of the buildings at the Site.

**VII.   Conclusion.**

For the foregoing reasons, JCI's *Motion to Exclude the Expert Opinions of (1) Joseph Rechtin and Joseph Giddens, (2) Kristen Stout and (3) Adam Stepanek* should be denied.

Respectfully submitted,

 /s/ *Thomas A. Barnard*               
Thomas A. Barnard, Atty. No. 4011-49
Rodney L. Michael, Jr., Atty. No. 23681-49
Benjamin A. Wolowski, Atty. No. 33733-49
TAFT STETTINIUS & HOLLISTER LLP
One Indiana Square, Suite 3500
Indianapolis, Indiana 46204
tbarnard@taftlaw.com
rmichael@taftlaw.com
bwolowski@taftlaw.com
Telephone: (317) 713-3500
Fax: (317) 713-3699

Mark T. Hayden, Atty. No. 6653-95-TA
TAFT STETTINIUS & HOLLISTER LLP
425 Walnut Street, Suite 1800
Cincinnati, OH 45202-3957
mhayden@taftlaw.com
Telephone: (513) 357-9610

John D. Ulmer, Attorney No. 921-20
YODER AINLAY ULMER & BUCKINGHAM, LLP
130 North Main Street
Goshen, Indiana 46527
Telephone: (574) 533-1171

**CERTIFICATE OF SERVICE**

The undersigned hereby certifies that on October 21, 2019, a copy of the foregoing was electronically filed with the Clerk of Court using the CM/ECF system, which sent notification of such filing to all counsel of record. The undersigned also certifies that on October 21, 2019, a copy of the foregoing was mailed by U.S. Mail, to:

> TOCON Holdings LLC
> c/o Tony Adkins
> 5722 Pond Ridge Circle
> Georgetown, IN 47122

                              /s/    *Thomas A. Barnard*

26026326.2