UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
SOUTH BEND DIVISION

| | |
|---|---|
| AMOS HOSTETLER, et al., | ) |
| | ) |
| Plaintiffs, | ) |
| | ) |
| v. | )  Case No. 3:15-cv-226 JD |
| | ) |
| JOHNSON CONTROLS, INC., et al., | ) |
| | ) |
| Defendants. | ) |

## OPINION AND ORDER

In this order, the Court addresses the motion to strike the Plaintiffs' expert opinions that they each face increased health risks due to exposures to contamination from the former Johnson Controls property. The Plaintiffs are five individuals who have lived in one or more homes near the site. They allege that during that time, they have been exposed to various contaminants that originated at the site, including TCE and PCE that migrated through the ground and produced vapors in their indoor air, and asbestos fibers that were released during demolition at the site and blew to their homes.

The Plaintiffs do not claim to have experienced any effects from those exposures to date. However, they offer opinions by three experts that they face increased risks of experiencing adverse health effects in the future as a result of those exposures. Dr. Orris is a medical doctor who addressed the cancer and non-cancer effects of TCE. Dr. Gilbert is an immunotoxicologist who addressed TCE's effect on the immune system. And Dr. Spaeth is a medical doctor who addressed the effects of TCE, PCE, and asbestos. All three opine that the five Plaintiffs are each at an increased risk of various health effects due to their exposures. Johnson Controls argues that those opinions fail to satisfy Rule 702, primarily because the experts fail to bridge the gap between the substances' ability to cause adverse effects in general, under some conditions, to a

risk posed to these five individuals given their particular exposures. The Court agrees and grants the motion.

**A.     Standard of Review**

Rule 702 governs the admission of testimony by expert witnesses. Under that rule, a witness "who is qualified as an expert by knowledge, skill, experience, training, or education" may offer an opinion if the following criteria are met:

>   (a)     the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
>
>   (b)     the testimony is based on sufficient facts or data;
>
>   (c)     the testimony is the product of reliable principles and methods; and
>
>   (d)     the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702.

A court has a gatekeeping role to ensure that expert testimony meets these criteria. *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579 (1993); *C.W. ex rel. Wood v. Textron, Inc.*, 807 F.3d 827, 834–35 (7th Cir. 2015). The proponent of the expert testimony bears the burden of demonstrating that the testimony meets each of those elements. *Varlen Corp. v. Liberty Mut. Ins. Co.*, 924 F.3d 456, 459 (7th Cir. 2019). However, a court does not assess "'the ultimate correctness of the expert's conclusions.'" *Textron*, 807 F.3d at 834 (quoting *Schultz v. Akzo Nobel Paints, LLC*, 721 F.3d 426, 431 (7th Cir. 2013)). Rather, a court must focus "solely on principles and methodology, not on the conclusions they generate." *Schultz*, 721 F.3d at 432 (quoting *Daubert*, 509 U.S. at 595). "So long as the principles and methodology reflect reliable scientific practice, 'vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence.'" *Id.* (quoting *Daubert*, 509 U.S. at 596).

**B.     Analysis**

The Plaintiffs offer three expert opinions that their exposures increased their risk of experiencing negative health effects in the future. Johnson Controls moved to strike each of those opinions. In their response, the Plaintiffs reframe and narrow the nature of their claims and the experts' role in relation to those claims. To deflect Johnson Controls' arguments that their experts failed to reliably address causation, the Plaintiffs disavow that their experts have offered opinions on general or specific causation, and argue that those subjects are not necessary to their claims for nuisance, trespass, or negligent infliction of emotional distress.

