UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
SOUTH BEND DIVISION

AMOS HOSTETLER, et al.,

    Plaintiffs,

    v.                         Case No. 3:15-CV-226 JD

JOHNSON CONTROLS INC, et al.,

    Defendants.

## OPINION AND ORDER

Until 2006, Defendant Johnson Controls Inc. ("JCI") operated a manufacturing facility in Goshen, Indiana. The Plaintiffs are five persons who have lived near the facility. They sued JCI alleging that they have been exposed to various industrial contaminants that migrated to their homes. Plaintiffs claim that JCI is liable for trespass, nuisance, negligence, and negligent infliction of emotional distress as well as for violations of Indiana Environmental Legal Action ("ELA") statute. They seek compensatory and punitive damages.

Both sides have moved for summary judgment. Plaintiffs maintain that they're entitled to judgment as a matter of law on their trespass, nuisance, and ELA claims. In turn, JCI believes the law is on its side as to Plaintiffs' entire case. This is the first of two orders ruling on the motions, with ELA claims first up for consideration. For the reasons explained below, the Court will grant JCI's motion for summary judgment on Plaintiffs' ELA claim.

### A. Standard of Review

On summary judgment, the burden is on the moving party to demonstrate that there "is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of

law." Fed. R. Civ. P. 56(a). That means that the Court must construe all facts in the light most favorable to the nonmoving party, making every legitimate inference and resolving every doubt in its favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). Summary judgment is not a tool to decide legitimately contested issues, and it may not be granted unless no reasonable jury could decide in favor of the nonmoving party. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). The party seeking summary judgment "bears the initial responsibility of informing the district court of the basis for its motion, and identifying" the evidence which "demonstrate[s] the absence of [a] genuine issue of material fact." *Id.* at 323. Once the moving party meets this burden, the nonmoving party may not rest on allegations or denials in its own pleading but must set out specific facts showing a genuine issue for trial. Fed. R. Civ. P. 56(c)(1); *Beard v. Whitley County REMC*, 840 F.2d 405, 410 (7th Cir. 1988). The disputed facts must be material, which means that they "might affect the outcome of the suit under the governing law." *Brown v. City of Lafayette*, 2010 WL 1570805, at *2 (N.D. Ind. Apr. 16, 2010). "If the nonmoving party fails to establish the existence of an element essential to his case, one on which he would bear the burden of proof at trial, summary judgment must be granted to the moving party." *Ortiz v. John O. Butler Co.*, 94 F.3d 1121, 1124 (7th Cir. 1996). Finally, in a case involving cross-motions for summary judgment, each party receives the benefit of all reasonable inferences when considering the opposing party's motion. *Tegtmeier v. Midwest Operating Eng'rs Pension Tr. Fund*, 390 F.3d 1040, 1045 (7th Cir. 2004).

## B. Material Facts

Penn Controls began manufacturing operations at 1302 E. Monroe Street in Goshen, Indiana, in 1937. It merged with JCI in 1968, which operated the facility until 2006. (DE 422-1 ¶

10.) JCI used the site to manufacture measuring devices used in commercial applications. (DE 422-1 ¶ 13.) Certain of the manufacturing processes required the use of a vapor degreaser that used the solvent trichloroethylene ("TCE").  Between 1981 and 1998, the year that JCI ended the use of TCE, there were at least six documented spills of TCE at the site. (DE 415-1 ¶ 25.) There were also spills of TCE between 1965 and 1970. (DE 415-1 ¶ 26.) In many industries in general, TCE and perchloroethane ("PCE"), known as chlorinated volatile organic compounds ("cVOC"), have historically been widely used as solvents and degreasers. (DE 415-1 ¶ 8.)

In 1991, while conducting sampling pursuant to its facility closure plan with the Indiana Department of Environmental Management ("IDEM"), JCI detected TCE, PCE, and other cVOCs on the soil of the site and in the groundwater. (DE 422-1 ¶ 16; DE 415-1 ¶ 29.) Further testing showed that a contaminated groundwater plume extended underground toward nearby residential dwellings. (DE 422-1 ¶17.)

As relevant to this case, JCI sampled Plaintiff Becky Null's private well at her home at 1113 Sander Avenue, on February 6, 1992, but no contaminants were detected above the U.S. Environmental Protection Agency's applicable maximum contaminant levels. On February 24, 1992, JCI's Plant Engineering Manager, Joe McCorkel, mailed the results of the well water sample to Ms. Null. (DE 422-1 ¶ 20.) According to Ms. Null, she first knew about the "contamination in the neighborhood" "in 1991 when a contractor knocked on the door to conduct water sampling" (DE 422-1 ¶ 20), although she did not understand that groundwater was contaminated (Df.'s Ex-137 at 48:23–495). Ms. Null heard rumors that someone in the neighborhood who worked at JCI was sick with kidney disease and was paid off by JCI. (Pl.'s Ex. 103 at 185:14–188:20; 186:19–24.) Concerned that some contaminants were found in her well water, Ms. Null took the water sampling results to her son's neurologist to see if that had

anything to do with his medical condition (DE 422-1 ¶ 22), but the doctor said he did not know (Pl.'s Ex 103 at 49:9–12). In 1992, Ms. Null moved to 1214 Egbert and lived there for four years, when she moved across the street to 1213 Egbert.

