UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
SOUTH BEND DIVISION

AMOS HOSTETLER, et al.,

     Plaintiffs,

     v.                                                    Case No. 3:15-CV-226 JD

JOHNSON CONTROLS INC, et al.,

     Defendants.

**<u>OPINION AND ORDER</u>**

Until 2006, Defendant Johnson Controls Inc. ("JCI") operated a manufacturing facility in Goshen, Indiana. The Plaintiffs are five persons who have lived near the facility. They sued JCI alleging that they have been exposed to various industrial contaminants that migrated to their homes. Plaintiffs claim that JCI is liable for trespass, nuisance, negligence, and negligent infliction of emotional distress as well as for violations of Indiana Environmental Legal Action ("ELA") statute. They seek compensatory and punitive damages.

On September 30, 2021, the Court granted JCI's motion for summary judgment on Plaintiffs' ELA claims. This order will address the parties' cross-motions for summary judgment on Plaintiffs' common law claims. Plaintiffs maintain that they're entitled to judgment as a matter of law on their trespass and nuisance claims, whereas JCI believes that no common law claim may proceed to trial. For the reasons stated below, the Court will deny Plaintiffs' motion in its entirety and will grant in part and deny in part JCI's motion regarding Plaintiffs' common law claims.

**A. Standard of Review**

On summary judgment, the burden is on the moving party to demonstrate that there "is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). That means that the Court must construe all facts in the light most favorable to the nonmoving party, making every legitimate inference and resolving every doubt in its favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). Summary judgment is not a tool to decide legitimately contested issues, and it may not be granted unless no reasonable jury could decide in favor of the nonmoving party. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). The party seeking summary judgment "bears the initial responsibility of informing the district court of the basis for its motion, and identifying" the evidence which "demonstrate[s] the absence of [a] genuine issue of material fact." *Id*. at 323. Once the moving party meets this burden, the nonmoving party may not rest on allegations or denials in its own pleading but must set out specific facts showing a genuine issue for trial. Fed. R. Civ. P. 56(c)(1); *Beard v. Whitley County REMC*, 840 F.2d 405, 410 (7th Cir. 1988). The disputed facts must be material, which means that they "might affect the outcome of the suit under the governing law." *Brown v. City of Lafayette*, 2010 WL 1570805, at *2 (N.D. Ind. Apr. 16, 2010). "If the nonmoving party fails to establish the existence of an element essential to his case, one on which he would bear the burden of proof at trial, summary judgment must be granted to the moving party." *Ortiz v. John O. Butler Co.*, 94 F.3d 1121, 1124 (7th Cir. 1996). Finally, in a case involving cross-motions for summary judgment, each party receives the benefit of all reasonable inferences when considering the opposing party's motion. *Tegtmeier v. Midwest Operating Eng'rs Pension Tr. Fund*, 390 F.3d 1040, 1045 (7th Cir. 2004).

**B. Material Facts**

Although the Court has already set forth the material facts in its order disposing of

Plaintiffs' ELA claims, it repeats them here for the sake of completeness:

Penn Controls began manufacturing operations at 1302 E. Monroe Street in Goshen,

Indiana, in 1937. It merged with JCI in 1968, which operated the facility until 2006. (DE 422-1 ¶

10.) JCI used the site to manufacture measuring devices used in commercial applications. (DE

422-1 ¶ 13.) Certain of the manufacturing processes required the use of a vapor degreaser that

used the solvent trichloroethylene ("TCE").  Between 1981 and 1998, the year that JCI ended the

use of TCE, there were at least six documented spills of TCE at the site. (DE 415-1 ¶ 25.) There

were also spills of TCE between 1965 and 1970. (DE 415-1 ¶ 26.) In many industries in general,

TCE and perchloroethane ("PCE"), known as chlorinated volatile organic compounds ("cVOC"),

have historically been widely used as solvents and degreasers. (DE 415-1 ¶ 8.)

In 1991, while conducting sampling pursuant to its facility closure plan with the Indiana

Department of Environmental Management ("IDEM"), JCI detected TCE, PCE, and other

cVOCs on the soil of the site and in the groundwater. (DE 422-1 ¶ 16; DE 415-1 ¶ 29.) Further

testing showed that a contaminated groundwater plume extended underground toward nearby

residential dwellings. (DE 422-1 ¶17.)

As relevant to this case, JCI sampled Plaintiff Becky Null's private well at her home at

1113 Sander Avenue, on February 6, 1992, but no contaminants were detected above the U.S.

Environmental Protection Agency's applicable maximum contaminant levels. On February 24,

1992, JCI's Plant Engineering Manager, Joe McCorkel, mailed the results of the well water

sample to Ms. Null. (DE 422-1 ¶ 20.) According to Ms. Null, she first knew about the

"contamination in the neighborhood" "in 1991 when a contractor knocked on the door to conduct

water sampling" (DE 422-1 ¶ 21), although she did not understand that groundwater was contaminated (Df.'s Ex-137 at 48:23–495). Ms. Null heard rumors that someone in the neighborhood who worked at JCI was sick with kidney disease and was paid off by JCI. (Pl.'s Ex. 103 at 185:14–188:20; 186:19–24.) Concerned that some contaminants were found in her well water, Ms. Null took the water sampling results to her son's neurologist to see if that had anything to do with his medical condition (DE 422-1 ¶ 22), but the doctor said he did not know (Pl.'s Ex 103 at 49:9–12). In 1992, Ms. Null moved to 1214 Egbert and lived there for four years, when she moved across the street to 1213 Egbert.

After discovering that contamination had spread, JCI paid to install an additional water main in the area of underground water contamination and, by December 1993, connected the fourteen residences, including Ms. Null's, to the municipal water supply. (DE 422-1 ¶23.)

In 1994, with IDEM's approval, JCI installed an interceptor well on the site to pump groundwater so as to prevent contaminants from continuing to migrate off-site. (DE 422-1 ¶27.) On August 5, 1996, JCI enrolled the site in IDEM's Voluntary Remediation Program ("VRP") and signed a Voluntary Remediation Agreement ("VRA") with IDEM which obligated JCI to continue to investigate and remediate the site. IDEM can terminate JCI's participation in the VRP at any time and refer JCI to IDEM enforcement if IDEM believes that JCI is not acting in good faith, is not properly cleaning up the site, or is not acting in a timely manner. (DE 419-1 ¶ 90.) JCI has never been out of compliance with the requirements of the VRP and has performed all the work IDEM has requested. (DE 419-1 ¶ 89.) In paragraphs 54 through 92 of its statement of material facts in support of its motion for summary judgment on Plaintiffs ELA claims, JCI recounts in great detail its remediation efforts pursuant to the Remedial Work Plan that has been approved by IDEM. (DE 419-1 ¶¶ 54–92.) The account is largely undisputed (DE 434 ¶ 54–92)

and establishes that JCI has been cleaning up the site and the surrounding area in accordance with the Remedial Work Plan. The VRA remains in effect to this day. (DE 422-1 ¶28.)

JCI's remediation at the site is primarily concerned with TCE. PCE degrades into TCE which, in turn, degrades to cis-1,2 dichloroethene ("DCE"), which degrades into vinyl chloride, which degrades into ethene, an innocuous gas. (DE 419-1 ¶ 51.) While the textbook version of the chain reaction is easy enough to write out, in reality, various environmental circumstances have to be just right for the PCE to eventually degrade into ethene. Remediation of TCE will also remediate these other compounds. (DE 149-1 ¶52.)

In 2006, ten years after entering into the VRA, JCI was preparing to sell the site to Tocon Inc. As part of the preparations, JCI engaged Micro Air Inc. to prepare a detailed asbestos survey, mapping out the types and locations of asbestos in the buildings on the site. (DE 422-1 ¶29.) JCI sold the site to Tocon on June 1, 2007, and provided a copy of the 2006 asbestos survey as part of the sale. Consistent with its VRA, JCI retained the right to access, and the right to give IDEM access, to the site for the purposes of its ongoing soil and groundwater remediation. According to the agreement with Tocon, JCI could access any location on the site at any time. (DE 422-1 ¶32, 34.) For the next five years, JCI's remediation activities primarily consisted of pumping and treating the underground water through a network of wells. The sale agreement allowed Tocon to demolish the buildings on the site but required Tocon to pay to relocate the remediation equipment. (DE 422-1 ¶35.)