Even under the Plaintiffs' description of those claims, though, it is hard to see how these experts' opinions are relevant to some of them. The Plaintiffs assert, for example, that the opinions support their claim for trespass, which they argue requires only an unauthorized entry onto land, not any actual physical injury. Yet these experts don't opine whether the substances entered the Plaintiffs' properties; they opine that the Plaintiffs face an increased risk of adverse health effects due to their exposures to contamination, which the experts rely on other experts to establish. The Plaintiffs likewise argue that their emotional-distress claim requires only some sort of physical contact with a contaminant (or even just with a medium that has contained a contaminant), and that these experts' opinions satisfy that element. But again, the Plaintiffs fail to show how their experts' opinions that they face future health risks pertain to whether they experienced such a physical contact; that's a question of exposure, not risk of injury.

Regardless of how the Plaintiffs characterize their legal claims, that doesn't change the opinions their experts actually offered. The Court must analyze those opinions, which are that the Plaintiffs each face an increased risk of adverse health effects due to their exposures. And those opinions each entail at least a general causation opinion: in order for the Plaintiffs to face an increased risk of developing adverse health effects, the exposures they experienced must be

3

capable of causing those effects. The experts must therefore have a reliable basis upon which to opine that each individual plaintiff's exposure places that individual at an increased risk.

On that topic, Johnson Controls argues that none of the experts adequately connected the dots from the substances' ability to cause certain effects given some amount of exposure, to the Plaintiffs' risk of experiencing those effects given their particular exposures. Much of the experts' reports discusses the effects that the substances can cause under some exposure conditions, as shown by various studies and other evidence. When it comes to translating those possible effects to the Plaintiffs' risks, though, the reports rely almost exclusively on regulatory values. Because contamination has been measured or estimated in the Plaintiffs' homes in amounts that exceed those levels, the experts opine that the Plaintiffs all face increased health risks from their exposures.

This approach poses multiple problems that fatally undermine the reliability of these analyses. First, courts routinely condemn experts' reliance on regulatory values when attempting to evaluate the risk posed to a particular individual: "exceedance of government regulation, as we've held before, does not by itself prove causation." *C.W. ex rel. Wood v. Textron, Inc.*, 807 F.3d 827, 838 (7th Cir. 2015); *see also Cunningham v. Masterwear Corp.*, 569 F.3d 673, 675 (7th Cir. 2009); *C.W. v. Textron, Inc.*,[1] No. 3:10-cv-87, 2014 WL 1047940, at *5 (N.D. Ind. Mar. 17, 2014) ("[Reliance on regulatory standards] alone is an improper basis for an expert opinion, for mere exposure to toxins in excess of regulatory levels is insufficient to establish causation."). As Judge Simon discussed in *Textron*, "The rationale for this is understandable: 'regulatory

---

[1] In *Textron*, the experts' opinions included that the plaintiffs' exposures "presented[ed] an unacceptable risk of cancer in the future" and put them "at an increased risk of cancer." 2014 WL 1047940, at *4, 11. The Plaintiffs' attempt to distinguish that case on the basis that their experts here address only the risk of future injury, not the cause of a manifested injury, thus falls flat.

agencies are charged with protecting public health and thus reasonably employ a lower threshold of proof in promulgating their regulations than is used in tort cases.'" *Textron*, 2014 WL 1047940, at *5 (quoting *Baker v. Chevron USA, Inc.*, 680 F. Supp. 2d 865, 880 (S.D. Ohio 2010)).

When faced with uncertainties (like how an effect observed in animals might translate to humans), agencies draw conservative assumptions to ensure that the levels they adopt protect the health of the public at large. *See* Bernard D. Goldstein, *Reference Guide on Toxicology*, *in* Fed. Judicial Ctr., *Reference Manual on Scientific Evidence* 633, 649–50 (3d ed. 2011) ("Because of their use of appropriately prudent assumptions in areas of uncertainty and their use of default assumptions when there are limited data, risk assessments often intentionally encompass the upper range of possible risks."). [*See also* DE 394-17 p. 75 ("ATSDR uses a conservative (i.e., protective) approach to address these uncertainties consistent with the public health principle of prevention. . . . In the absence of evidence to the contrary, ATSDR assumes that humans are more sensitive than animals to the effects of hazardous substances that certain persons may be particularly sensitive. Thus the resulting MRL [minimal risk level] may be as much as a hundredfold below levels shown to be nontoxic in laboratory animals." (quoting *Minimal Risk Levels (MRLs) – For Professionals*, https://www.atsdr.cdc.gov/mrls/index.asp)), p. 76 ("Because of conservative models used to derive [cancer slope factors] and IURs, using this approach provides a theoretical estimate of risk; the true or actual risk is unknown and could be as low as zero.") (alteration in original)]. But plaintiffs who bear the burden of proof must confront those uncertainties and offer a reliable basis to conclude—not merely assume—that the exposures in question actually pose a risk to their health.