After discovering that contamination had spread, JCI paid to install an additional water main in the area of underground water contamination and, by December 1993, connected the fourteen residences, including Ms. Null's, to the municipal water supply. (DE 422-1 ¶23.)

In 1994, with IDEM's approval, JCI installed an interceptor well on the site to pump groundwater so as to prevent contaminants from continuing to migrate off-site. (DE 422-1 ¶27.) On August 5, 1996, JCI enrolled the site in IDEM's Voluntary Remediation Program ("VRP") and signed a Voluntary Remediation Agreement ("VRA") with IDEM which obligated JCI to continue to investigate and remediate the site. IDEM can terminate JCI's participation in the VRP at any time and refer JCI to IDEM enforcement if IDEM believes that JCI is not acting in good faith, is not properly cleaning up the site, or is not acting in a timely manner. (DE 419-1 ¶ 90.) JCI has never been out of compliance with the requirements of the VRP and has performed all the work IDEM has requested. (DE 419-1 ¶ 89.) In paragraphs 54 through 92 of its statement of material facts in support of its motion for summary judgment on Plaintiffs ELA claims, JCI recounts in great detail its remediation efforts pursuant to the Remedial Work Plan that has been approved by IDEM. (DE 419-1 ¶¶ 54–92.) The account is largely undisputed (DE 434 ¶ 54–92) and establishes that JCI has been cleaning up the site and the surrounding area in accordance with the Remedial Work Plan. The VRA remains in effect to this day. (DE 422-1 ¶28.)

JCI's remediation at the site is primarily concerned with TCE. PCE degrades into TCE which, in turn, degrades to cis-1,2 dichloroethene ("DCE"), which degrades into vinyl chloride, which degrades into ethene, an innocuous gas. (DE 419-1 ¶ 51.) While the textbook version of

the chain reaction is easy enough to write out, in reality, various environmental circumstances have to be just right for the PCE to eventually degrade into ethene. Remediation of TCE will also remediate these other compounds. (DE 149-1 ¶52.)

In 2006, ten years after entering into the VRA, JCI was preparing to sell the site to Tocon Inc. As part of the preparations, JCI engaged Micro Air Inc. to prepare a detailed asbestos survey, mapping out the types and locations of asbestos in the buildings on the site. (DE 422-1 ¶29.) JCI sold the site to Tocon on June 1, 2007, and provided a copy of the 2006 asbestos survey as part of the sale. Consistent with its VRA, JCI retained the right to access, and the right to give IDEM access, to the site for the purposes of its ongoing soil and groundwater remediation. According to the agreement with Tocon, JCI could access any location on the site at any time. (DE 422-1 ¶32, 34.) For the next five years, JCI's remediation activities primarily consisted of pumping and treating the underground water through a network of wells. The sale agreement allowed Tocon to demolish the buildings on the site but required Tocon to pay to relocate the remediation equipment. (DE 422-1 ¶35.)

Tocon used the site for manufacturing operations for about one year, but shut it down because of the economic recession in 2008. In 2009, the Goshen Community Schools expressed an interest in acquiring the site from Tocon for use as athletic fields. In April 2012, to improve the value of the site, Tocon contracted with R&C Truck Service, whose principal was Richard Swift, to demolish the buildings on the site and to remove the demolition debris. (DE 422 ¶¶ 80–81.)

Under Indiana law, before demolition could commence, Tocon was obligated to file with IDEM a certification by an Indiana licensed asbestos contractor that any asbestos in the buildings would be abated before demolition. In addition, Tocon was supposed to get a permit from the

City of Goshen. On February 21, 2012, JCI's Director of Environment Jeff Werwie alerted

Becky Hershberger of the City of Goshen that Tocon was commencing demolition, apparently

without permits and without asbestos abatement. In response to Mr. Werwie's complaint, the

City inspected the site and issued a stop work order. Ms. Hershberger emailed Mr. Werwie

letting him know that IDEM would be stepping in as there were issues with asbestos abatement.

(DE 422-1 ¶ 88.)

Over the next two months, both IDEM and Mr. Werwie communicated to one of the

owners of Tocon, Tony Adkins, the need for Tocon to obtain permits from the city and to abate

asbestos. In April 2012, despite the City's stop work order remaining in effect, Tocon resumed

the demolition. On April 13, 2012, Mr. Werwie alerted Ms. Hershberger of the violation. (DE

422-1 ¶ 95.) On May 30, 2012, Tocon engaged an Indiana licensed asbestos inspector to oversee

asbestos abatement. Tocon also obtained demolition permits for some of the buildings on the

site, but the buildings continued being demolished in 2013 without proper asbestos abatement

certifications. (DE 422-1 ¶ 103–110.) Tocon finished the demolition in late 2013 or early 2014

leaving numerous piles of debris on the site. (DE 422-1 ¶ 114.)