Tocon used the site for manufacturing operations for about one year, but shut it down because of the economic recession in 2008. In 2009, the Goshen Community Schools expressed an interest in acquiring the site from Tocon for use as athletic fields. In April 2012, to improve the value of the site, Tocon contracted with R&C Truck Service, whose principal was Richard

Swift, to demolish the buildings on the site and to remove the demolition debris. (DE 422 ¶¶ 80–81.)

Under Indiana law, before demolition could commence, Tocon was obligated to file with IDEM a certification by an Indiana licensed asbestos contractor that any asbestos in the buildings would be abated before demolition. In addition, Tocon was supposed to get a permit from the City of Goshen. On February 21, 2012, JCI's Director of Environment Jeff Werwie alerted Becky Hershberger of the City of Goshen that Tocon was commencing demolition, apparently without permits and without asbestos abatement. In response to Mr. Werwie's complaint, the City inspected the site and issued a stop work order. Ms. Hershberger emailed Mr. Werwie letting him know that IDEM would be stepping in as there were issues with asbestos abatement. (DE 422-1 ¶ 88.)

Over the next two months, both IDEM and Mr. Werwie communicated to one of the owners of Tocon, Tony Adkins, the need for Tocon to obtain permits from the city and to abate asbestos. In April 2012, despite the City's stop work order remaining in effect, Tocon resumed the demolition. On April 13, 2012, Mr. Werwie alerted Ms. Hershberger of the violation. (DE 422-1 ¶ 95.) On May 30, 2012, Tocon engaged an Indiana licensed asbestos inspector to oversee asbestos abatement. Tocon also obtained demolition permits for some of the buildings on the site, but the buildings continued being demolished in 2013 without proper asbestos abatement certifications. (DE 422-1 ¶ 103–110.) Tocon finished the demolition in late 2013 or early 2014 leaving numerous piles of debris on the site. (DE 422-1 ¶ 114.)

It's unclear whether Tocon actually did any abatement in the buildings, and the parties dispute how much JCI knew about whether Tocon was abating asbestos. On March 30, 2012, JCI shut off the water remediation system. While the water treatment pumps were on, Mr. Werwie

was at the site twice a week. Once the pumps were shut off, he came less frequently. JCI maintains that Mr. Werwie lacked actual knowledge whether Tocon was abating asbestos. (DE 422-1 ¶ 85.) However, he must have had his suspicions because he contacted the City of Goshen and IDEM a number of times concerned that Tocon might have been demolishing the buildings without adequate asbestos abatement. (DE 422-1 ¶ 85.) In fact, Mr. Werwie remarked at the time that Tocon must have been doing asbestos abatement "in the middle of the night" because he never saw any such activity at the site. (DE 436 ¶ 85–86.) David Troup, who was operating at the site as an outside-contracted site operations supervisor for JCI, also had concerns about proper asbestos abatement, although he didn't know whether asbestos had been removed or if it was even there to begin with. (DE 422-1 ¶ 86.)

Tocon's ongoing demolition impeded certain of JCI's remediation activities for two years, including core sampling of soils which was done by drilling through the building slabs to access and sample the soil to locate solvent contamination. As of April 2014, the debris piles continued to impair access to locations on the site where GZA Environmental, JCI's environmental consultant, planned to conduct core sampling. On April 15, 2014, Mr. Werwie informed Carmen Anderson of IDEM that subslab sampling was on hold due to the demolition debris piles at the site. Ms. Anderson responded by recognizing that JCI's hands were tied "given the situation with the property owner" and added that "someone from IDEM's Immediate Removal section is going to contact Mr. Adkins regarding the debris on Site." (DE 422-1 ¶ 119.)

Anxious to resume core sampling of soils, JCI and GZA considered themselves moving the debris piles out of the way. (DE 422-1 ¶ 120.) On April 11, 2014, Mr. Werwie emailed Mr. Troup suggesting that someone should be hired to move the piles out of the way, but Mr. Troup responded that GZA's project manager Bernie Fenelon was hesitant to move any of the piles

"due to the possible contamination." According to Mr. Troup, Mr. Fenelon was concerned that "if [they] moved it [they] could own it." Mr. Werwie replied saying, "I guess we are the only people that believe asbestos is present in the debris, because the City and IDEM are in denial that asbestos exists in the debris, otherwise they would have done something by now." (DE 415 ¶ 94–96.)

On May 28, 2014, Mr. Fenelon emailed Mr. Troup a map with proposed boring locations. (DE 415-1 ¶ 97; DE 440 ¶ 97.) Mr. Troup responded that he would contact Mr. Swift to see if he would move the debris. Later, Mr. Troup wrote that he had "a meeting setup up with Richard Swift to discuss movement of debris from the area surrounding the old degreaser tank, as well as MW29." (DE 415-1 ¶ 99.) Mr. Troup was requesting Mr. Swift to "move about 15 feet off the north end" of one of the debris piles that was blocking JCI's access for core drilling. (DE 422-1 ¶ 128.) Mr. Swift remained unresponsive to the request. (DE 440 ¶ 102.) In the end, it was a group effort involving First Federal Savings Bank, which holds the mortgage for the site, representatives from IDEM, Mr. Adkins, and Mr. Troup, communicating with each other and Mr. Swift, to make sure that Mr. Swift cleared a small area for GZA to be able to access the sampling locations. (DE 415-1 ¶¶ 99–101.) In June 2014, GZA collected 35 boring samples and 52 in September.

On December 3, 2014, Mr. Troup asked Mr. Swift to move soil and some debris along the north end of the site to allow JCI core sampling in that area. Mr. Swift did so, but he did not move enough of the material so Mr. Troup had him finish moving the balance later. (DE 422-1 ¶¶ 130–132; DE 436 ¶ 130; DE 415-1 ¶ 103–104.) At no time when moving the piles did Mr. Swift take any preventative measures against possible spread of asbestos.

The parties disagree whether asbestos was present on any of the material that Mr. Swift moved. JCI points out that no asbestos testing was done on any of the piles that Mr. Swift moved. Moreover, in February 2016, Plaintiffs expert, Dr. Vasiliki Keramida, collected 115 samples from the site of which less than half, 47 samples, tested positive for asbestos. (DE 422-1 ¶ 155.) There's no evidence that any of the samples were from the debris that was moved. Around the same time, EPA collected 24 samples of which 9 tested for asbestos. (DE 422-1 ¶ 156.) JCI submits Tocon wasn't cited with any asbestos violations during the demolition and no evidence exists showing that Tocon did not actually abate asbestos before the demolition. (DE 422-1 ¶ 160.)

On the other hand, Plaintiffs point to JCI's own evidence indicating that JCI's pre-sale site survey showed that asbestos was present in the buildings and that JCI's representatives at the site never observed any abatement action before or during the demolition. Plaintiffs also cite to the EPA Action Memorandum issued on July 15, 2016, that describes the need for emergency clean up at the site:

> The demolition went forward with no (or grossly inadequate) abatement of asbestos. As a result, the site is covered with piles of asbestos-containing debris. Some of the asbestos is on the surface and can (and has) become airborne. The site is in a busy part of Goshen and near a public school and homes. The response actions proposed herein will continue the efforts made during the emergency removal action and are necessary to mitigate the threats to public health, welfare and the environment posed by the presence of uncontrolled asbestos waste abandoned in several waste piles located on the site.

(DE 415-1 ¶ 136; Pl.'s Ex 58, USEPA Action Memorandum at 1–2.) Plaintiffs further note that EPA viewed the post-demolition site as a potential threat to public health:

> Based on the damaged condition and presence of ACM [asbestos containing materials] within the debris piles observed during the site assessment, the debris at the site presents a potential threat to the public health or welfare or the environment through migration as windblown particles. Additionally, storm water runoff could cause migration of ACM offsite through storm drains and overland to residences.

(De 415-1 ¶ 137; Pl.'s Ex 58, USEPA Action Memorandum at 7.)

Plaintiffs insist that, as a result of the demolition, asbestos at the site became comingled with dust and debris throughout the site. (DE 415-1 ¶ 10; Pl.'s Ex. 44 at 50.) Plaintiffs' expert Jeffrey Rechtin testified that asbestos fibers are lighter than dust and can travel at least as far as the dust. (DE 415-1 ¶ 110–111.) For this reason, debris containing asbestos must be kept wet at all times, to prevent it from becoming airborne. Plaintiffs point out that, when EPA eventually removed the debris from the site, the entire 7,000 tons of debris was treated as containing asbestos. (DE 422-1 ¶ 157; DE 436 ¶ 157.)