5

Regulatory levels are not meant to represent thresholds for adverse effects, either, but to reflect concentrations known to be safe even for the most at-risk populations, with margins built in for safety.[2] That the most at-risk population would not face an increased risk even with a lifetime of exposure to a given concentration (which is what the Reference Concentration reflects, for example), does not mean that a particular individual would face an increased risk from any exposure above that concentration. While it is appropriate for regulatory agencies to rely on those values in ensuring the safety of populations as a whole, experts who seek to determine whether a particular individual faces an increased risk from a particular exposure must do more than merely compare an exposure to a regulatory value. *See Textron*, 807 F.3d at 838; *Cunningham*, 569 F.3d at 675.[3] Courts thus routinely hold that "to the extent that [an expert's] opinions are based on exceedance of regulatory standards, they are not admissible." *Textron*, 2014 WL 1047940, at *14. Even though Johnson Controls heavily relied on this point in its motion, and even though the Plaintiffs argue that their experts' opinions are reliable based on their use of regulatory values, the Plaintiffs failed to meaningfully argue otherwise in their response.

---

[2] Even one of the sources Dr. Gilbert relied on makes this abundantly clear: "The EPA/MassDEP exposure guideline of 2 µg/m$^3$ is set well below levels expected to result in health effects and is designed to protect the most sensitive individuals." *Trichloroethylene (TCE) in indoor air*, https://www.mass.gov/service-details/trichloroethylene-tce-in-indoor-air (last visited Sept. 7, 2020) (cited at DE 394-4 p. 18).

[3] *See also Reference Guide on Toxicology*, p. 665–66 ("Particularly problematic are generalizations made in personal injury litigation from regulatory positions. Regulatory standards are set for purposes far different than determining the preponderance of evidence in a toxic tort case. . . . [I]t must be recognized that there is a great deal of variability in the extent of evidence required to support different regulations. . . . In addition, regulatory standards traditionally include protective factors to reasonably ensure that susceptible individuals are not put at risk. Furthermore, standards often are based on the risk that results from lifetime exposure. Accordingly, the mere fact that an individual has been exposed to a level above a standard does not necessarily mean that an adverse effect has occurred.").

Even if regulatory values could be used to assess individual risk, the experts would still have to reliably apply those levels to a particular individual's exposure in order to offer opinions about whether that individual faces an increased risk. Regulatory values generally assume lifetime exposure. A Reference Concentration, for example, assumes that an individual is continuously exposed to a given concentration every hour of the day, every day of the year, for 70 years. [DE 394-17 p. 73; 394-4 p. 20]. None of the Plaintiffs were exposed for that duration. Yet, none of the experts offered any analysis to extrapolate those values to the Plaintiffs' exposures. More, the experts appeared under the misimpression that Dr. Keramida had conducted a dose-and-duration analysis for the Plaintiffs' exposures, when she did no such thing. Instead, her opinion estimated only the indoor air concentrations in the Plaintiffs' homes. Though she noted the number of years each Plaintiff lived in each home, neither she nor any of these experts considered the amount of time any Plaintiff spent indoors being exposed to those concentrations during those periods, nor did they attempt to compare the resulting exposure to any regulatory values. Without having even considered the duration of any of the Plaintiffs' exposures, these experts were not comparing apples to apples in relying on the regulatory values. *Textron*, 2014 WL 1047940, at *7 ("Ignoring the dose . . . is a critical error. This is because, as one commentator has put it, 'the dose makes the poison.'").