It's unclear whether Tocon actually did any abatement in the buildings, and the parties

dispute how much JCI knew about whether Tocon was abating asbestos. On March 30, 2012, JCI

shut off the water remediation system. While the water treatment pumps were on, Mr. Werwie

was at the site twice a week. Once the pumps were shut off, he came less frequently. JCI

maintains that Mr. Werwie lacked actual knowledge whether Tocon was abating asbestos. (DE

422-1 ¶ 85.) However, he must have had his suspicions because he contacted the City of Goshen

and IDEM a number of times concerned that Tocon might have been demolishing the buildings

without adequate asbestos abatement. (DE 422-1 ¶ 85.) In fact, Mr. Werwie remarked at the time

that Tocon must have been doing asbestos abatement "in the middle of the night" because he never saw any such activity at the site. (DE 436 ¶ 85–86.) David Troup, who was operating at the site as an outside-contracted site operations supervisor for JCI, also had concerns about proper asbestos abatement, although he didn't know whether asbestos had been removed or if it was even there to begin with. (DE 422-1 ¶ 86.)

Tocon's ongoing demolition impeded certain of JCI's remediation activities for two years, including core sampling of soils which was done by drilling through the building slabs to access and sample the soil to locate solvent contamination. As of April 2014, the debris piles continued to impair access to locations on the site where GZA Environmental, JCI's environmental consultant, planned to conduct core sampling. On April 15, 2014, Mr. Werwie informed Carmen Anderson of IDEM that subslab sampling was on hold due to the demolition debris piles at the site. Ms. Anderson responded by recognizing that JCI's hands were tied "given the situation with the property owner" and added that "someone from IDEM's Immediate Removal section is going to contact Mr. Adkins regarding the debris on Site." (DE 422-1 ¶ 119.)

Anxious to resume core sampling of soils, JCI and GZA considered themselves moving the debris piles out of the way. (DE 422-1 ¶ 120.) On April 11, 2014, Mr. Werwie emailed Mr. Troup suggesting that someone should be hired to move the piles out of the way, but Mr. Troup responded that GZA's project manager Bernie Fenelon was hesitant to move any of the piles "due to the possible contamination." According to Mr. Troup, Mr. Fenelon was concerned that "if [they] moved it [they] could own it." Mr. Werwie replied saying, "I guess we are the only people that believe asbestos is present in the debris, because the City and IDEM are in denial that asbestos exists in the debris, otherwise they would have done something by now." (DE 415 ¶ 94–96.)

On May 28, 2014, Mr. Fenelon emailed Mr. Troup a map with proposed boring locations. (DE 415-1 ¶ 97; DE 440 ¶ 97.) Mr. Troup responded that he would contact Mr. Swift to see if he would move the debris. Later, Mr. Troup wrote that he had "a meeting setup up with Richard Swift to discuss movement of debris from the area surrounding the old degreaser tank, as well as MW29." (DE 415-1 ¶ 99.) Mr. Troup was requesting Mr. Swift to "move about 15 feet off the north end" of one of the debris piles that was blocking JCI's access for core drilling. (DE 422-1 ¶ 128.) Mr. Swift remained unresponsive to the request. (DE 440 ¶ 102.) In the end, it was a group effort involving First Federal Savings Bank, which holds the mortgage for the site, representatives from IDEM, Mr. Adkins, and Mr. Troup, communicating with each other and Mr. Swift, to make sure that Mr. Swift cleared a small area for GZA to be able to access the sampling locations. (DE 415-1 ¶¶ 99–101.) In June 2014, GZA collected 35 boring samples and 52 in September.

On December 3, 2014, Mr. Troup asked Mr. Swift to move soil and some debris along the north end of the site to allow JCI core sampling in that area. Mr. Swift did so, but he did not move enough of the material so Mr. Troup had him finish moving the balance later. (DE 422-1 ¶¶ 130–132; DE 436 ¶ 130; DE 415-1 ¶ 103–104.) At no time when moving the piles did Mr. Swift take any preventative measures against possible spread of asbestos.

The parties disagree whether asbestos was present on any of the material that Mr. Swift moved. JCI points out that no asbestos testing was done on any of the piles that Mr. Swift moved. Moreover, in February 2016, Plaintiffs expert, Dr. Vasiliki Keramida, collected 115 samples from the site of which less than half, 47 samples, tested positive for asbestos. (DE 422-1 ¶ 155.) There's no evidence that any of the samples were from the debris that was moved. Around the same time, EPA collected 24 samples of which 9 tested for asbestos. (DE 422-1 ¶

156.) JCI submits Tocon wasn't cited with any asbestos violations during the demolition and no evidence exists showing that Tocon did not actually abate asbestos before the demolition. (DE 422-1 ¶ 160.)

On the other hand, Plaintiffs point to JCI's own evidence indicating that JCI's pre-sale site survey showed that asbestos was present in the buildings and that JCI's representatives at the site never observed any abatement action before or during the demolition. Plaintiffs also cite to the EPA Action Memorandum issued on July 15, 2016, that describes the need for emergency clean up at the site:

> The demolition went forward with no (or grossly inadequate) abatement of asbestos. As a result, the site is covered with piles of asbestos-containing debris. Some of the asbestos is on the surface and can (and has) become airborne. The site is in a busy part of Goshen and near a public school and homes. The response actions proposed herein will continue the efforts made during the emergency removal action and are necessary to mitigate the threats to public health, welfare and the environment posed by the presence of uncontrolled asbestos waste abandoned in several waste piles located on the site.