In addition, Plaintiffs believe that the wind carried dust containing asbestos to their homes during and after the demolition. Plaintiffs' meteorology expert, Dr. Adam Stepanek, analyzed the wind data near the site from 2012 until 2016 and opined that, out of a total of 1,509 days, wind blew toward Ms. Tovar's home for 141 days, the Hostetlers' home for 169 days, Ms. Chairez's home for 213 days, and Ms. Null's home for 365 days. (DE 415-1 ¶¶ 108–111; DE 440 ¶ 109.) Each Plaintiff testified during their depositions that, beginning with the demolition, there was an increase in dust blowing from the site to their homes and covering outside and inside furniture. (DE 415-1 ¶¶ 119–132.) Plaintiffs do not quantify their alleged asbestos exposure, nor do their experts, and no one has tested the air at or around Plaintiffs' homes for asbestos at any time. (DE 422-1 ¶ 177.)

\* \* \* \* \*

Rewinding back to 2009, JCI's monitoring and remediation contractor, GZA, became concerned that the pump-and-treat system was not fully capturing the cVOC mass. Testing showed a shallow groundwater plume off-site at the depth of about 10 feet. As a result, JCI

began vapor intrusion investigations under IDEM's oversight, which led to vapor intrusion sampling in 15 homes immediately above the plume in early 2011.[1] (DE 422-1 ¶66.)

Between May 11 and May 13, 2011, GZA collected subslab and indoor air samples from Plaintiffs Amos and Debbie Hostetler's rental residence at 1118 East Monroe Street. The Hostetlers were not informed what was being tested. Rather, their landlord simply told them "there would be some gentlemen coming to do a sample of the air." (JCI's Ex 21 at 95:25–96:11.) Mr. Hostetler wasn't home when the testing was done, and to Mrs. Hostetler's question as to what the home was being tested for, the workers only told her that they were "[j]ust checking the vapors in the air." (JCI's Ex. 21 at 97:8–11.) The test results were sent to the landlord, and the Hostetlers were never informed of the findings. Nevertheless, Ms. Hostetler testified that, in 2011, she "heard of there being an issue with chemicals in the ground from the plant." Also around that time, she discussed the "release of chemicals" at the site with her neighbors Richard and Marnie. (DE 422-1 ¶ 69.)

On June 14, 2011, GZA installed a subslab depressurization system at their residence to prevent vapor intrusion into the home from the groundwater. Mrs. Hostetler asked the workers why the system was being installed and they told her that "it was because of some vapors and because of some chemicals in the ground." (JCI Ex. 21 at 99:8–14.) When she asked if there was any cause for concern, "the guy in charge" said there was nothing to worry about. (JCI Ex. 21 at 99:20–100:4.) On August 15, GZA mailed Hostetlers a check for $135 to cover the electrical costs for operating the system for a year.

---

[1] Vapor intrusion is the general term given to migration of volatile chemical vapors from a subsurface source, such as contaminated soil or groundwater, through the soil and into an overlying building. Shallow groundwater contamination can present such a risk. (DE 422-1 ¶42.)

The IDEM residential and commercial indoor air screening levels for the following cVOCs are as follows:

|  | **Residential** in $\mu g/m^3$ | **Commercial** in $\mu g/m^3$ |
|---|---|---|
| **TCE** | 2.1 | 8.8 |
| **PCE** | 42 | 180 |
| **Vinyl Chloride** | 1.7 | 28 |
| **1, 2 dichloroethane (1,2 DCA)** | 1.1 | 4.7 |
| **1,1 dichloroethane (1,1 DCA)** | 18 | 77 |
| **1, 1, 1 TCA** | 5,200 | 22,000 |

(DE 422-1 ¶ 52.)

Before the depressurization system was installed at the Hostetlers' residence, subslab probes in their basement detected TCE at the rate of 100 $\mu g/m^3$. On the first floor, TCE was present at the rate 21 $\mu g/m^3$. (DE 422-1 ¶ 70.) No other contaminants were present above IDEM's applicable indoor air screening levels. Once the subslab depressurization system was installed, subsequent samplings detected some presence of TCE, PCE, and 1,2-dichloroethane in the residence (DE 436 ¶ 72), but none of them were above the IDEM indoor air screening levels. (DE 422-1 ¶72.)

JCI also sampled the indoor air at the Plaintiff Rita Chairez's residence at 1120 Sander in February 2018, collecting several samples. As with the Hostetlers' residence, although there were detectable quantities of TCE, PCE, and 1,2-dichloroethane, no contaminant was detected above IDEM's applicable indoor air screening levels. (DE 422 ¶ 73; DE 436 ¶ 73.)[i]

In 2011, JCI sampled 1113 Sander, Ms. Null's residence from 1988 until 1992. In the basement, TCE was present at the rate of 38 $\mu g/m^3$ and at the rate of 34 $\mu g/m^3$ on the first floor. In 2017 and 2019, JCI collected four air samples at 1214 Egbert, Ms. Null's residence from 1992 until 1996, and only 1,2-dichloroethane ("1,2-DCA") was detected above IDEM's applicable screening levels, at the rate of 1.8 $\mu g/m^3$. Ms. Null's most recent residence, 1213 Egbert, was

sampled nine times in 2017–2019, and, again, only 1,2-DCA was detected above IDEM's threshold at the rate of 24 μg/m$^3$. However, other contaminants were found at detectable levels. (DE 422 ¶¶ 74–75; DE 436 ¶¶ 74–75.)

JCI sampled numerous times the indoor air of Plaintiff Maria Tovar's residence at 1109 Sander in 2011 and 2018. The only contaminant detected above IDEM's levels was 1,2-DCA which was present at the rate of 17 μg/m3. (DE 422-1 ¶ 76.) TCE and PCE were detected only in 2019, but below IDEM's applicable indoor air screening levels. (DE 436 ¶ 76.)

Plaintiffs' expert Dr. Keramida submits that sewers, utility lines, and utility line backfills could serve as preferential pathways through which subsurface vapors could migrate and enter homes and structures. (DE 415-1 ¶ 52.) Dr. Keramida estimates the following lower-bound levels for TCE vapor intrusion in Plaintiffs' homes:

- Hostetlers (2009–Present): 64.3–75.7 μg/m$^3$;
- Ms. Chairez (2009–Present): 46.7–55.2 μg/m$^3$;
- Ms. Tovar (1996–Present): 45.1–96.7 μg/m$^3$;
- Ms. Null (1988–1992): 51.9 μg/m$^3$;
     (1992–1996): 59.2 μg/m$^3$;
     (1996–2018): 60.8 μg/m$^3$.

 (DE 415-1 ¶ 63.)

JCI disputes Dr. Keramida's opinion that cVOCs can enter homes through sewer lines and disputes the soundness of Dr. Keramida's methodology in reaching her opinions and especially her conclusion that Hostetlers' residence remained vulnerable to vapor exposure after the depressurization system was installed.[ii] (DE 422 ¶ 63; DE 436 ¶ 63).

While the parties agree that the groundwater under Plaintiffs' homes was not a significant contributor of PCE (DE 422 ¶ 64; DE 436 ¶ 64), Dr. Keramida submits that contamination in the sewer lines running under the site and connected to Plaintiffs' homes "would contribute" PCE vapor levels above IDEM's norms. (DE 415-1 ¶ 64.)

According to the mathematical modeling by JCI's expert Dr. Helen Dawson, the worst-possible theoretical impact from TCE vapor intrusion in Plaintiffs' homes is as follows:

- Hostetlers (2009–until vapor mitigation system was installed in 2011): 66–120 $\mu g/m^3$;
- Ms. Chairez (2009–2018): 1.1–1.5 $\mu g/m^3$;
- Ms. Tovar (1996–2017): 3.1–6.2 $\mu g/m^3$;
- Ms. Null (1988–1992): 1.1–38 $\mu g/m^3$;
    (1992–1996): 1.7 $\mu g/m^3$;

(DE 415-1 ¶65; DE 436 ¶ 65.)

Chlorinated volatile organic compounds can also be present in the "background," as a result of general industrial pollution or through cleaning products, air fresheners, arts-and-crafts products, gun cleaners, and home maintenance produce. In other words, there can be cVOC sources other than the vapor intrusion. (DE 419-1 114–118.) The average vapor concentration from these sources is 0.02–2.7 $\mu g/m^3$ for TCE and 0.03–3.4 $\mu g/m^3$ for PCE. (DE 419-1 ¶ 117.)