An expert cannot avoid that problem by asserting that there is no safe level of exposure, either. As the Seventh Circuit recently observed, "more than thirty other federal courts and state courts have held that this cumulative/'any exposure' theory is not reliable." *Krik v. Exxon Mobil Corp.*, 870 F.3d 669, 677 (7th Cir. 2017); *see also Moeller v. Garlock Sealing Techs., LLC*, 660 F.3d 950, 955 (6th Cir. 2011). First, to the extent these assertions rest on the lack of scientific proof that a de minimis exposure *cannot* cause cancer, they get the burden of proof backwards.

[*See* DE 394-2 p. 12 (Dr. Orris: "[T]here is no data to support a level below which no health risks are expected.")]. An inability to prove that a particular exposure is "safe" is not the same as proof that exposure at that level has a causal connection to adverse effects. *Anderson v. Ford Motor Co.*, 950 F. Supp. 2d 1217, 1224 (D. Utah 2013). Second, even assuming that exposure to a single molecule of a substance may theoretically be capable of causing a cancer, the law does not provide recovery for remote, speculative, theoretical possibilities.[4] Merely pointing to a theoretical possibility that even the most minute exposure may be able to cause a cancer fails to establish that a given individual has suffered a cognizable harm. *See Krik*, 807 F.3d at 677.

Take, for example, the Inhalation Unit Risk, on which each of the experts rely. That value provides an estimate of the increased cancer risk from a lifetime of exposure to a given substance at a concentration of 1 µg/m$^3$. For PCE, that exposure is estimated (at the upper bound) to cause 0.26 cancers over a lifetime in a population of 1 million people. [DE 394-3 p. 10]. In other words, a person with a lifetime of exposure at that level has a 99.999974 percent chance of never getting cancer from that exposure; few things in life are as certain *not* to happen. An expert who opines that an individual faces an unquantified increased risk of cancer because even the most minute exposure is theoretically capable of causing cancer, without offering a basis upon which to assess the magnitude of the risk, is simply not offering an opinion that is useful to the

---

[4] It is unclear if Indiana would even recognize a claim for damages for medical monitoring based on an increased risk of future injury. *See AlliedSignal, Inc. v. Ott*, 785 N.E.2d 1068, 1075 (Ind. 2003) (noting that a product liability claim does not accrue upon mere exposure to asbestos); *Allgood v. Gen'l Motors Corp.*, No. 102cv1077, 2005 WL 2218371, at *5–7 (S.D. Ind. Sept. 12, 2005) (concluding that Indiana law would allow recovery of medical monitoring costs for a risk of future injury as relief on tort claims). But even the states that do allow such a claim generally require that a plaintiff have a "significantly increased risk of contracting a serious latent disease." *In re Marine Asbestos Cases*, 265 F.3d 861, 866 (9th Cir. 2001).

8

decisional process. *Krik*, 870 F.3d at 677–78. And again, even though this was a principal basis for Johnson Controls' motion, the Plaintiffs did not meaningfully argue otherwise in response.

Dr. Orris' report presents the clearest case of these problems. Much of his report is devoted to discussing effects that TCE can produce under some conditions. The report offers only cursory discussion when it comes to translating that to an increased risk for the five Plaintiffs here, though. On that topic, all the report does is note the measured[5] or estimated levels of TCE in the Plaintiffs' homes, then note regulatory levels for cancer and non-cancer effects (the Inhalation Unit Risk and Reference Concentration, respectively), and then assert without further explanation that the Plaintiffs "are now at an increased risk of cancer and other negative health effects due to their exposure to TCE." [DE 394-2 p. 12–13, 16]. In other words, the only basis Dr. Orris offers for extrapolating the Plaintiffs' exposures to their increased risk is an exceedance of regulatory standards. That is not a reliable methodology. *Textron*, 807 F.3d at 838 ("[E]xceedance of government regulation, as we've held before, does not by itself prove causation. The district court did not abuse its discretion in rejecting this methodology." (citation omitted)).