(DE 415-1 ¶ 136; Pl.'s Ex 58, USEPA Action Memorandum at 1–2.) Plaintiffs further note that EPA viewed the post-demolition site as a potential threat to public health:

> Based on the damaged condition and presence of ACM [asbestos containing materials] within the debris piles observed during the site assessment, the debris at the site presents a potential threat to the public health or welfare or the environment through migration as windblown particles. Additionally, storm water runoff could cause migration of ACM offsite through storm drains and overland to residences.

(De 415-1 ¶ 137; Pl.'s Ex 58, USEPA Action Memorandum at 7.)

Plaintiffs insist that, as a result of the demolition, asbestos at the site became comingled with dust and debris throughout the site. (DE 415-1 ¶ 10; Pl.'s Ex. 44 at 50.) Plaintiffs' expert Jeffrey Rechtin testified that asbestos fibers are lighter than dust and can travel at least as far as the dust. (DE 415-1 ¶ 110–111.) For this reason, debris containing asbestos must be kept wet at all times, to prevent it from becoming airborne. Plaintiffs point out that, when EPA eventually

removed the debris from the site, the entire 7,000 tons of debris was treated as containing asbestos. (DE 422-1 ¶ 157; DE 436 ¶ 157.)

In addition, Plaintiffs believe that the wind carried dust containing asbestos to their homes during and after the demolition. Plaintiffs' meteorology expert, Dr. Adam Stepanek, analyzed the wind data near the site from 2012 until 2016 and opined that, out of a total of 1,509 days, wind blew toward Ms. Tovar's home for 141 days, Hostetlers' home for 169 days, Ms. Chairez's home for 213 days, and Ms. Null's home for 365 days. (DE 415-1 ¶¶ 108–111; DE 440 ¶ 109.) Each Plaintiff testified during their depositions that, beginning with the demolition, there was an increase in dust blowing from the site to their homes and covering outside and inside furniture. (DE 415-1 ¶¶ 119–132.) Plaintiffs do not quantify their alleged asbestos exposure, nor do their experts, and no one has tested the air at or around Plaintiffs' homes for asbestos at any time. (DE 422-1 ¶ 177.)

* * * * *


Rewinding back to 2009, JCI's monitoring and remediation contractor, GZA, became concerned that the pump-and-treat system was not fully capturing the cVOC mass. Testing showed a shallow groundwater plume off-site at the depth of about 10 feet. As a result, JCI began vapor intrusion investigations under IDEM's oversight, which led to vapor intrusion sampling in 15 homes immediately above the plume in early 2011.[1] (DE 422-1 ¶66.)

Between May 11 and May 13, 2011, GZA collected subslab and indoor air samples from Plaintiffs Amos and Debbie Hostetler's rental residence at 1118 East Monroe Street. The

---

[1] Vapor intrusion is the general term given to migration of volatile chemical vapors from a subsurface source, such as contaminated soil or groundwater, through the soil and into an overlying building. Shallow groundwater contamination can present such a risk. (DE 422-1 ¶42.)

Hostetlers were not informed what was being tested. Rather, their landlord simply told them "there would be some gentlemen coming to do a sample of the air." (JCI's Ex 21 at 95:25–96:11.) Mr. Hostetler wasn't home when the testing was done, and to Mrs. Hostetler's question as to what the home was being tested for, the workers only told her that they were "[j]ust checking the vapors in the air." (JCI's Ex. 21 at 97:8–11.) The test results were sent to the landlord, and the Hostetlers were never informed of the findings. Nevertheless, Ms. Hostetler testified that, in 2011, she "heard of there being an issue with chemicals in the ground from the plant." Also around that time, she discussed the "release of chemicals" at the site with her neighbors Richard and Marnie. (DE 422-1 ¶ 69.)

On June 14, 2011, GZA installed a subslab depressurization system at their residence to prevent vapor intrusion into the home from the groundwater. Mrs. Hostetler asked the workers why the system was being installed and they told her that "it was because of some vapors and because of some chemicals in the ground." (JCI Ex. 21 at 99:8–14.) When she asked if there was any cause for concern, "the guy in charge" said there was nothing to worry about. (JCI Ex. 21 at 99:20–100:4.) On August 15, GZA mailed Hostetlers a check for $135 to cover the electrical costs for operating the system for a year.

The IDEM residential and commercial indoor air screening levels for the following cVOCs are as follows:

|  | **Residential** in μg/m³ | **Commercial** in μg/m³ |
|---|---|---|
| **TCE** | 2.1 | 8.8 |
| **PCE** | 42 | 180 |
| **Vinyl Chloride** | 1.7 | 28 |
| **1, 2 dichloroethane (1,2 DCA)** | 1.1 | 4.7 |
| **1,1 dichloroethane (1,1 DCA)** | 18 | 77 |
| **1, 1, 1 TCA** | 5,200 | 22,000 |

(DE 422-1 ¶ 52.)