\* \* \* \* \*

No Plaintiff claims to have experienced a manifest disease or physical injury from their alleged exposures to TCE, PCE, or asbestos fibers. (DE 422-1 ¶ 179.) However, each Plaintiff claims, and their psychiatric expert confirms, that the exposures have resulted in their suffering extreme emotional distress because of fear of the possibility of future illness. (DE 415-1 ¶¶ 140–146.) JCI counters this evidence with reports from its psychiatric expert, Dr. Benedek, who opines that none of the Plaintiffs are suffering emotional distress as a result of exposure to chlorinated solvents or asbestos. (DE 440 ¶¶ 140–146.) Another of JCI's experts, Dr. Joseph Fedoruk, submits that chemical screening levels are not absolute indictors of health outcome resulting from chemical exposure:

> Because screening levels are considered health-protective, contaminant concentrations below screening levels can generally be interpreted as indicating the absence of any excess health risk. Conversely, however, exceedance of a screening level does not necessarily indicate an increased risk of an adverse health outcome, nor does it necessarily require a response action; rather it is intended to provide guidance for public health and regulatory decision-making.

(DE 422 ¶ 246.)

JCI's expert on asbestos exposures, Dr. Gabor Mezei, opined that Plaintiffs have not provided sufficient information from which to conclude that their health may have been jeopardized:

> [B]ecause Plaintiffs did not provide an estimated dose or other exposure metric regarding asbestos, there is insufficient information to conclude that potential exposure to chrysotile fibers, if any, associated with living in the vicinity of the Site increased Plaintiffs' risk of malignant mesothelioma, lunch cancer or asbestosis (e.g., asbestos related diseases).

(DE 422 ¶ 256.)

Of the five Plaintiffs, only Ms. Null owns or ever owned her residences. (DE 422-1 ¶ 235.) Ms. Null has not submitted any expert reports regarding the value of any of her homes and has not otherwise stated the amount of property damages she believes to have suffered as a result of contamination. (DE 422-1 ¶ 239.)

## C. Discussion

### 1. *Statute of Limitations*

Plaintiffs filed their lawsuit in May 2014. The parties agree that the two-year statute of limitations in Indiana Code 34-11-2-4(a)(1) governs the Plaintiffs' claims for personal injuries arising from cVOC exposure. Under the discovery rule, "the statute of limitations begins to run when the plaintiff knew or, in the exercise of ordinary diligence, could have discovered that an injury had been sustained as a result of the tortious act of another." *Wehling v. Citizens Nat.*

*Bank*, 586 N.E.2d 840, 843 (Ind. 1992). "For a cause of action to accrue, it is not necessary that the full extent of the damage be known or even ascertainable but only that some ascertainable damage has occurred." *Doe v. United Methodist Church*, 673 N.E.2d 839, 842 (Ind. Ct. App. 1996). The exercise of reasonable diligence is an objective standard:

> The exercise of reasonable diligence means simply that an injured party must act with some promptness where the acts and circumstances of an injury would put a person of common knowledge and experience on notice that some right of his has been invaded or that some claim against another party might exist.

*Arflack v. Town of Chandler*, 27 N.E.3d 297, 303 (Ind. Ct. App. 2015). "The determination of when a cause of action accrues is a question for the court." *Id.* at 842. Nevertheless, "[w]hen application of a statute of limitation rests on questions of fact, it is generally an issue for a jury to decide." *Cooper Indus., LLC v. City of S. Bend*, 899 N.E.2d 1274, 1279 (Ind. 2009); *see also Malachowski v. Bank One, Indianapolis*, 590 N.E.2d 559, 564 (Ind. 1992) (denying summary judgment where question of fact exists as to whether ordinary diligence should have led to discovery of cause of action).

JCI argues that the Hostetlers' cVOC intrusion claims and Ms. Null's claims related to her residency at 1113 Sander, from which she moved in 1992, are time barred. To evaluate these assertions, the Court must first identify the allegedly tortious conduct directed toward the Hostetlers and Ms. Null and their alleged injuries. The Court must then determine when this tortious conduct and circumstances of an injury put them (as persons of common knowledge and experience) on notice that some right of theirs has been invaded or that some claim against JCI might exist. *See Arflack*, 27 N.E.3d at 303.

Plaintiffs claim that JCI's tortious conduct consisted of spilling noxious chemicals on its manufacturing site which have migrated over to their homes as cVOCs. As for their injuries, both sides seem to focus exclusively on emotional distress for fear of future illness as a result of

16

the exposure, but those aren't the only possible injuries. Rather, Plaintiffs may also seek general damages for their annoyance, loss of enjoyment, disruption, inconvenience and discomfort, as well as emotional and physical burden of dealing with the hazards.[2] *See Barlow v. GMC*, 595 F. Supp. 2d 929, 939–940 (S.D. Ind. Jan. 20, 2009) (detailing the kinds of general damages available for torts of nuisance or trespass in addition to property damages). Therefore, in deciding when the statute of limitations began to run, the Court considers the advent of all alleged injuries, not just emotional distress arising out of fear of future illnesses.

When Ms. Null lived at 1113 Sander, JCI sampled her private well on February 6, 1992, but no contaminants were detected above the U.S. Environmental Protection Agency's applicable maximum contaminant levels. Several weeks later, JCI's Plant Engineering Manager mailed the sampling results to Ms. Null. According to Ms. Null, that's when she first learned about the contamination in the neighborhood (DE 422-1 ¶ 20), although she did not understand that the groundwater was contaminated (Df.'s Ex-137 at 48:23–495)  Ms. Null also heard the rumors in the neighborhood of contamination and that someone who lived in the neighborhood and worked for JCI had become sick with kidney disease and had been paid off by JCI. Concerned with the test results she took them to her son's neurologist to see if the chemicals had anything to do with his medical condition. The doctor told her he did not know.

These facts do not establish that, when Ms. Null received the water test results, she knew or could have discovered that she had sustained an injury. JCI argues that the statute of limitations began to run when she learned that the cVOCs were present in her well water because her claim of emotional distress for fear of future illness is based on her belief that any amount of

---

[2] The Court is not suggesting that those are all the injuries Plaintiffs have suffered; the Court is only observing that the scope of injuries may be broader than just the emotional distress for fear of future illness.

toxins may be detrimental to her health. But JCI stretches Plaintiffs' theory of the case. Plaintiffs do not claim that even a short-term exposure entitles them to damages, so that Ms. Null should have immediately realized, or through ordinary diligence should have discovered, that she has had "some ascertainable damage." *United Methodist Church*, 673 N.E.2d at 842; *see also Malachowski*, 590 N.E.2d at 564. Rather, Plaintiffs insist that they have been breathing toxic vapors over many years, and in Ms. Null circumstances, since at least 1992. Therefore, a one-time water test that did not show toxins above allowable levels and did not require an immediate remediation was insufficient to put Ms. Null on notice of a possible wrongdoing. In addition, as explained above, emotional distress for fear of future illness is not the only kind of damage available to Plaintiffs if they prevail in their case. JCI does not identify any other point of time when the statute of limitations began to run, so the Court does not need to consider this issue any further. Accordingly, the Court will deny JCI's motion for summary judgment on this issue.

On the other hand, the Hostetlers filed their claims related to the cVOC intrusion too late. GZA collected subslab samples in their home around May 13, 2011, and when Mrs. Hostetler asked what was being sampled for, she was told that they were "just checking for vapors in the air. (JCI Ex. 212 at 97:8–11.) Although the test results were not sent to them, a month later GZA installed a subslab depressurization system at their residence. To Mrs. Hostetler's inquiry why the system was being installed, the workers told her that "it was because of some vapors and because of some chemicals in the ground." Two months later, in July 2011, the Hostetlers received a check from GZA to cover the cost of operating the system for a year. Although the installers told Mrs. Hostetler there was nothing to worry about, these events put the Hostetlers on notice that something was amiss and further investigation may have been warranted to determine if they have sustained any injuries. *See Katzioris*, 908 N.E.2d 1183, 1188 (testing and

remediation activity constituted "sufficient information to cause [plaintiff] to inquire further in order to determine whether a legal wrong [had] occurred"). Their circumstances were different from Ms. Null's whose water well was not treated at the time she learned of the presence of the chemicals. And although the Hostetlers did not know the cVOC levels in their home, they had reason to be concerned that they were breathing in toxic vapors. After all, Mrs. Hostetler was told that JCI installed the depressurization system "because of some vapors and because of some chemicals in the ground." In addition, JCI paid for the cost of electricity to operate the system. A reasonably prudent person would have suspected that this wasn't an ordinary event and further investigation was warranted to determine if an injury had been sustained.