Nor did Dr. Orris consider the amount of time any Plaintiff was exposed. His report incorrectly asserts that "Dr. Keramida has predicted the dose and duration of TCE exposure for each of the five Plaintiffs," when all she did was estimate the indoor air concentrations of TCE,

---

[5] Dr. Orris' statement that the sampling data independently supports his opinion is also curious and unsupported by any analysis in his report. His report notes the range of indoor air measurements in "the Class Area," but this is not a class action; his report is meant to address the risks faced by the five individual plaintiffs in this suit. Some of the plaintiffs have never had TCE detected in their homes anywhere near the regulatory levels Dr. Orris cites. For example, Ms. Tovar's home has had TCE detected only once out of more than a dozen tests, in an amount of 0.18 µg/m$^3$, over an order of magnitude below the Reference Concentration Dr. Orris relies on. Dr. Orris' report does not explain how that sampling data supports his opinion that Ms. Tovar faces an increased risk of non-cancer effects.

not their exposures to it. [DE 394-2 p. 12]. Thus, Dr. Orris did not reliably extrapolate either of the regulatory values (both of which assume continuous exposures for a lifetime) to the Plaintiffs' particular exposures. The only other basis for Dr. Orris' opinions is the assertion that there is no safe dose for exposure to TCE, such that even the most minute exposure necessarily places an individual at an increased risk of cancer. For the reasons already explained, that no-safe-dose opinion is not helpful in evaluating the extent to which these specific individuals have a cognizable risk due to their specific exposures. Nor has Dr. Orris identified a reliable basis for concluding that any exposure, no matter how small, has been shown to have a causal connection to a detectable increase in the risk of adverse health effects.[6] The Plaintiffs therefore have not shown that Dr. Orris' opinions satisfy Rule 702's reliability criteria.

      Dr. Gilbert's opinions, which focus on immunological risk from TCE, are little different. Her report discusses at length various evidence that exposures to TCE can cause autoimmune diseases. Her report offers no reliable basis, though, for extrapolating TCE's ability to cause those effects under *some* circumstances, to its ability to cause those effects to *these* Plaintiffs under *their* circumstances. While she cites and discusses various studies on TCE's ability to cause certain effects, she never attempts to explain how any of those studies would support a finding that these Plaintiffs are at risk of those effects given their exposures. Instead, like Dr. Orris, the only evidence her report discusses for comparing these Plaintiffs' exposures to a level at which a risk occurs is regulatory levels, like the Reference Concentration and Inhalation Unit Risk. As already discussed, those levels do not present a reliable basis for identifying an increased risk in a particular individual. Also like Dr. Orris, Dr. Gilbert's report never considers

---

[6] Even the Plaintiffs' argument in defense of this opinion states that "every exposure carries some *theoretical* risk of cancer." [DE 399 p. 26 (emphasis added)].

the Plaintiffs' actual exposures so as to compare them to the regulatory levels, either. The regulatory levels thus cannot support Dr. Gilbert's opinions for that independent reason.

The only discussion Dr. Gilbert's report offers to address the length of the Plaintiffs' exposures was based on the contamination at Camp Lejeune, where very heavy contamination by TCE and other chemicals was discovered in the drinking water in the 1980s. Dr. Gilbert notes that the Department of Veterans Affairs has stated that veterans and their families may qualify for health benefits if they have been diagnosed with one of a number of diseases and had at least 30 days of exposure at Camp Lejeune. She asserts that this assumption of fiscal responsibility is based on "the assumption" that even short exposures can increase health risks. [DE 394-4 p. 25]. First, though, the Plaintiffs offer no reason to believe that a legislative decision to grant health benefits to veterans and their families is the type of evidence a toxicologist would rely on in reaching conclusions about causation. And second, they have not shown that Dr. Gilbert reliably extrapolated from those circumstances to any risks that may be posed here. The Camp Lejeune contamination involved multiple different contaminants in the drinking water, whereas Dr. Gilbert's opinion here addresses the effect of TCE in indoor air. Dr. Gilbert's report offers no explanation to bridge the gap from the types and amounts of exposures there to the exposures here.