Before the depressurization system was installed at the Hostetlers' residence, subslab probes in their basement detected TCE at the rate of 100 $\mu g/m^3$. On the first floor, TCE was present at the rate 21 $\mu g/m^3$. (DE 422-1 ¶ 70.) No other contaminants were present above IDEM's applicable indoor air screening levels. Once the subslab depressurization system was installed, subsequent samplings detected some presence of TCE, PCE, and 1,2-dichloroethane in the residence (DE 436 ¶ 72), but none of them were above the IDEM indoor air screening levels. (DE 422-1 ¶72.)

JCI also sampled the indoor air at the Plaintiff Rita Chairez's residence at 1120 Sander in February 2018, collecting several samples. As with the Hostetlers' residence, although there were detectable quantities of TCE, PCE, and 1,2-dichloroethane, no contaminant was detected above IDEM's applicable indoor air screening levels. (DE 422 ¶ 73; DE 436 ¶ 73.)[i]

In 2011, JCI sampled 1113 Sander, Ms. Null's residence from 1988 until 1992. In the basement, TCE was present at the rate of 38 $\mu g/m^3$ and at the rate of 34 $\mu g/m^3$ on the first floor. In 2017 and 2019, JCI collected four air samples at 1214 Egbert, Ms. Null's residence from 1992 until 1996, and only 1,2-dichloroethane ("1,2-DCA") was detected above IDEM's applicable screening levels, at the rate of 1.8 $\mu g/m^3$. Ms. Null's most recent residence, 1213 Egbert, was sampled nine times in 2017–2019, and, again, only 1,2-DCA was detected above IDEM's threshold at the rate of 24 $\mu g/m^3$. However, other contaminants were found at detectable levels. (DE 422 ¶¶ 74–75; DE 436 ¶¶ 74–75.)

JCI sampled numerous times the indoor air of Plaintiff Maria Tovar's residence at 1109 Sander in 2011 and 2018. The only contaminant detected above IDEM's levels was 1,2-DCA which was present at the rate of 17 $\mu g/m3$. (DE 422-1 ¶ 76.) TCE and PCE were detected only in 2019, but below IDEM's applicable indoor air screening levels. (DE 436 ¶ 76.)

Plaintiffs' expert Dr. Keramida submits that sewers, utility lines, and utility line backfills could serve as preferential pathways through which subsurface vapors could migrate and enter homes and structures. (DE 415-1 ¶ 52.) Dr. Keramida estimates the following lower-bound levels for TCE vapor intrusion in Plaintiffs' homes:

- Hostetlers (2009–Present): 64.3–75.7 $\mu g/m^3$;
- Ms. Chairez (2009–Present): 46.7–55.2 $\mu g/m^3$;
- Ms. Tovar (1996–Present): 45.1–96.7 $\mu g/m^3$;
- Ms. Null (1988–1992): 51.9 $\mu g/m^3$;
          (1992–1996): 59.2 $\mu g/m^3$;
          (1996–2018): 60.8 $\mu g/m^3$.

 (DE 415-1 ¶ 63.)

JCI disputes Dr. Keramida's opinion that cVOCs can enter homes through sewer lines and disputes the soundness of Dr. Keramida's methodology in reaching her opinions and especially her conclusion that Hostetlers' residence remained vulnerable to vapor exposure after the depressurization system was installed.[ii] (DE 422 ¶ 63; DE 436 ¶ 63).

While the parties agree that the groundwater under Plaintiffs' homes was not a significant contributor of PCE (DE 422 ¶ 64; DE 436 ¶ 64), Dr. Keramida submits that contamination in the sewer lines running under the site and connected to Plaintiffs' homes "would contribute" PCE vapor levels above IDEM's norms. (DE 415-1 ¶ 64.)

According to the mathematical modeling by JCI's expert Dr. Helen Dawson, the worst-possible theoretical impact from TCE vapor intrusion in Plaintiffs' homes is as follows:

- Hostetlers (2009–until vapor mitigation system was installed in 2011): 66–120 $\mu g/m^3$;
- Ms. Chairez (2009–2018): 1.1–1.5 $\mu g/m^3$;
- Ms. Tovar (1996–2017): 3.1–6.2 $\mu g/m^3$;
- Ms. Null (1988–1992): 1.1–38 $\mu g/m^3$;
          (1992–1996): 1.7 $\mu g/m^3$;

(DE 415-1 ¶65; DE 436 ¶ 65.)

Chlorinated volatile organic compounds can also be present in the "background," as a result of general industrial pollution or through cleaning products, air fresheners, arts-and-crafts products, gun cleaners, and home maintenance produce. In other words, there can be cVOC sources other than the vapor intrusion. (DE 419-1 114–118.) The average vapor concentration from these sources is 0.02–2.7 µg/m$^3$ for TCE and 0.03–3.4 µg/m$^3$ for PCE. (DE 419-1 ¶ 117.)