To the extent that the Hostetlers claim that the depressurization system has not remediated the cVOC vapor intrusion, they are claiming a continuing wrong for which, generally, "the limitations period begins to run at the end of the continuing wrongful act." *Chariton v. City of Hammond*, 146 N.E.3d 927, 936 (Ind. Ct. App. 2020). However, "the doctrine of continuing wrong will not prevent the statute of limitations from beginning to run when the plaintiff learns of facts which should lead to the discovery of his cause of action even if his relationship with the tortfeasor continues beyond that point." *Id.* As explained above, by July 2011, the Hostetlers were on notice that they may have been breathing chemical vapors, so their claims are untimely no matter if vapors continued to impact their home.[3] Therefore, the Court will grant JCI's motion for summary judgment as to the Hostetlers.

---

[3] Although the Court will continue referring to the parties as "Plaintiffs" and "JCI," the Hostetlers should not be counted among them in relation to claims involving the cVOC vapor intrusion.

**2. *Trespass***

Both sides have moved for summary judgment on Plaintiffs' trespass claims. "In Indiana, '[e]very unauthorized entry on the land of another constitutes a trespass.'" *Reed v. Reid*, 980 N.E.2d 277, 294 (Ind. 2012). "The defendant in a trespass action need not have personally entered upon the plaintiff's land, but may trespass by causing a thing to enter the land." *Id.* Trespass is an intentional tort, and "it is required for trespass that there be an intentional act and an intent to do the very act which results in the trespass." *Garner v. Kovalak*, 817 N.E.2d 311, 314 (Ind. Ct. App. 2004) (quoting *Hawke v. Maus*, 226 N.E.2d 713, 716 (Ind. Ct. App. 1967)). Without proof of injury, nominal damages are available; if there's injury to the property, plaintiff is entitled to compensatory damages. *Hawke v. Maus*, 226 N.E.2d 713, 717 (1967). As noted above, supra at 17, Plaintiffs may also seek general damages for their annoyance, loss of enjoyment, disruption, inconvenience and discomfort, as well as emotional and physical burden of dealing with the hazards. *See Barlow*, 595 F. Supp. 2d at 939–940.

Although they're categorized under the same cause of action, Plaintiffs in reality have two kinds of trespass claims: for the cVOC intrusion in their homes and for asbestos. The Court will handle them in turn, beginning with the Plaintiffs' motion for summary judgment regarding the cVOC intrusion.

*a.   cVOC Intrusion*

Plaintiffs submit that chlorinated solvents were released from JCI's former facility over more than fifty years of operation. There have been at least six spills of TCE at the site since 1981 and several more before then. The cVOCs have impacted the soil and groundwater beneath the site and have migrated under the Plaintiffs' neighborhood. Plaintiffs' expert Dr. Keramida

has opined that Plaintiffs have been exposed to TCE and PCE through vapor intrusion into their homes from the groundwater and city sewer lines. (DE 415-1 at 52–65.) In fact, JCI has been remediating the effects of its spills for the last twenty years.

If uncontested, these facts are enough in Indiana to subject JCI to trespass liability. *See Lever Bros. Co. v. Langdoc*, 655 N.E.2d 577, 582 (Ind. Ct. App. 1995) (finding that defendant's release of noxious materials into the city sewer system that eventually entered plaintiff's property constituted a negligent trespass). While JCI disagrees with the holding in *Lever Brothers*, arguing that it is an outlier case in Indiana and that Indiana does not recognize the doctrine of negligent trespass, its one-paragraph argument is conclusory and offers no authority distinguishing *Lever Brothers* from the situation at hand. Nevertheless, in addressing Plaintiffs' motion for summary judgment, JCI has shown that a genuine issue of material fact exists as to whether the cVOCs sourced to the site actually entered the Plaintiffs' homes so as to constitute trespass. Namely, JCI disputes that the cVOCs from the site reached the homes of Ms. Tovar and Ms. Chairez, and the three residences of Ms. Null. JCI insists that, to the extent the cVOCs were detected in those homes, they were trace amounts commensurate with background sources, not the site. (DE 439-1 at 5.) JCI acknowledges that TCE likely sourced to the site was detected inside Ms. Null's first residence in 2011, almost 20 years after Ms. Null moved out, but it disputes that vapors had reached her home when she lived there. (DE 439-1 at 4.) Likewise, JCI acknowledges that Ms. Null's well water tested for the cVOCs in 1992 but notes that those detections were within drinking water limits. Finally, JCI disputes whether the cVOCs detected inside public sewer lines are actually migrating into Plaintiffs' homes.[4] (*Id.*) These contradictions

---

[4] JCI does not dispute that the cVOCs linked to the site were detected inside the Hostetlers' home in 2011, but any of their claims relating to the cVOCs are barred by the statute of limitations.

require a jury to sort out the facts. Accordingly, the Court will deny Plaintiffs' motion for summary judgment on their trespass claims in relation to the cVOCs.

While defeating Plaintiffs motion on the grounds that a genuine issue of material fact exists, JCI nevertheless argues that its own motion for summary judgment must be granted because, without any physical injuries, Plaintiffs cannot show that they have been damaged by any trespass. In making this assertion, JCI focuses on only two kinds of injuries—emotional distress for fear of future illness and property damages—giving no attention to other types of possible injuries.

It is true that, as discussed below, in the context of negligence and negligent infliction of emotional distress, that Plaintiffs here cannot recover damages for their alleged fear of future illness as a result of the cVOC exposure.

It is also true that Plaintiffs have not shown that they have suffered damages to their properties. Only Ms. Null has owned her residences. And although she believes the value of her current home has been negatively impacted, she has presented no evidence or computation to back up her claims. A property owner may testify to the value of her property, but she must "offer some factual basis for [her] valuation." *Cunningham v. Masterwear Corp.*, 569 F.3d 673, 676 (7th Cir. 2009) ("What the owner is not allowed to do is merely repeat another person's valuation which was what [plaintiff] wanted to do. Nor was what prospective buyers told the real estate agent within [plaintiff's] personal knowledge. More important, he could not offer a responsible opinion about the cause of a change in the value of his property. Even if he knew its value at time x and at time x + y, he had no basis for testifying to what caused its value to fall.") While Ms. Null asserts that her home's value decreased as a result of the contamination, she has

not shown an admissible basis for her opinion. As a result, she may not recover any property damages.

However, the parties fail to discuss whether the trespass claim may survive on the basis of other damages alleged and available to the Plaintiffs should they prove that JCI caused the cVOCs to enter their properties. Accordingly, JCI has not shown that, as a matter of law, Plaintiffs cannot prevail on their trespass claims in relation to the cVOC vapor intrusion as to all potential damages. [5] As such, to the extent the trespass claim relies upon emotional distress for fear of future illness or property damage as the basis of damages, JCI's motion for summary judgment is granted. However, without any clear indication that there may not be another bases for damages the court allows the trespass claim to proceed to that limited extent.

b. *Asbestos*

Next, the Court considers Plaintiffs' trespass claims in relation to asbestos. Plaintiffs claim that the movement of the debris on the site, in May and December 2014, to give GZA access for collecting soil core samples also constituted trespass because it caused asbestos particles to trespass onto their properties. [6] Plaintiffs insist that Mr. Werwie and Mr. Troup knew

---

[5] It's possible that Plaintiffs are also seeking an injunction against JCI's continue trespass, *see Harris v. Krekler*, 46 N.E.2d 267, 269 (1943) ("If a wrongdoer manifests a purpose to persist in perpetrating his unlawful acts, the vexation, expense and trouble of prosecution of appropriate actions at law, make such legal remedy inadequate, and justifies one injured thereby in coming into equity for injunctive relief."), but that question is not addressed in the parties' briefs and is best left to be decided, if at all, at a later date. The same is true of nominal damages. *See Sigsbee v. Swathwood*, 419 N.E.2d 789, 799 (Ind. Ct. App. 1981) ("If the plaintiff proves both elements [of trespass] he is entitled to nominal damages without proof of injury.").