Dr. Gilbert's report also relies on sources of exposure that are not even present. She writes, for example, that all five Plaintiffs face increased risk because they were exposed to high concentrations of TCE in the soil, groundwater, and surface water. [DE 394-4 p. 22–23, 25 ("Thus, the plaintiffs were living in an area where the levels of TCE in the soil were higher than human health guidelines for non-cancer effects; thus increasing the likelihood that they would manifest such effects.")]. She does not identify any evidence that any Plaintiff has been exposed

11

to contamination in that manner, though. She also relies on elevated levels of TCE in the sub-slab soil gases. Again, however, there is no suggestion that any Plaintiff has inhaled sub-slab soil gases; the Plaintiffs' theory is that they breathed vapors inside their homes.[7]

Dr. Gilbert also notes that one of the Plaintiffs (Ms. Null) lived in the neighborhood before the homes were connected to municipal water lines, such that she could have been exposed to contaminated drinking water if her well was contaminated. Her report only cites levels of contamination of other wells some distance away, though. [DE. 394-4 p. 22]. It does not identify the level of contamination in Ms. Null's well that Dr. Gilbert was basing her opinion on or how much exposure Ms. Null had to that contamination. And notably, an actual test of Ms. Null's well water detected no TCE within the reporting limits. [DE 394-7]. Dr. Gilbert's report also discusses potential impacts of exposure to multiple toxins, but her report does not appear to rely on that analysis; it concludes that "little is known about the impact of co-exposure to TCE and other chemicals such as PCE in humans," and that "little is known about their combined effects." [DE 394-4 p. 28].

In defending Dr. Gilbert's opinions, the Plaintiffs rely heavily on *Kirk v. Schaeffler Grp. USA, Inc.*, 887 F.3d 376 (8th Cir. 2018). That decision affirmed the admission of opinions by Dr. Gilbert in another case, but that decision is of little use, as the circumstances and Dr. Gilbert's opinions were quite different than here. In *Kirk*, the plaintiff developed a rare auto-immune disease after living in an area heavily contaminated with TCE. Dr. Gilbert opined that TCE was capable of causing that disease, and she conducted a differential etiology and offered a specific causation opinion that the contamination caused that disease. 887 F.3d at 390–92. But here, Dr.

---

[7] To the extent Dr. Gilbert was suggesting that the sub-slab vapors would reach the indoor air at an increased level, that is not a matter within her expertise.

Gilbert did not conduct a differential etiology and is not offering a specific causation opinion, nor have any of the Plaintiffs manifested any disease.

Also, while Dr. Gilbert did not identify a particular amount of exposure for the plaintiff in *Kirk*, that step was unnecessary to her analysis. The plaintiff had already manifested a disease. It was also a rare disease, one that was capable of being caused by TCE, and which manifested after exposure to high levels of contamination for many years. Those factors allowed Dr. Gilbert to opine that the exposure caused that rare disease. *Id.* Here, though, none of the Plaintiffs have manifested any illness, so Dr. Gilbert cannot rely on the illness to infer exposure to sufficient quantities. Instead, she has to reliably connect the dots between these Plaintiffs' exposures and their future risks of experiencing effects that have yet to manifest themselves. As already discussed, she has not done so. The Court therefore grants the motion to exclude Dr. Gilbert's opinions as well.