* * * * *

No Plaintiff claims to have experienced a manifest disease or physical injury from their alleged exposures to TCE, PCE, or asbestos fibers. (DE 422-1 ¶ 179.) However, each Plaintiff claims, and their psychiatric expert confirms, that the exposures have resulted in their suffering extreme emotional distress because of fear of the possibility of future illness. (DE 415-1 ¶¶ 140–146.) JCI counters this evidence with reports from its psychiatric expert, Dr. Benedek, who opines that none of the Plaintiffs are suffering emotional distress as a result of exposure to chlorinated solvents or asbestos. (DE 440 ¶¶ 140–146.) Another of JCI's experts, Dr. Joseph Fedoruk, submits that chemical screening levels are not absolute indictors of health outcome resulting from chemical exposure:

> Because screening levels are considered health-protective, contaminant concentrations below screening levels can generally be interpreted as indicating the absence of any excess health risk. Conversely, however, exceedance of a screening level does not necessarily indicate an increased risk of an adverse health outcome, nor does it necessarily require a response action; rather it is intended to provide guidance for public health and regulatory decision-making.

(DE 422 ¶ 246.)

JCI's expert on asbestos exposures, Dr. Gabor Mezei, opined that Plaintiffs have not provided sufficient information from which to conclude that their health may have been jeopardized:

> [B]ecause Plaintiffs did not provide an estimated dose or other exposure metric regarding asbestos, there is insufficient information to conclude that potential exposure to chrysotile fibers, if any, associated with living in the vicinity of the Site increased Plaintiffs' risk of malignant mesothelioma, lunch cancer or asbestosis (e.g., asbestos related diseases).

(DE 422 ¶ 256.)

Of the five Plaintiffs, only Ms. Null owns or ever owned her residences. (DE 422-1 ¶ 235.) Ms. Null has not submitted any expert reports regarding the value of any of her homes and has not otherwise stated the amount of property damages she believes to have suffered as a result of contamination. (DE 422-1 ¶ 239.)


## C. Motions to Strike[2]

### 1. *Plaintiffs' Motion*

Plaintiffs moved to strike JCI's Exhibit 48 (2020 First Semiannual Report) which is referenced in the cited paragraph of JCI's Statement of Facts. In their motion, Plaintiffs object to Exhibit 48 because it was filed after the discovery period had passed and because it includes cVOC testing results collected after the close of fact and expert discovery. (DE 438-1 at 1–2.) JCI objects to the motion, noting that "[t]he only new data in the 2020 Report are testing results from samples taken after Winter 2019 and up to May 2020." (DE 444-1 at 4.) JCI points out that it is not using the Report to assert any new arguments but simply to support its position that any risk posed by cVOC contamination has not recurred. In addition, there are only several passages

---

[2] The *Material Facts* section already reflects the Court's rulings on the parties' motions to strike.

where JCI is referring to the new data exclusively. In their reply brief, Plaintiffs ask the Court to

disregard "sampling data generated during Fall of 2019 and Winter of 2020." (DE 451-1 at 3.)

While the new data does appear to be innocuous enough, they were produced after the discovery

period ended. Therefore, the Court will not be relying upon the new data for purposes of ruling

on the parties' motions for summary judgment. In summary, the Court will grant Plaintiffs'

motion to strike (DE 438) as modified in their reply brief (DE 451).


**2. *JCI's Motions***

JCI moved to strike references to the following opinions of Dr. Vasiliki Keramida:

- regarding the source or impact of any cVOC other than TCE and PCE, including 1,1,1

  trichloroethane (TCA). 1,2-dichloroethane (1,2-DCA), cis-1,2-dichloroethene (cis-1,2-

  DCE), trans-1,2-dichloroethene (trans1,2-DCE), and 1,1-dichloroethane (1,1-DCA); and

- that vapor mitigation systems "are not guaranteed to prevent intrusion of vapors into the

  indoor air" and are prone to malfunction.

JCI points out that these opinions seek to establish JCI's liability, yet they appeared for the first

time in Dr. Keramida's February 2019 Report that was expressly limited to causation and

damages, more than 18 months after the deadline for liability expert reports.

Plaintiffs characterize JCI's motion as a second bite at the Daubert apple and insist that if

JCI had issues with Dr. Keramida's opinions, it should have challenged them when the report

was filed, not at summary judgment. Plaintiffs argue that the opinions aren't new because they

had already been stated in the 2017 Report.

The Court agrees with JCI that the two opinions on liability in Dr. Keramida's 2019

Report are new and come too late because they were offered after the liability expert deadline

had expired. Moreover, Plaintiffs haven't shown that their failure to produce the opinions on time was "substantially justified or is harmless." Fed. R. Civ. P 37(c)(1). Before the 2019 Report, the only cVOC source opinion that Dr. Keramida had offered in this case was related to TCE. While she identified other contaminants in one short paragraph in her July 13, 2017, Class Report (DE 415-4 at 7–8), the statement does not constitute an opinion because it is conclusory and undeveloped. In fact, nearly the same statement was found to be insufficiently developed to constitute an expert opinion in *Schmucker v. Johnson Controls Inc.*, 3:14-cv-1593, DE 351 at 18 n.7 (N.D. Ind. Feb. 19, 2019).

Likewise, Dr. Keramida's opinions that vapor mitigations systems are unreliable wasn't offered before. In any case, an 8-point footnote to tables buried in the 200 pages of the 2019 Report is hardly worth being called an opinion. See Salgado by *Salgado v. Gen. Motors Corp.*, 150 F.3d 735, 742 n.6 (7th Cir. 1998) ("Rule 26(a) expert reports must be "detailed and complete.")