[6] Plaintiffs also declare that JCI should be responsible for the asbestos contamination of the site that has allegedly spread to their homes. (DE 414-1 at 10 ("[T]he undisputed evidence establishes that this demolition-generated dust from the Site was contaminated with asbestos fibers, which are lighter than air and capable of being carried through the dust that blew from the Site and toward and into Plaintiffs' homes. . . . It is beyond dispute that asbestos-containing dust and debris blowing toward Plaintiffs's homes would reasonably make Plaintiffs 'constantly apprehensive of injury to [their] life or property.'")

the debris contained asbestos, yet made Mr. Swift move the piles anyway, causing the release of asbestos. Plaintiffs insist that JCI should therefore be held liable as if JCI itself had done the moving.

The glaring hole in Plaintiffs' theory is that they don't have any evidence that the piles that were moved actually contained asbestos. There is no doubt asbestos was present in some of the debris, but there's no evidence that it was present universally. In fact, Dr. Keramida tested the site for asbestos presence but only 59% of the samples came back positive. In EPA's testing, only 38 % of the samples tested positive, and there's no evidence that anyone specifically tested the debris that Mr. Swift moved to allow GZA to access the testing locations. Moreover, while Plaintiffs have presented evidence that on many days wind blew from the direction of the site to their homes, there's no evidence that wind blew that way on the three days, or for a reasonable period after, the piles were moved or that the resulting asbestos migration was so significant that each Plaintiff was likely to inhale its fibers. In fact, Plaintiffs' meteorology expert's report shows that, even when the wind blew toward Plaintiffs' homes, it did not necessarily blow toward all their homes at the same time. That's why, between 2012 and 2016, Ms. Null's residence was downwind for 365 days but Ms. Tovar's residence was downwind only for 141 of those days.

Plaintiffs cite no case law to support their position that, on the basis of these facts, a reasonable jury could find in favor of each of them, and the Court has not found any either.

---

Yet, Plaintiffs say not a word why JCI should be liable for Tocon's demolition, when it didn't own the property and did not direct any of Tocon's demolition. *Cf. Inman v. Skelton*, 90 Ind. App. 41, 43, 168 N.E. 131 (Ind. Ct. App. 1929) (where fraternity sold building to be torn down in order to clear land to build new house and worker that was hired by buyer was injured in the demolition process, transaction between fraternity and buyer was one of sale and not one of employment, and thus fraternity had no liability under Act for injuries sustained by worker).

While Plaintiffs may argue that the jury is entitled to make reasonable inferences, here, the jury would instead be asked to theorize, speculate, and guess, which is not what they're called to do. *See, e.g., Tr. Co. of Chicago v. Erie R. Co.*, 165 F.2d 806, 809 (7th Cir. 1948) ("A jury may not speculate and formulate a plausible theory as to where the accident happened and how it happened, and then speculate on what it was that the defendant did that was negligent and caused the accident.") There is no conflict in the evidence regarding Plaintiffs' claim that asbestos trespassed on their properties. Rather, "[t]here is a woeful lack of evidence, which would leave a jury to nothing but speculation." *Id*. Accordingly, the Court will deny Plaintiffs' motion for summary judgment as to this issue and will grant JCI's motion.[7]

### 3. *Nuisance*

Next the parties argue that the Court should enter summary judgment in their favor on Plaintiffs' nuisance claims. JCI argues that Plaintiffs' claims fail as a matter of law because nuisance is the activity leading to the release of contaminants not the resulting contamination, and a nuisance claim generally contemplates an action that is designed to cease or lessen the defendant's offensive behavior. JCI thus submits that, since it ceased using TCE in 1998, ceased using PCE even before then, and shut down the facility in 2006, there is no existing nuisance for this Court to enjoin. JCI maintains that *Ka v. City of Indianapolis*, 954 N.E.2d 974 (Ind. Ct. App. 2011), and *KB Home Indiana Inc. v. Rockville TBD Corp.*, 928 N.E.2d 297, 307 (Ind. Ct. App. 2010), exonerate it from any liability. Plaintiffs disagree and point to the plain language of the nuisance statute, claiming that nuisance is not limited to ongoing activities. In particular,

---

[7] The Court's ruling here controls all other claims involving asbestos because all of them are premised on the same theory that JCI's employees caused asbestos to become airborne and invade their bodies.

Plaintiffs argue that *Ka* and *KB Home* were wrongly decided as they contradict *Gray v. Westinghouse Elec. Corp.*, 624 N.E.2d 49 (Ind. Ct. App. 1993), and *Reed v. Reid*, 980 N.E.2d 277 (Ind. 2012). As explained below, the Court agrees with Plaintiffs that their nuisance claims may proceed to trial, in part, because the Court sees no inconsistency among the four cases the parties put forward.

The Court begins with the language of the statute which defines nuisance and sets out what can be done about it:

> Whatever is:
> (1) injurious to health;
> (2) indecent;
> (3) offensive to the senses; or
> (4) an obstruction to the free use of property;
> so as essentially to interfere with the comfortable enjoyment of life or property, is a nuisance, and the subject of an action.

Ind. Code § 32-30-6-6.

> An action to abate or enjoin a nuisance may be brought by any person whose: (1) property is injuriously affected; or (2) personal enjoyment is lessened.

Ind. Code § 32-30-6-7.

> If a proper case is made, the nuisance may be enjoined or abated and damages recovered for the nuisance.

Ind. Code § 32-30-6-8.

The plain language of the statute contemplates an ongoing/present offending activity or condition. Importantly, subsection (8) allows for nuisance to be "enjoined or abated *and* damages recovered for the nuisance." In other words, this subsection does not provide for damages alone as would happen in a case of an activity or condition that had ceased; rather damages go hand-in-hand with enjoiner and abatement, further suggesting that the statute contemplates a present offending activity or condition.

Indiana cases are consistent with this interpretation. In *Ka*, 954 N.E.2d 974, plaintiffs sued the city for nuisance, among other things, after sewage from a city pipe backed up into their home when the city workers were performing pipe maintenance. The court of appeals held that plaintiffs did not have a nuisance claim because they were not suing to halt the city's operation of a sewer system where they lived but were suing for damages arising out of a single isolated event that had ended. Quoting *KB Home Indiana Inc.*, 928 N.E.2d at 307, the court noted that "[a] nuisance claim generally contemplates an action that is designed to cease or lessen the defendant's continued offensive behavior." *Ka*, 954 N.E.2d at 981.

In *KB Home*, James Lyons owned a company that manufactured airplane components at its facility in Indianapolis. Between 1969 and 1990, TCE was discharged into the facility's septic system and ultimately leached into the surrounding environment. *Id*. at 300. Beginning in 1989, various persons and entities purchased and traded land adjacent to the facility. Plaintiff KB was among the purchasers. Also in 1989, the company ownership was transferred to Ron and Clara Mears. In 1993, Ferco assumed control of the operations. Around that time, several gallons of TCE were released on the site of the facility. However, shortly after the spill, the company stopped using TCE. In 1995, the company executed a VRA with IDEM and by 1996 the site was remediated. In 1997, additional investigation revealed that a toxic plume from the site had migrated under the plaintiff's property. As relevant here, KB eventually sued current and previous owners of the company for nuisance.

In examining the nuisance claim, given that the contamination at the site—the source of the off-site plume—had ceased and remediation was completed, the court of appeals found that KB could not prevail on this nuisance claim:

> Again, the designated evidence showed that [the company's] contamination of the property ceased in 1993 and it sold the property to a subsequent purchaser. Thus,

under these circumstances, KB has failed to show that a nuisance existed or was ongoing that could be abated or enjoined. Put another way, the damages has already been done, and KB's cause of action is against [the company] sounds in negligence.

*Id*. at 307.

Furthermore, *KB Home* and *Ka* are consistent with *Gray v. Westinghouse Elec. Corp.*, 624 N.E.2d 49, and *Reed v. Reid*, 980 N.E.2d 277, which cites *Gray* favorably.[8] In *Gray*, plaintiff lived adjacent to a city dump in Bloomington, Indiana. Defendant contracted with various entities to dispose of PCBs and other toxic chemicals at the dump from 1957 to 1962. *Gray*, 624 N.E.2d at 52. In 1976, defendant failed to abate the nuisance upon learning widespread PCB contamination had occurred. In their lawsuit, plaintiff claimed that his property has become unmarketable and his health was at risk as a result of this nuisance. *Id*.