Dr. Spaeth's opinions, addressing the risks posed by exposures to TCE, PCE, and asbestos, suffer from the same shortcomings. As to TCE and PCE, his analysis parallels Dr. Orris' and Dr. Gilbert's. He discusses various evidence that TCE and PCE are carcinogenic and can have other toxic effects. But to conclude that these Plaintiffs are at risk of suffering those effects, all he does is note various regulatory levels and then the sampling data and Dr. Keramida's estimates about the indoor air concentrations in the Plaintiffs' homes.[8] Like the other experts, he does not consider the duration of any of the Plaintiffs' exposures so as to compare them to the regulatory levels, either.

---

[8] The Plaintiffs also argue based on Dr. Spaeth's deposition testimony that he also relied on studies of human exposures to TCE at levels comparable to the Plaintiffs' neighborhood. His report, however, offers no discussion of the levels of exposure in those studies or how they compare to the exposures for these five Plaintiffs.

Dr. Spaeth's opinions as to asbestos suffer from an even more fundamental problem, which is that the Plaintiffs offer no evidence whatsoever about how much asbestos any of them were exposed to. The Plaintiffs were clear on that point in responding to the motion to strike their exposure experts: "Rechtin and Giddens were not tasked with quantifying the amount of asbestos released from the Site or the amount to which the Plaintiffs were exposed; instead they confirmed that Plaintiffs were exposed to asbestos fibers from the Site." [DE 388 p. 20 n.4]. Though Dr. Spaeth offers some discussion about how the Plaintiffs might have been exposed to asbestos, ultimately he bases his opinion on the assumption that "their exposure was above background."[9] [DE 394-3 p. 23].

Since those opinions offer nothing more than that the Plaintiffs were each exposed to at least one asbestos fiber from the site, the only basis to opine that the Plaintiffs are at increased risk is to assert that every exposure to any single asbestos fiber increases a person's risk. As already discussed, that no-safe-dose opinion is not reliable and helpful in evaluating the extent to which these Plaintiffs' exposures put them at an increased risk. *Anderson*, 950 F. Supp. 2d at 1223 (excluding such an opinion where the plaintiffs' experts were "unable to point to any studies showing that 'any exposure' to asbestos above the background level of asbestos in the ambient air is causal of mesothelioma," but instead "base their opinion on the fact that scientists have been unable to determine a safe level for exposure to asbestos"). That is particularly so when asbestos is a naturally occurring substance and asbestos fibers are commonly present in the air, as even Dr. Spaeth discusses. [DE 394-3 p. 19–20]. Dr. Spaeth's opinions that the Plaintiffs

---

[9] To the extent Dr. Spaeth offers his own opinion that the Plaintiffs were exposed to asbestos (based on inappropriate demolition practices and the wind direction, among other factors) rather than explaining his reliance on other experts for that point, that is plainly a matter outside his expertise as a medical doctor.

each face increased risk of health effects from TCE, PCE, and asbestos, and therefore need ongoing medical monitoring, thus fail to satisfy Rule 702.

Because none of these experts' opinions that the Plaintiffs each face an increased risk of health effects satisfy Rule 702, the Court grants Johnson Controls' motion to exclude those opinions. It is unclear to what extent the Plaintiffs may still seek to offer these experts' foundational opinions, such as on whether these substances can cause cancer or other effects under some circumstances, or the regulatory standards for those substances. While that testimony might raise issues of relevance and prejudice, as Johnson Controls alludes to in its reply, Johnson Controls did not challenge those discussions under Rule 702's reliability prongs. Relevance and prejudice are best addressed when the Court can evaluate the specific testimony at issue and the specific purpose for which it is offered, so the Court does not address those issues at this time.

**C.     Conclusion**

The Court grants Johnson Controls' motion to exclude these three experts' opinions that the Plaintiffs are at an increased risk of adverse health effects. [DE 394].

SO ORDERED.

ENTERED: September 16, 2020

                                          /s/ JON E. DEGUILIO
                                          Chief Judge
                                          United States District Court