Accordingly, the Court will grant JCI's motion to strike (DE 442-1). But it's worth noting, that—essentially for the same reasons that the references to the two opinions are stricken from the Plaintiffs' summary judgment briefing—the opinions bring no value to Plaintiffs' case. In most instances TCA, 1,2-DCA, cis-1,2-DCE, trans-1,2-DCE, and 1,1-DCA were found only at detectable, not critical, levels. And the challenge to depressurization equipment—that vapor mitigation systems don't always work—does nothing to undermine the fact that wherever such systems were installed, cVOC detection became virtually nonexistent.

In a separate motion (DE 449), JCI moves to strike Dr. Keramida's opinions in her March 17, 2017, Report regarding whether contamination presents a risk to the City of Goshen's North Wellfield; the adequacy of mitigation system functioning; and the necessity for, and scope of,

remediation at and near the Site. JCI also asks the Court to strike the opinions of Plaintiffs'

medical experts, Drs. Peter Orris, Kenneth Spaeth, and Kathleen Gilbert, which the Court

previously excluded as unreliable and inadmissible under Rule 702 (DE 405).

JCI's request regarding the medical doctors is moot because the Court has already

excluded their opinions and will not rely upon them in deciding JCI's motions for summary

judgment regarding Plaintiffs' ELA claims.

The motion is also moot in relation to Dr. Keramida's opinions. Between the three cross-

motions for summary judgment, the Court has had to sift through many hundreds of pages, so it

appreciates JCI's effort to keep the Schmucker files with the *Schmucker* case and not to treat

them as if they're interchangeable. However, in evaluating the merits of JCI's motion for

summary judgment regarding Plaintiffs' ELA claims, the Court did not have to address any of

Dr. Keramida's opinions JCI is now challenging. Accordingly, the Court will deny its motion to

strike (DE 449) as moot.


**D. Discussion**

**1. *Environmental Legal Action***

JCI moved for summary judgment on Plaintiffs' claims under the Environmental Legal

Action ("ELA") statute, Indiana Code 13-30-9-1, et seq., arguing that they have not satisfied its

requirements. Namely, JCI submits that Plaintiffs have not incurred any obligation to pay costs

for removal or remediation actions; Plaintiffs claims are barred because JCI is immune because

of its participation in a VRP; and, to the extent that Plaintiffs request a clean-up order, ELA does

not provide for injunctive relief.

Section 2 of the ELA states that an action can be brought against a wrongdoer to recover the costs of clean up: "A person may . . . bring an environmental legal action against a person that caused or contributed to the release to recover reasonable costs of a removal or remedial action involving the hazardous substances or petroleum." Ind. Code § 13-30-9-2. This statutory clarity is also recognized in case law. *See Elkhart Foundry & Mach. Co. v. City of Elkhart Redevelopment Comm'n*, 112 N.E.3d 1123, 1128 (Ind. Ct. App. 2018) ("First, an ELA is an action for the recovery of cleanup costs, not an action for damage to real property. . . . In short, a cause of action for the recovery of cleanup costs does not accrue until a cleanup cost has been incurred.") (citing Ind. Code § 13-30-9-2)).

Plaintiffs set aside the plain language of the statute and argue that, a different section, Indiana Code § 34-11-2-11.5(b)(2), allows them to sue first and incur costs later. Plaintiffs misapply this provision. Indiana Code § 34-11-2-11.5 provides a 10-year window to sue from the time of incurring the costs of removal; it also states that the costs incurred after the lawsuit was filed can also be recovered. It does not, however, modify the requirement in § 13-30-9-2 that costs for removal action, etc. be incurred before the lawsuit is filed. Rather, it affirms that principle by incorporating § 13-30-9-2:

> [A] person may seek to recover the following . . . in an action under IC 13-30-9-2 or IC 13-23-13-8(b) to recover costs incurred for a removal action, a remedial action, or a corrective action:
>
> > (1) The costs incurred not more than ten (10) years before the date the action is brought, even if the person or any other person also incurred costs more than ten (10) years before the date the action is brought.
> >
> > (2) The costs incurred on or after the date the action is brought.

Ind. Code § 34-11-2-11.5(b).

Plaintiffs do not cite a single case where a court allowed an ELA claim to proceed before plaintiffs have incurred some removal or remediation costs.