In his motion to dismiss, defendant claimed that "a defendant in a nuisance action must own or control the property on which the nuisance is located." *Id.* But since the city owned the dump where the nuisance was located, defendant could not be liable for damages. In ruling for the plaintiff, the court found the question of ownership irrelevant in finding liability for nuisance:

> The statute focuses on an individual's right to enjoy property free from interference, without making a distinction as to the ownership, license, or tenancy status of either party. Further, the statute uses the broad term "whatever" to define the possible sources of a nuisance and it does not contain any reference to property ownership by the parting creating nuisance. This indicates the focus of the legislature was on protecting an individual's right to enjoy property from infringement by any source. We hold that the party which causes a nuisance can be held liable, regardless of whether the party owns or possesses the property on which the nuisance originates.

*Id.* at 53 (citations omitted).

---

[8] The parties spent a lot of ink arguing whether the two groups of cases are consistent. Plaintiffs argue that *KB Home* and *Ka* were wrongly decided because they disallowed nuisance claims where the activity had ceased whereas *Gray* allowed such claims. JCI maintained that the two groups of cases had nothing to do with each other. As explained in this section, while these cases do address different issues, they have one thing in common: nuisance claims are allowed only where there is an ongoing activity or an unremediated condition.

In light of its holding, *Gray* further concluded that "the creator of a nuisance on land which it does not own can be required to abate the nuisance." *Id.*

*Gray*'s holding does not contradict either *KB Home* or *Ka* because it addressed a question of whether a tortfeasor must own land adjacent to the plaintiff's in a nuisance action whereas *KB Home* and *Ka* dealt with the question of whether the nuisance must be active at the time the lawsuit is filed. And in any case, although in *Gray* the defendant had stopped dumping toxic chemicals years before the lawsuit was filed, the city dump remained an unabated source of nuisance. Hence, the plaintiff could proceed with his lawsuit. On the other hand, the court granted summary judgment in favor of the defendants in *KB Home* and *Ka because* both the offending activity and the source of nuisance were no longer present.

Likewise, in *Reed*, the issue before the Indiana Supreme Court was whether it mattered that the defendant created a nuisance on the plaintiff's property as opposed to an adjacent land.[9] *Reed*, 980 N.E.2d at 294. Again, that issue is wholly different from those in *KB Home* and *Ka*. But *Reed*'s facts further affirm that, even though a defendant stops polluting by the time the lawsuit is filed, a nuisance claim can proceed so long as the waste remains on the land unabated. *See id*. at 284.

*Gray* is similar to the case at hand. Although JCI's polluting had stopped before it sold the site to Tocon, it is still remediating the site, which is an indication that toxic materials are still present at the site. However, as discussed above, there is a genuine issue of material fact as to whether the pollutants are still migrating over to Plaintiffs' homes so as to constitute nuisance. In

---

[9] In *Reed*, the plaintiff sought clean fill for his land. Defendant responded to the solicitation but instead of bringing clean fill, dumped "solid waste in a manner which created a threat to human health or the environment." *Id*. at 283. When plaintiff sued, the toxic materials remained on his land unabated. *Id*. at 284.

addition, as explained in the context of trespass, there also remains a question of damages for a jury to decide. While Plaintiffs can no longer claim emotional distress for fear of future illness or property damages, the parties' briefs have not ruled out other damages generally recoverable for nuisance claims. Accordingly, the Court denies the parties' motions for summary judgment regarding Plaintiffs' nuisance claims.[10]

### 4. *Negligence and Negligent Infliction of Emotional Distress*

JCI moved for summary judgment on Plaintiffs' claims of negligence and negligent infliction of emotional distress. JCI submits that, as a matter of law, Plaintiffs cannot recover for emotional distress resulting from mere contact with a toxic substance where, as here, no related disease or symptom has manifested. JCI further argues that, even if Indiana law did permit recovery for emotional distress for fear of future disease on the basis of mere contact with a toxin, Plaintiffs fail to meet the threshold requirement of evidence of exposure to contaminants at levels capable of causing physical harm.

Plaintiffs counter JCI, arguing that Indiana employs a modified impact rule that allows recovery when litigants have a sufficiently "direct involvement" with the tortfeasor's conduct. They insist that such direct involvement is present here because their homes sit atop a chemical plume containing TCE which they have been breathing and they have personally observed what they believe to be asbestos containing dust blow onto and into their homes from the site. As a result, they contend that they reasonably fear for what may happen to their health in the future.

---

[10] The ruling encompasses only the cVOC vapor intrusion. As explained above, JCI has never created an asbestos nuisance to begin with. JCI did not own the site when the buildings were torn down and did not participate in the demolition. Moreover, for the reasons noted above, requesting Mr. Swift to move several piles in order to gain access to testing locations did not constitute nuisance.

Plaintiffs do not claim that they have suffered any physical injury as a result of JCI's alleged negligence, and as explained above, they cannot maintain any claims for property damage. Accordingly, as there is no other discernable basis of damages on their negligence claims, their only theory of recovery is the negligent infliction of emotional distress.

"To prevail on a negligence claim, the plaintiff must show (1) a duty owed to the plaintiff by the defendant; (2) a breach of that duty by allowing conduct to fall below the applicable standard of care; and (3) compensable injury proximately caused by the breach of duty." *Smith v. Walsh Constr. Co. II, LLC*, 95 N.E.3d 78, 84 (Ind. Ct. App. 2018). "The right to seek damages for emotional distress in actions for negligence often referred to as actions for negligent infliction of emotional distress, is carefully circumscribed under Indiana jurisprudence." *Spangler v. Bechtel*, 958 N.E.2d 458, 466 (Ind. 2011). As relevant here, Indiana allows recovery for negligent infliction of emotional distress under a "modified impact" rule:

> When . . . a plaintiff sustains a direct impact by the negligence of another and, by virtue of that direct involvement sustains an emotional trauma which is serious in nature and of a kind and extent normally expected to occur in a reasonable person, we hold that such a plaintiff is entitled to maintain an action to recover for that emotional trauma without regard to whether the emotional trauma arises out of or accompanies any physical injury to the plaintiff.

*Shuamber v. Henderson*, 579 N.E.2d 452, 456 (Ind. 1991).

In its motion for summary judgment, JCI claims that Plaintiffs have not met the requirement of "direct impact" to establish negligent infliction of emotional distress, and in any case, they can't prevail either on a claim of negligent infliction of emotional distress because they cannot recover damages on the grounds that they're suffering emotional distress as a result of a fear of what may happen to their health or the health of their loved ones in the future.

The parties skip any discussion regarding the duty of care and jump right into the question of whether Plaintiffs damages, if any, are recoverable. The Court will follow suit.

There are no Indiana cases indicating whether breathing the cVOCs constitutes direct impact. However, the Court does not need to decide this question because, even if a cVOC intrusion in Plaintiffs' homes constitutes direct impact, they have not shown that their claimed emotional distress is the kind of injury that is "expected to occur in a reasonable person."[11] *Shuamber*, 579 N.E.2d at 456. This is so, even when the facts are viewed in the light most favorable to them.

There are two directly on point district court cases in Indiana that reached the same conclusion. In *Barlow v. General Motors Corp.*, 595 F. Supp. 2d 929 (S.D. Ind. 2009), plaintiffs alleged that the defendant contaminated their properties with PCBs. Just like in the case here, none of the plaintiffs in *Barlow* became ill or presented health effects as a result of the exposure to PCBs released by the defendant. *Id.* at 931. In another similarity, those "[p]laintiffs [] offered no evidence that they have a higher risk of disease because of the exposure to PCBs." *Id.* at 942. Lastly, each plaintiff claimed to have suffered damages "for emotional distress resulting from fear that they might become ill as a result of exposure to PCBs." *Id.* at 941. In finding for the defendant, Judge Hamilton ruled that plaintiffs neither had evidence that the defendant acted