Plaintiffs do suggest that, even if JCI is right, they have incurred "removal and remedial activity costs as disclosed to JCI in Plaintiff's Rule 26(a) Initial disclosures." (DE 433-1 at 4.) They argue that they engaged Dr. Keramida to "monitor, assess and evaluate JCE's release of chlorinated solvents, the Defendant's releases of asbestos, and the continuing effectiveness of JCI's response actions to date. Plaintiffs have repeatedly designated Dr. Keramida's invoices for these services in its Initial Disclosures and supplements." (*Id.*) Plaintiffs do not develop their argument beyond these bare assertions, and a passing reference to Dr. Keramida's entire file, without actual cost disclosures and computations, is insufficient to defeat a motion for summary judgment. *United States v. Lanzotti*, 205 F.3d 951, 957 (7th Cir. 2000) ("[P]erfunctory and undeveloped arguments, and arguments that are unsupported by pertinent authority, are waived"). While Plaintiffs submit that ELA definitions of "removal" and "remedial" actions encompass Dr. Keramida's work, as JCI points out, Dr. Keramida's file contains almost 74,000 pages, and Plaintiffs have not disclosed pursuant to Rule 26(a) what they consider in that file to be ELA costs that JCI is obligated to pay. (DE 445-1 at 4–5.) Dr. Keramida billed Plaintiffs' law firm under the same project number for the work in five cases in which she has been an expert and her bills don't single out what work she may have done on behalf of Plaintiffs. (*See, e.g.,* DE 423-25 at 145:12–16.) There's no way to tell if Dr. Keramida was "looking over the shoulder" of JCI's remediation consultant, *see, e.g.*, *Wickens v. Shell Oil Co., 2008 U.S. Dist. LEXIS 59734 (IN SD August 1, 2008) (noting that to be paid experts cannot merely copy the work of others),* or if she was performing her own work, or perhaps the work of litigation support.

There's an additional reason for granting JCI's motion for summary judgment on

Plaintiffs' ELA claim: having entered into the VRA, JCI is immune from ELA claims.

Subsection 18 of the ELA protects from suit those who have entered into a VRA and who meet

certain conditions:

> After an applicant and the department have signed a voluntary remediation agreement, a person may not bring an action . . . against the applicant . . . for any cause of action arising under this title or rules adopted under this title and relating to the release or threatened release of a hazardous substance . . . that is the subject of the agreement. However, this section does not apply if:
>
> (1) the applicant fails to file a proposed voluntary remediation work plan within the time period established in section 8(a)(8) of this chapter; [or]
>     . . .
>
> (3) the applicant . . . fails to complete a voluntary remediation in accordance with an approved voluntary remediation work plan.

Ind. Code § 13-25-5-18(g).

While this case was pending in state court, JCI moved to dismiss the ELA claim, but

Judge Terry Shewmaker of the Elkhart Circuit Court denied the motion on the grounds that JCI

had not completed the voluntary remediation work in accordance with the approved plan, so that

section 18(g) did not protect it from suit. (Judge Shewmaker's Op., DE 1-12 ¶ 13). Plaintiffs now

ask the Court to reaffirm that ruling. But Judge Shewmaker's ruling was in response to a motion

to dismiss where he had to accept as true Plaintiffs' allegations that JCI failed to complete

voluntary remediation in accordance with the VRP. At this stage, however, Plaintiffs must show

sufficient facts backing up allegations that JCI "fail[ed] to complete a voluntary remediation in

accordance with approved voluntary remediation plan," Ind. Code § 13-25-5-18(g), especially

given that they "do not dispute that IDEM has considered JCI to have complied with all work

that it required of JCI"[3] (DE 434 ¶ 89). Yet, no such facts are before the Court. In addition, Judge Shewmaker interpreted the statute as not granting immunity until the completion of the VRP (Judge Shewmaker's Op., DE 1-12 ¶ 13 ("Ind. Code 13-25-5-18(g) further requires that for immunity to apply the applicant must have <u>completed</u> (emphasis added) the voluntary remediation in accordance with the approved plan."), whereas the explicit language of the statute grants the immunity unless the applicant *fails* to complete the VRP. Remediation is completed only when IDEM issues "a certificate of completion," Ind. Code 13-25-5-18, which operates as "a covenant not to sue for any liability . . . ." Ind. Code § 13-25-5-18. Thus, subsection 18(g) protects an applicant in the interim because the applicant has no need for subsection 18(g) protection once it has completed its remediation and received a covenant not to sue. JCI is the beneficiary of such interim protection.

Plaintiffs also argue that JCI has no immunity because it has not submitted its work plan within 180 days of entering into a VRA with IDEM, as required by subsections (18)(g)(1) and (8)(a)(8). This argument has no merit because, although JCI signed a VRA with IDEM in 1996 and submitted its first work plan in 1997, this happened before the 180-day requirement was written into the statute. In other words, at the time JCI submitted its first work plan, there was no requirement to submit the plan within a certain number of days.

For all these reasons, the Court will grant JCI's motion for summary judgment on Plaintiffs' ELA claims.

---

[3] Plaintiffs do point out that evidence about JCI complying with the requirements of the VRP is from four years ago, but they have not pointed to anything establishing that, since then, JCI has been found non-compliant with the VRP thus far.

**C. Conclusion**

For these reasons, the Court—

- GRANTS IN PART Plaintiff's motion to strike (DE 438);

- GRANTS JCI's motion to strike (DE 442)

- DENIES AS MOOT JCI's motion to strike (DE 449);

- GRANTS JCI's motion for summary judgment on Plaintiffs' ELA claims (DE 417).

The Court will be issuing a separate order on the parties' motions for common law claims.

SO ORDERED.

ENTERED: September 30, 2021

                                      /s/ JON E. DEGUILIO
Chief Judge
United States District Court