---

[11] Among other cases, JCI cites *Metro-N. Commuter R. Co. v. Buckley*, 521 U.S. 424 (1997), as authority to persuade the Court that the cVOC exposure does not constitute direct impact. While *Buckley* is a FELA case, FELA mirrors common law. *See* id. *at 429.* *Buckley* found that an hourly daily contact with insulation dust at work did not amount to "physical impact." In the court's view, "the physical impact' . . . does not include a simple physical contact with a substance that might cause a disease at a substantially later time––where that substance, or related circumstance, threatens no harm other than that disease-related risk." *Id.* at 430. Having reviewed multiple state court cases, the court concluded that "Taken together, language and cited precedent indicate that the words "physical impact" do not encompass every form of "physical contact." And, in particular, they do not include a contact that amounts to no more than an exposure—an exposure, such as that before us, to a substance that poses some future risk of disease and which contact causes emotional distress only because the worker learns that he may become ill after a substantial period of time." *Id.* at 432. In reaching its decision, the court also relied on public policy reasons, observing that "the physical contact at issue here—a simple (though extensive) contact with a carcinogenic substance—does not seem to offer much help in separating valid from invalid emotional distress claims. That is because contacts, even extensive contacts, with serious carcinogens are common." *Id.* at 434. Again, while the Court is not deciding the question of whether direct impact has occurred in this case, *Buckley*'s guidance is worth noting if this issue is ever faced head on.

with intent to inflict emotional distress nor evidence from which a reasonable jury could

conclude that the plaintiffs' distress was reasonable:

> There is no suggestion here that General Motors acted with the intent to inflict
> emotional distress on these plaintiffs. Most important, the disputed emotional
> effects here—the claims of fear for plaintiffs' health—necessarily involve matters
> beyond the scope of a lay jury's common knowledge and experience. The problem
> for these plaintiffs is that they do not have evidence showing that any of them face
> an increased health risk as a result of anything General Motors might have done.
> The plaintiffs have not directed the court's attention to any authority, in Indiana or
> elsewhere, holding that an unsubstantiated fear of health risks can support an
> emotional distress claim, let alone claims of the magnitude plaintiffs assert here.
> The general *Cullison* principle does not extend to this situation in which plaintiffs
> claim emotional distress based on fears of illness but have not offered any evidence
> of increased health risk.

*Id. at* 943.

The case at hand is no different. Plaintiffs have not presented any evidence that JCI acted

with intent to inflict emotions distress upon them. And the Court agrees with *Barlow* that

Plaintiffs cannot submit their emotional distress claims to the jury as presented because "the

claims of fear for plaintiffs' health [] necessarily involve matters beyond the scope of a lay jury's

common knowledge and experience." *Id*. The opinions of Plaintiffs' medical experts have been

excluded because those experts could not particularize the risks the Plaintiffs were facing as a

result of the alleged exposure. Without such evidence, a jury would be asked to speculate.

Moreover, Plaintiffs own testimony must be based on facts not abstract assumptions, and they

cannot do in a round-about way what which their experts cannot do directly.

This latter point is illustrated in the second district court decision, *Heackock v. Southland

Corp.*, 1994 WL 114656 (N.D. Ind. March 29, 1994). There, the plaintiffs were exposed to

gasoline fumes seeping through the ground into their home. The plaintiffs suffered flu-like

symptoms and experienced headaches and vomiting to various degrees. Among other things,

they sued the defendants for emotional distress caused by fear of cancer. *Id*. at *4. At trial, the

court excluded the opinion of the plaintiffs' expert regarding their increased risk of contracting cancer because the opinion was not stated with the required degree of certainty. *Id.*  While the plaintiffs testified about their fear of future illness, the defendants called their expert, a toxicologist, who testified that they were not at risk to contract cancer. On a post-trial Rule 50 motion, the court found that "[b]ased upon evidence introduced at trial, no reasonable juror could have concluded that the plaintiffs had a reasonable fear of cancer in the future. *Id.* at *7.

The same is true here. Plaintiffs base their fears upon their now excluded experts' opinions that they have been predisposed for future illness as a result of the exposure.[12] Yet, as the Court explained in detail previously (DE 405), the medical experts have not shown any basis for the reliability of those opinions. Therefore, Plaintiffs cannot build their case upon opinions that are not scientifically sound and that have been excluded. As Judge Hamilton found, "an unsubstantiated fear" cannot support a claim for emotional distress. *Barlow*, 595 F. Supp. 2d at 943.

Plaintiffs nevertheless rely on *Dollar Inn v. Slone*, 695 N.E.2d 185 (Ind. Ct. App. 1998), and *Holloway v. Bob Evans Farms, Inc.*, 695 N.E.2d 991, 993 (Ind. Ct. App. 1998), to support their case. In *Slone*, the plaintiff, a guest at the defendant's hotel, stabbed herself with a hypodermic needle, concealed inside the toilet paper tube. A staff member told the plaintiff that

---

[12] It should be mentioned that there's no evidence as to the duration of exposure Plaintiffs experienced. While Dr. Keramida has estimated cVOC vapor levels inside Plaintiffs' residences, missing from those estimates are any calculations of how much time each Plaintiff has actually been breathing the vapors. This, too, is detrimental to Plaintiffs' case. *Hannan v. Pest Control Servs., Inc.*, 734 N.E.2d 674, 685 (Ind. Ct. App. 2000) ("Inasmuch as we have concluded that there was a total lack of evidence that the plaintiffs' residence was over-contaminated as a result of PESCO's actions, they cannot establish that any such belief would be reasonable. The failure of the plaintiffs to prove the necessary causation element is that which bars all of the plaintiffs' claims and all damages flowing from those claims, whether those damages are for personal injury, property damage or emotional distress.").

it was likely the needle was left by an intravenous drug user on the hotel staff. Fearing an AIDS infection, the plaintiff went to a hospital to get blood tests, which she repeated regularly.  She sued the hotel for negligent infliction of emotional distress. The court of appeals held that the plaintiff "presented sufficient evidence that her distress was proximately caused by the needle stab for purposes of both negligence analysis and impact rule analysis." Slone, 695 N.E.2d at 189 n.6.

Yet, *Sloan* differs from the case here. The plaintiff in *Sloan presented* admissible medical opinion that "she would need to be tested for as long as ten years in order to insure that she had not contracted AIDS from the needle." *Id*. at 190. Her allegations of fear thus had a substantial basis to be reasonable, whereas the same cannot be said about the instant case. In addition, there was evidence of punctured skin, bleeding, and a staff member telling her that the needle must have come from a staff member who was an intravenous drug user. No such specificity exists here, and most importantly, no medical evidence about the likelihood of future illness.

In *Holloway*, the plaintiff ordered a dinner at a restaurant and, halfway through the meal, found a cooked worm, about the size of a match, on her plate. She sued the restaurant for negligence, claiming she "missed work because of her illness and treatment and that the incident at Bob Evans has affected her emotionally, psychologically and physically." *Holloway*, 695 N.E.2d at 993 (Ind. Ct. App. 1998). The court of appeals found the plaintiff sustained a direct impact and there was "designated evidence to support [plaintiff's] contention that she experienced emotional trauma from that impact." *Id.* at 997.

It was reasonable to find that the incident was the proximate cause of subsequent distress because the plaintiff made specific allegations about the effects of nearly eating the worm. Just as important, though, is the fact that the plaintiff claimed that her treatment at the restaurant after

she found the worm also affected her emotionally, psychologically, and physically. Thus, the jurors could rely on their experience whether the treatment the plaintiff received is consistent with her claimed damages. No expert would be necessary for such a determination. On the other hand, no reasonable juror could find without reference to a medical expert's opinion that Plaintiffs' alleged distress can be linked to the cVOC exposure when it's unknown whether such exposure has any lasting effects as to any of the Plaintiffs. The experts' opinions have been found to be unreliable and Dr. Keramida is not qualified to opine on the increased risk of harm to Plaintiffs nor do her predictions support such increased harm. Accordingly, neither *Sloan* nor *Holloway* persuade the Court to side with Plaintiffs. Therefore, the Court will grant JCI's motion for summary judgment on Plaintiffs' claims for negligence and negligent infliction of emotional distress.

**D. Conclusion**

For these reasons, the Court—

- DENIES Plaintiffs' motion for partial summary judgment (DE 413);

- GRANTS IN PART AND DENIES IN PART JCI's motion for summary judgment on Plaintiffs' common law claims (DE 420).

As a result, only the trespass and nuisance claims, arising out of the alleged cVOC vapor intrusion in the homes of Ms. Chairez, Ms. Tovar, and Ms. Null, remain for trial. Plaintiffs may not recover damages for emotional distress for fear of future illness as a result of cVOC vapor exposure.

SO ORDERED.

ENTERED: November 2, 2021

_____/s/ JON E. DEGUILIO_____
Chief Judge
United States District Court